Gerald H. Suniville (3160)
David P. Billings (11510)
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City, Utah 84111-2323
Telephone: (801) 531-8900
gsuniville@fabianvancott.com
dbillings@fabianvancott.com
*Attorneys for Bank of the West*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>SUGARLOAF HOLDINGS, LLC,<br><br>     Debtor | **BANK OF THE WEST'S OPPOSITION AND RESPONSE TO DEBTOR'S MOTIONS/APPLICATIONS FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING THE USE OF CASH COLLATERAL AND APPROVAL OF BUDGET, (2) FOR CONTINUATION OF UTILITY SERVICE AND APPROVAL OF ADEQUATE PROTECTION PAYMENT TO UTILITYCOMPANY UNDER § 366(b), (3) TO PAY AND MAINTAIN INSURANCE POLICIES, PROGRAMS, AND RELATED RELIEF, (4) TO EMPLOY PARSONS BEHLE & LATIMER ATTORNEYS FOR THE DEBTOR AND FOR APPROVAL OF COMPENSATION PROCEDURES**<br><br>Case No. 18-bk-27705<br><br>Chapter 11<br><br>Judge Kevin R. Anderson |

Bank of the West ("**BOTW**"), by and through its counsel, hereby responds and objects to

the Motions by Sugarloaf Holdings, LLC (the "**Debtor**" or "**Sugarloaf**") for Interim and Final

Orders (1) under 11 U.S.C. § 363 Authorizing Use of Cash Collateral and Approval of Budget (the

"**Cash Collateral Motion**"), (2) for Continuation of Utility Service and Approval of Adequate

Assurance of Payment to Utility Company Under 11 U.S.C. § 366(b) (the "**Utility Motion**"), (3) to

Pay and Maintain Insurance Policies, Programs, and Related Relief (the "**Insurance Motion**"),

and (4) Application to Employ Parsons Behle & Latimer as Attorneys for the Debtor and for

Compensation Procedures (the "**PBL Motion**," and together with the Cash Collateral Motion, the

Utility Motion, and the Insurance Motion, the "**First Day Motions**."). In opposition/response to

the First Day Motions, BOTW states as follows:

### INTRODUCTION

For over a month, the Debtor's operations have been essentially shut down. Employees

were let go on or about August 30, 2018. That same day, the Debtor attempted to round up all the

remaining cattle on the property and sell them at an auction in Nebraska. Through counsel, the

Debtor informed BOTW that the proceeds of the sale of these cattle would be given to BOTW to

pay down the substantial debt the Debtor owed to BOTW that was secured against the Debtor's

livestock, farm equipment, crops, and real estate. Instead, the Debtor kept the check for over a

month and now seeks to use that check to restart operations on a farm and ranch with practically

all of its water rights in litigation and/or already resolved against the Debtor. With no clear water

rights, the power company refused to connect service to the pivots, and with no power to the

pivots, little crops could be grown. With the onset of fall and its operations shut down, the

Debtor discontinued crop insurance. The Debtor seeks to put the cart before the horse.

Contrary to the Debtor's assertion that there is a substantial equity cushion present, none

exists, even assuming the Debtor were to prevail in litigation over water rights months or years

from now. If the Debtor loses these water rights cases, the land will be worth far less. The vast majority of the value asserted for the personal property is the sunk costs of installing items like piping for the pivots, and those pipes are now fixtures.

The Debtor's pro forma budget reveals that no funds have been allocated towards resolving the water rights cases, which has already cost the Debtor $250,000 without much progress or success. There is nothing in the budget for accountants, despite the fact that the Debtor will need to prepare numerous filings for the taxing authorities, let alone the month operating reports.  In short, the Debtor's proposes to pay BOTW nothing until June 2019 while it uses BOTW's collateral to fund litigation and restart an operation using at best uncertain water rights. Any use of water rights by the Debtor that are being actively challenged by multiple parties might imperil BOTW's future crop and livestock collateral. This proposal is completely unworkable. Accordingly, the First Day Motions should be denied.

## RELEVANT BACKGROUND

1.      The Debtor has conducted its farming and ranching operations on an approximate total of 7,164.35 owned acres covering 77 parcels near Fillmore, Utah. Cropland consists of roughly 3,440 potential farming acres of alfalfa, wheat, and forage crops with balance in range land for cattle. Additionally, the Debtor has certain grazing rights on approximately 50,000 acres of BLM-owned land.

2.      On or about June 15, 2017, Sugarloaf, as Borrower, executed that certain Loan and Security Agreement (the **"Agreement"**), along with three Promissory Notes in favor of BOTW, as lender:  a Term Note (the "**Term Loan**") in the principal sum of $9,565,400.00; a Livestock Operating Line of Credit Note in the principal sum of $1,100,000.00 (the "**Livestock LOC**"); and

3

a Crop Line of Credit Note in the principal sum of $1,500,000.00 (the "**Crop LOC**"). The BOTW

loan proceeds paid off a $4.9 million term debt, a line of credit of $890,000, and provided the

funds for a new $1.25 million real estate purchase of 160 acres at 100% financing (including

appraisal, environmental & closing costs). The total commitment of BOTW was $12.1 million,

double what the Debtor's prior lender had provided. (**Exs. A-D**).

3.      In connection with the execution of the Term Loan, Crop LOC, and Cattle LOC

and Agreement, the Debtor's members and managers each executed and entered into on June 15,

2017 certain Unlimited Guaranties, guarantying the full amount of the Loans between BOTW and

the Debtor.

4.      On or about June 15, 2017, Sugarloaf, as Borrower and Trustor, executed and

delivered to BOTW, as Trustee, for the benefit of BOTW, as Beneficiary, a Deed of Trust (the

"**Trust Deed**") which Trust Deed was recorded in the office of the Millard County Recorder, State

of Utah, on June 20, 2017, as Entry No. 00199887 at Book 628, Page 489, to secure the

performance of Trustor of its obligations under the Term Note dated June 15, 2017.  The Trust

Deed covers the Debtor's real property situated in Millard County, State of Utah. (**Ex. E**).

5.      On or about August 14, 2017, BOTW caused a UCC-1 filing statement to be

recorded with the Utah Department of Commerce to perfect its security interests in the Debtor's

personal property, which was amended via a UCC-3 filing on or about January 8, 2018. (**Ex. F**).

6.      Under the Agreement, all or virtually all of the Debtor's farming equipment (and

the proceeds thereof) are BOTW's collateral. That interest has been perfected by the filing of a

financing statement with the Utah Department of Commerce.

4836-7704-4088, v. 1

7.      Under the Agreement and the Livestock Loan, the cattle and the proceeds of the cattle are BOTW's collateral. That interest has been perfected by the filing of a financing statement with the Utah Department of Commerce.

8.      Under the Agreement and the Crop Loan, the Debtor's crops and the proceeds thereof (including but not limited to crop insurance proceeds) are BOTW's collateral. That interest has been perfected by the filing of a financing statement with the Utah Department of Commerce.

9.      A condition for the Term Loan included a requirement for post-closing clarifications on water rights to fully complete BOTW's secured interests.

10.     BOTW also funded a $1.6 million Pivot Project and provided $960,000 to pay the Gray Holdings Corp. insider note of $960,000. This note memorialized Gray Holding's loan to Mr. Gray to buyout a former member of the Debtor, Rex Jacklin. However, BOTW held back funding for Gray Holdings pending completion of the Pivot Project.

11.     Instead of paying off the Gray Holdings Note, BOTW applied the $960,000 with the Debtor's authorization towards the Crop LOC in December 2017. The Debtor immediately drew down another $960,000 on the Crop LOC.

12.     Unbeknownst to BOTW, the Debtor's asserted ground water rights were challenged in State Court on August 24, 2017. A second similar suit (different defendants) was filed on March 30, 2018. From publicly filed documents, BOTW understands that both lawsuits seek forfeiture of Sugarloaf's proclaimed ground water rights. The Debtor did not notify BOTW of any issues with the water rights it claimed it had in its loan application until May 18, 2018 during a telephone call.

13.     On August 30, 2018, the Debtor informed BOTW through its then counsel for the first time that "Due to lack of funds, Sugarloaf was required to lay-off its employees" and that

5

"Sugarloaf has determined that it is going to sell the herd immediately through an auction house. The net proceeds of such sale will be remitted to the Bank." (**Ex. G**).

14.    On or about November 14, 2017, an appraiser hired by BOTW inspected Sugarloaf's cattle and determined there were 1,480 cows, 1,470 calves, and 47 bulls present on the Sugarloaf Farm, for a total of 2,997 cattle at the ranch. (**Ex. H**).

15.    On or about May 1, 2018, an appraiser hired by BOTW inspected Sugarloaf's cattle and determined there were 960 cows, 300 calves, and 33 bulls on the Sugarloaf Farm, for a total of 1,293 cattle present. (**Ex. I**).

16.    Borrower has provided no explanation to BOTW to date for what became of the 520 cows, 1,170 calves, and 14 bulls and/or the proceeds from the sale and/or transfers of such cattle from between November 11, 2017 and May 1, 2018. Instead, Borrower has merely baldly asserted that the proceeds of all cattle sales were provided to BOTW and with Mr. Gray's declaration provided a chart of 2018 cattle sales. Except the Ogalalla, Nebraska sale detailed below, BOTW was previously unaware that these sales had occurred.

17.    On August 22, 2018, Rob Olson of Erkelsens & Olson visited the Debtor's property and inspected the Debtor's farm equipment described in BOTW's UCC filings. He concluded that the fair market value of such items was $1,430,700 and the liquidation value was $944,500. (**Ex. J**). At the time, both BOTW and Mr. Olson were unaware that some of that farm equipment may be subject to one or more purchase money security interests that may have priority over BOTW.

4836-7704-4088, v. 1

18.     After two months of exchanging correspondence with counsel and scheduled meetings that the Debtor failed to attend, representatives for BOTW and the Debtor met with their respective counsel to discuss potential workout options at the offices of Kirton & McKonkie.

19.     Neither Defendants nor their counsel made any mention or regarding Sugarloaf's employees or cattle during this meeting.

20.     Shortly after the meeting that same day, Sugarloaf's counsel informed BOTW for the first time that "Due to the lack of funds, Sugarloaf was required to lay-off its employees." In that same email, Sugarloaf's counsel informed BOTW for the first time that "Sugarloaf has determined that it is going to sell the herd immediately through an auction house. ***The net proceeds of such sale will be remitted to the Bank***.  Sugarloaf is going to try to do this as soon as possible, which may be in the next day or two." (Ex. G) (emphasis added)

21.     In response, BOTW asked for more detailed information regarding this roundup and expressed doubts that it could be accomplished in such a short time span given the logistics entailed with rounding up a herd of that size on that property, as well the logistics entailed with locating appropriate transport and sellers.

22.     The following day, August 31, 2018, Sugarloaf's counsel informed BOTW that Gray "had arranged for the cows to be gathered and trucked today." Other than the number of truckloads, more details were not forthcoming. (Ex. G)

23.     Upon information and belief, the Debtor had known about and been planning the roundup and auction of cattle for some time and yet chose to withhold that information from BOTW from August 30 through September 5, 2018, in violation of the Agreement and the Livestock LOC.

24.     On September 5, 2018, BOTW renewed its request for more information regarding the transport and auction of the cattle, and provided Sugarloaf with wiring instructions.

25.     Instead, the next day, Sugarloaf provided BOTW with August 31, 2018 brand inspection reports from the Utah Department of Agriculture and a settlement statement regarding the cows and bulls that were sold at auction in Ogallala, Nebraska, that included a copy of a joint check for $568,359.33 (the "**Check**") to BOTW and Sugarloaf for the net proceeds of the sale of 92 cows and 33 bulls, or 2 cows and 1 bull less than were noted by the Utah Department of Agriculture's brand inspection report. (**Exs. K & L**).

26.     Since September 5, 2018, BOTW has repeatedly requested the net proceeds from the sale of the Debtor's cattle after the August 31, 2018 roundup. Even after the Debtor provided a scanned copy of the Check to BOTW on September 6, 2018, it continued to refuse to endorse the Check and provide it to BOTW, in further violation of the Agreement and the Livestock LOC.

27.     Since August 30, 2018, BOTW has repeatedly asked for an accounting of the cattle. When BOTW pointed out that there were 1 bull and 2 cows missing from the sale in Ogallala, Nebraska that were present in the August 31, 2018 branding inspection report, the Debtor informed BOTW that in route one cow died and one cow had broken a leg but had no information regarding the bull. This turned out to be inaccurate.

28.     On or about September 6, 2018, Victor L. "Le" Jackson visited the Debtor's property. Mr. Jackson prepared an appraisal report dated September 10, 2018, determining that the value of the real estate in its current state was $5,170,000, with 180 days to market it for sale,

8

$4,135,000, and presuming all the Debtor's proclaimed water rights were valid was worth $11,870,000. (**Ex. M**).[1]

29.     On or about September 14, 2018, agents of BOTW located two emaciated cows bearing the Debtor's branding, one with a calf, another with a broken leg. Agents of BOTW nursed the cow and her calf to health, leaving the cow with a broken leg on the Debtor's property. When BOTW learned of the bankruptcy filing and the Debtor's desire for the cow and calf to be returned, BOTW made arrangements so the Debtor could retrieve the animals.

## ARGUMENT

### I.     No Equity Cushion Exists.

The Debtor argues that there is a substantial equity cushion based on Mr. Gray's assessment that the Debtor's assets are worth over $21 million. [Dkt. 9 at 11] This conclusion is premised upon a nearly year-old appraisal and the purchase price of the farm equipment. Both are faulty assumptions.

A far more recent appraisal concludes the real property is worth at best $11,870,000 and at worst $4,135,000, not $14,716,000 under the November 2017 appraisal. Similarly, the personal property is not worth $6,351,619, but anywhere from $1,430,700 to $944,500. The money spent on piping and overall set up of the pivots cannot be recouped until the real property has been sold. The pivots highest and best value appear to be remaining in place at this time. Moreover, the Debtor asserts there are secured claims to the Debtor's farm equipment by lenders other than BOTW totaling $1,130,142. If these other creditors have a security interest that is superior to

---

[1] BOTW has omitted the addenda to Mr. Jackson's appraisal due to their large file size. However, copies of the addenda will be made available to the Court and parties in interest upon request.

BOTW's UCC filings—such as a PMSI—then the best-case scenario of a $835,927.62 difference between the value of the real estate and farm equipment and the amount of BOTW's secured claims becomes negative. And if the real estate is worth only $4,135,000 and the equipment only $944,500, then all secured creditors are substantially undersecured.

"The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *MBank Dallas, NA v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987) (citing House Rep. No. 95-595, 95th Cong., 2d Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6295). Debtors bear the burden of proof that an equity cushion exists. *See In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL 2654919, at *3 (Bankr. D. Utah Jul. 3, 2008) (Boulden, J.). "Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." *O'Connor*, 802 F.2d at 1396 (citations omitted).

The Debtor has presented no evidence outside Mr. Gray's layman opinion of the value of any of the assets at issue. The November 2017 appraisal cannot be relied upon at this point to accurately reflect the value of the real estate.  But the September 2018 appraisal can. Likewise, Mr. Gray's personal views of how much the personal property is worth is unsupported by any admissible evidence. But Mr. Olson's August 2018 appraisal is admissible. The Debtor cannot meet its burden that an equity cushion exists. The Cash Collateral Motion should be denied.[2]

## II.    The Debtor's Budget is Unworkable.

Mr. Gray notes Kirton & McKonkie incurred over $257,000 in attorney fees litigating the water rights cases, [Dkt 9 at 9] but the Debtor's budget provides $0 to continue to prosecute and

---

[2] BOTW reserves the right to supplement this section as new information becomes available to it.

defend those cases. [Dkt 6 at 19] Either the Debtor is not interested in clearing up issues related to its water rights, or it knows that the answer will destroy any hopes of reorganizing. But the Debtor cannot reorganize without it.

Without a determination of the Debtor's water rights, the power company is reluctant to turn on the power to the pivots to water crops. Currently the Debtor has no clear water right to water crops, so planting and insuring crops would be imprudent. And even if the power company did not have any apprehensions regarding the use of water, the budget makes no provision for restarting or electricity usage. Without water, not only does the Debtor have no crops, but the Debtor also cannot keep cattle alive that it is budgeted to buy in November and sell for double the cost in March. [Dkt 6 at 19]

The true value of the real estate, the enterprise as a whole, and the ability to find new refinancing going forward all depends on the outcome of the water rights cases, which the Debtor appears to be wanting to place on indefinite hold. This alone dooms the Debtor's proposed budget.

Also noticeably absent from the budget is any funding for accountants, [Dkt 6 at 19] who will be necessary to prepare the Debtor's tax filings and monthly operating reports. As outlined in BOTW's letters to the Debtor over the summer, the Debtor has failed to provide numerous financial reports and tax filings to BOTW. Upon information and belief, this is because no such reports or filings have ever been prepared. Unless these items are filed promptly, the appointment of a trustee will be necessary. *See* 11 U.S.C. §§ 1104(a), 1112(b)(4)(I).

For these reasons, the Cash Collateral Motion, the Insurance Motion, and the Utility Motion should be denied. BOTW reserves the right to supplement this section as new information becomes available to it.

4836-7704-4088, v. 1

### III.   A $35,000 Flat Fee and Monthly Payment is Unreasonable Under the Circumstances.

BOTW does not object to the qualifications or hiring of Parsons Behle & Latimer as Debtor's counsel. However, the PBL Motion's proposal to permit its $35,000 retainer to be considered a flat fee and then authorize monthly draws is at this point premature at best.

The PBL Motion provides no authority for the proposition that the proposed compensation procedures are reasonable for a case of this nature under the federal or local bankruptcy rules. Without the benefit of a fee application of the work performed to date, it is difficult to know whether Parsons Behle & Latimer has yet earned the proposed $35,000 flat fee.

And given the history of the Check, the thousands of unaccounted for cattle, and other issues, it is quite difficult to know how long this Debtor will remain in bankruptcy, let alone in possession, making pre-authorization of monthly bills inappropriate at this juncture.  This is especially true given the fact that Mr. Rothchild's Rule 2016 disclosure fails to state the ultimate source of the wire transfer. *See, e.g., In re South Station, LLC*, 464 B.R. 46, 53-54 (Bankr. D. Utah 2011) (Thurman, J.); *Rushton v. Woodbury & Kesler* (*In re C.W. Mining Co.*), 440 B.R. 878, 888-90 (Bankr. D. Utah 2010) (Mosier, J.).

The Court should grant the PBL Motion's request to appoint Parsons Behle & Latimer as Debtor's counsel, but deny its request for the compensation procedures proposed therein and not approve the $35,000 retainer as a flat fee at this time.

12

**CONCLUSION**

For the reasons stated above and at the October 18, 2018 hearing, the First Day Motions

should be denied.

DATED this 17th day of October, 2018.

FABIAN VANCOTT

By      /s/ David P. Billings
        Gerald H. Suniville
        David P. Billings
        *Attorneys for Bank of the West*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2018, I caused a copy of the foregoing **BANK OF THE WEST'S OPPOSITION AND RESPONSE TO DEBTOR'S MOTIONS / APPLICATIONS FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING THE USE OF CASH COLLATERAL AND APPROVAL OF BUDGET, (2) FOR CONTINUATION OF UTILITY SERVICE AND APPROVAL OF ADEQUATE PROTECTION PAYMENT TO UTILITYCOMPANY UNDER § 366(b), (3) TO PAY AND MAINTAIN INSURANCE POLICIES, PROGRAMS, AND RELATED RELIEF, (4) TO EMPLOY PARSONS BEHLE & LATIMER ATTORNEYS FOR THE DEBTOR AND FOR APPROVAL OF COMPENSATION PROCEDURES** to be served via the Court's ECF/CM system all those entitled to receive service, including the following:

Brian M. Rothschild
Grace S. Pusavat
Michael R. Brown
Parsons Behle & Latimer
*Proposed Debtor's Counsel*

John Morgan
United States Trustee
*Attorney for the U.S. Trustee*

/s/ David P. Billings

# INDEX TO EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Term Note |
| B | Crop Line of Credit Note |
| C | Livestock Operating Line of Credit Note |
| D | Loan and Security Agreement (as Amended) |
| E | Trust Deed |
| F | UCC Filings |
| G | August 30, 2018 through August 31, 2018 Correspondence |
| H | November 14, 2017 inspection report |
| I | May 1, 2018 inspection report |
| J | Erkelsens & Olson Personal Property Appraisal |
| K | August 31, 2018 brand inspection reports |
| L | Ogallala settlement statement and $568,359.33 Check |
| M | September 6, 2018 Real Estate Appraisal |

4836-7704-4088, v. 1

# Exhibit A

# TERM NOTE

June 15, 2017

**$9,565,400.00**

For value received, the undersigned **Sugarloaf Holdings, LLC, a Utah limited liability company** (the "Borrower"), promises to pay to the order of Bank of the West (together with its successors and assigns, the "Lender"), the principal amount of **Nine Million, Five Hundred Sixty-Five Thousand, Four Hundred Dollars and Zero Cents ($9,565,400.00)** on or before **August 15, 2027** (the "Expiration Date"), as set forth below. The aggregate principal balance outstanding shall bear interest, and interest shall be payable, in accordance with that certain Interest Rate Election Rider, attached hereto and made a part hereof (the "Interest Rate Election Rider").

Upon the terms and conditions as set forth herein, the Borrower may request a loan in multiple drawings, upon the Borrower's request therefore made prior to **June 12, 2018**, up to the maximum amount shown above. Proceeds of the Note shall be used to refinance existing debt with another lender, refinance an equipment lease with the Lender, refinance a personal note due to Gray Holdings, Corp. and purchase 160 acres of real property located in Millard County, Utah. Each drawing under the Note shall be conclusively deemed to have been made at the request of and for the benefit of the Borrower (i) when credited to any deposit account of the Borrower maintained with the Lender or (ii) when paid in accordance with the Borrower's written instructions.

This Note is entered into in connection with one or more certain Loan and Security Agreements or Loan Agreements, dated of even date herewith (each a "Loan Agreement" and collectively, the "Loan Agreements") between the Borrower and the Lender, and any capitalized terms not defined herein shall have the meanings given to them in the Loan Agreements.

The Borrower shall pay consecutive installments of principal as follows: **$382,616.00** commencing on **June 15, 2018**, and the same amount (except the last installment which shall be the unpaid balance) on the fifteenth calendar day of each June thereafter.

Principal and interest shall be payable at the Lender's main office or at such other place as the Lender may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year. If interest is not paid as and when it is due, it shall be added to the principal, become and be treated as a part thereof, and shall thereafter bear like interest.

"Business Day" shall mean a day, other than a Saturday or Sunday, on which the Lender is open for business for the funding of corporate loans, and, with respect to a LIBOR Rate or One Month LIBOR Rate, a day on which dealings are carried on in the London interbank market and banks are open for business in London.

At the option of the Lender, this Note shall become immediately due and payable upon default of any liability, obligation, covenant or undertaking of the Borrower hereunder or the occurrence at any time of an Event of Default under the Loan Agreement.

Any payments received by the Lender on account of this Note shall, at the Lender's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance, then any fees, or charges then owed to the Lender by the Borrower; with payments being applied to installments remaining due in such order and amounts as the Lender may determine in its discretion. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Lender may determine. The Borrower hereby authorizes the Lender to charge any deposit account which the Borrower may maintain with the Lender for any payment

Sugarloaf Holdings CR125253

required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Lender that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**

The Borrower grants to the Lender a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Lender to the Borrower and any cash, securities, instruments or other property of the Borrower in the possession of the Lender, whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Lender at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and any other party obligated on account of this Note by contract, by operation of law or otherwise (the Borrower and each Borrower, if more than one, and each such other party, an "Obligor"), regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of protest and all other notices and demands of every kind in connection with the delivery, acceptance, performance or enforcement of this Note, all suretyship defenses of any kind, in each case that would otherwise be available in connection with this Note including, without limitation, any right (whether now or hereafter existing) to require the holder hereof to first proceed against the Borrower, or any other party obligated on account of this Note, for any security, and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower waives and terminates any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws, including without limitation, Utah Code 78-23-4 and hereby agrees not to file a declaration of homestead under Utah Code 78-23-4.

The Borrower shall indemnify, defend and hold the Lender and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Borrower (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Lender.

The Borrower agrees to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. If any payment due under this Note is unpaid for 15 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Lender's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount.

Sugarloaf Holdings CR125253

2

This Note shall be binding upon the Borrower and upon its heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any Obligor are joint and several; provided, however, the release by the Lender of the Borrower or any one or more Obligors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any Obligor are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Lender. Each reference in this Note to the Borrower and each Borrower, if more than one, and Obligor, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Lender of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Lender of any collateral shall not release any person obligated on account of this Note.

The Borrower authorizes the Lender to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

This Note shall be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer of agent of the Borrower or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Lender at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

The Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, address shown below or as notified to the Lender and (ii) by serving the same upon the Borrower(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower.

THE BORROWER AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER TO THE LENDER, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER AND THE LENDER EACH CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Sugarloaf Holdings CR125253

Executed as of **June 15, 2017.**

Borrower:

Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager

1471 N. 900 West
Lehi, Utah
84043

Sugarloaf Holdings CR125253

Term Note(2)

## INTEREST RATE ELECTION RIDER

### 1.   INTEREST RATE(S); PAYMENTS AND PREPAYMENTS.

1.1    Interest Rates.  The Note shall bear interest at the following rate(s): (a) **Two and Four-Tenths Percent (2.40%)** above the One-Month LIBOR Rate (as hereinafter defined) (a "One-Month LIBOR Rate Balance"); or (b) **Two and Four-Tenths Percent (2.40%)** above the LIBOR Rate (as hereinafter defined) (a "LIBOR Rate Balance"); each an "Available Rate" or an "Available Rate Balance."

1.2    Notice of Borrowing and Rate Selection.   Upon written or telephonic notice which shall be received by the Lender at or before 1:00 p.m. Central time on a Business Day, the Borrower may draw this loan by requesting an Available Rate Balance. The draw may be made on the day notice is received by the Lender, provided however, that if the Lender shall not have received notice at or before 1:00 p.m. Central time on the day such request is made, such draw may, at the Lender's option, be made on the next Business Day.  Notice of any LIBOR Rate Balance shall be received by the Lender no later than two Business Days prior to the day (which shall be a Business Day) on which the Borrower requests such LIBOR Rate Balance to be made.  The notice shall specify the effective date thereof (which shall be a Business Day), the type of interest rate and the amount to which the interest rate shall apply.  Any such notice shall be irrevocable and shall be subject to other terms and conditions set forth in this Note.  For any interest rate selected, the Lender shall record on the books and records of the Lender an appropriate notation evidencing such selection, each repayment on account of the principal thereof and the amount of interest paid, and the Borrower authorizes the Lender to maintain such records and make such notations and agrees that the amount shown on the books and records as outstanding from time to time shall constitute the amount owing to the Lender pursuant to this Note, absent manifest error.

1.3    Payments.  The Borrower hereby promises and agrees to pay interest in arrears on this Note on the fifteenth calendar day of each September, December, March and June, commencing on **September 15, 2017**.  If any payment required to be made by the Borrower hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at then applicable rate during such extension.   On the Expiration Date, the Borrower hereby promises and agrees to pay to the Lender in full the aggregate unpaid principal amount outstanding, together with all accrued and unpaid interest and all other fees and charges owing to the Lender under this Note.

1.4    Interest Periods.  Each Interest Period selected by the Borrower pursuant to the terms of this Interest Rate Election Rider shall commence on the date selected and shall end on the last day of the time period the Borrower shall elect, in each case as set forth in the definition of Interest Period in Paragraph 2.1 hereof; provided, however, that (a) any Interest Period that would otherwise end on a day which is not a Business Day shall be extended to the next Business Day unless such extension would carry such Interest Period into the next month, in which event such Interest Period shall end on the preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a date for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end), shall (subject to clause (a) above) end on the last Business Day of such calendar month; and (c) any Interest Period that would otherwise extend beyond the Expiration Date shall end on the Expiration Date.  Notwithstanding the terms of any other provision of this Note or the Loan Agreement, if an LIBOR Rate Balance is subject to a rate swap contract, then, with respect to such LIBOR Rate Balance and for the entire period of time that such LIBOR Rate Balance is subject to a rate swap contract, at the end of each Interest Period applicable to such LIBOR Rate Balance the Borrower shall automatically be deemed to have selected a LIBOR Rate Balance and the same Interest Period as was in effect for the Interest Period just ended, and such deemed selection may not be revoked or otherwise changed at any time that such Available Rate Balance is subject to a rate swap contract.  If the LIBOR Rate for such LIBOR Rate Balance in the following Interest Period is greater or less than the LIBOR Rate for the immediately preceding Interest Period, then the rate of interest paid by the Borrower with respect to such LIBOR Rate Balance will be adjusted accordingly effective on the first day of such Interest Period.

5

Sugarloaf Holdings CR125253

1.5     Conversion of Outstanding Amounts.  Upon written or telephonic notice which shall be received by the Lender at or before 1:00 p.m. Central time on a Business Day, and so long as no Event of Default shall have occurred and be continuing, the Borrower may, on the last Business Day of the then current Interest Period applicable to an Available Rate Balance, convert the rate on such balance to another Available Rate. The conversion may be effective on the day notice is received by the Lender, provided however, that if the Lender shall not have received notice at or before 1:00 p.m. Central time on the day such request is made, such election may, at the Lender's option, become effective on the next Business Day, except that notice to select any LIBOR Rate shall be received by the Lender no later than two Business Days prior to the day (which shall be a Business Day) on which the Borrower requests such LIBOR Rate. The notice shall specify the date of such conversion and the amount to be converted.

1.6     End of Interest Period.  If, at the end of the relevant Interest Period, and subject to all of the terms and conditions applicable to a request that a new interest rate be selected, the Lender does not receive timely notice to continue the existing rate or request another Available Rate, the Borrower shall be deemed to have selected a One-Month LIBOR Rate Balance.

1.7     Unavailability of Rate.  In the event that the effective interest rate(s) applicable to the Borrower's loan evidenced hereby shall cease to be published or has become unlawful or infeasible by reason of the Lender's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule regulation, guideline or order, the Lender, it is sole discretion shall designate a new base, reference or other rate for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto.

1.8     Funding the Note.  The Lender shall be entitled to fund all or any portion of the Note in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as set forth herein without regard to the manner in which the Lender actually funded the Note.

1.9     Indemnification for Costs.  During any period of time in which interest on the Note is accruing on the basis of an Available Rate other than one that adjusts on a daily basis, the Borrower shall, upon the Lender's request, promptly pay to and reimburse the Lender for all costs incurred and payments made by the Lender by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Lender or as a result of the Lender's compliance with any directive or requirement of any regulatory authority pertaining or relating to funds used by the Lender in quoting and determining such Available Rate.

1.10     Termination of Pricing Option.  After the occurrence of an Event of Default, the Borrower's right to select pricing options, if applicable, shall cease, and, if the Borrower would, but for the application of the preceding clause, have had the right to elect among interest rate options, notwithstanding anything to the contrary in this Note, interest shall accrue at a rate per annum equal to 5.0% plus the current effective rate for a One-Month LIBOR Rate Balance.

1.11     Prepayment.  Borrower may prepay amounts outstanding under this Note bearing interest at an Available Rate in whole or in part provided that any for any amounts outstanding subject to an Interest Period, Borrower has given Lender not less than 5 Business Days prior written notice of Borrower's intention to make such prepayment and pays to Lender the Prepayment Fee (defined below) due as a result. The Prepayment Fee shall also be paid, if Lender, for any other reason, including acceleration or foreclosure, receives all of any portion of the LIBOR Rate Balance prior to its scheduled payment date. "Prepayment Fee" is the positive amount, if any, equal to the present value of (i) the amount of interest that would have been paid through the end of the current Interest Period on the principal amount being repaid at the LIBOR Rate and minus (ii) the amount of interest Lender would earn if the amount of such prepayment of principal was used to purchase a(n) LIBOR Rate contract having a maturity date most closely matching with the last day of the relevant Interest Period and such contract was held by Lender until the last day of the relevant Interest Period. The rate used in the present value calculation shall be the rate of interest offered on the LIBOR Rate contract having a maturity most closely matching with the last day of the relevant Interest Period. The time period used in the present value calculation shall be a

6

Sugarloaf Holdings CR125253

fraction, the numerator of which is the number of days in the period between the date of prepayment and the last date of the relevant Interest Period, and the denominator of which shall be 360 days.

## 2.    DEFINITIONS

2.1    <u>Definitions</u>. The following definitions are applicable to this Interest Rate Election Rider:

a)    "Interest Period" shall mean,

i)    with respect to any LIBOR Rate Balance, one month or any other period as approved by Lender.

b)    "LIBOR Rate" shall mean the rate per annum determined by the Lender equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in U.S. dollars with a term equivalent to the Interest Period appearing on the applicable page or screen at Bloomberg.com (or, in the event such rate does not appear on a Bloomberg.com page or screen, on the appropriate page or screen of such other information service that publishes such rate as shall be selected by Lender from time to time in its reasonable discretion) at approximately 11:00 a.m., London time on the second Business Day prior to the initial drawing, or the second Business Day prior to the next Interest Period; provided that, except as set forth below, in no event shall the LIBOR Rate be less than zero; and provided, further, that the LIBOR Rate may be adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs on that day (or, if such day is not a Business Day, the immediately preceding Business Day). Notwithstanding the foregoing, the prohibition on the LIBOR Rate being less than zero shall not apply to interest accruing on any portion of the principal outstanding under this Note that is subject to an interest rate derivative agreement, such as a swap, cancellable swap, cap, corridor, or collar.

c)    "One-Month LIBOR Rate" shall mean a fluctuating rate of interest as of and adjusted on each Business Day that is equal from time to time the rate per annum determined by the Lender equal to the London interbank offered rate for an interest period of one month as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in U.S. dollars with a term equivalent to such interest period appearing on the applicable page or screen at Bloomberg.com (or, in the event such rate does not appear on a Bloomberg.com page or screen, on the appropriate page or screen of such other information service that publishes such rate as shall be selected by Lender from time to time in its reasonable discretion) at approximately 11:00 a.m., London time on that day (or, if such day is not a Business Day, the immediately preceding Business Day); provided that, except as set forth below, in no event shall the One-Month LIBOR Rate be less than zero; and provided, further, that the One-Month LIBOR Rate may be adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs on that day (or, if such day is not a Business Day, the immediately preceding Business Day). Notwithstanding the foregoing, the prohibition on the One-Month LIBOR Rate being less than zero shall not apply to interest accruing on any portion of the principal outstanding under this Note that is subject to an interest rate derivative agreement, such as a swap, cancellable swap, cap, corridor, or collar.

2.2    <u>Other Terms</u>. Terms set forth in this Note which are defined in the Note shall have the meanings set forth in the Note.

Sugarloaf Holdings CR125253

# Exhibit B

4836-7704-4088, v. 1

## CROP LINE OF CREDIT NOTE

June 15, 2017

$1,500,000.00

For value received, the undersigned **Sugarloaf Holdings, LLC, a Utah limited liability company** (the "Borrower"), promises to pay to the order of Bank of the West (together with its successors and assigns, the "Lender"), the principal amount of up to **One Million, Five Hundred Thousand Dollars and Zero Cents ($1,500,000.00)** on or before **August 15, 2018** (the "Expiration Date"), as set forth below.

On terms and conditions as set forth herein, the Borrower may request advances (each an "Advance") from time to time from the date hereof to the Expiration Date up to the dollar amount of this Note (the "Crop Line of Credit"). Within the foregoing limits, the Borrower may borrow, partially or wholly prepay, and reborrow as described herein. Proceeds of the Crop Line of Credit shall be used to fund the Borrower's farming operation. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of the Borrower (i) when credited to any deposit account of the Borrower maintained with the Lender or (ii) when paid in accordance with the Borrower's written instructions. Subject to the requirements herein, and provided such request is made in a timely manner as provided below, Advances shall be made by the Lender under the Crop Line of Credit.

This Note is entered into in connection with one or more certain Loan and Security Agreements or Loan Agreements, dated of even date herewith (each a "Loan Agreement" and collectively, the "Loan Agreements") between the Borrower and the Lender, and any capitalized terms not defined herein shall have the meanings given to them in the Loan Agreements.

The Borrower hereby promises and agrees to pay interest in arrears on all Advances on the fifteenth calendar day of each September, December, March and June commencing on September 15, 2017. On the Expiration Date, the Borrower hereby promises and agrees to pay to the Lender in full the aggregate unpaid principal amount outstanding, together with all accrued and unpaid interest and all other fees and charges owing to the Lender under this Note.

The aggregate principal balance outstanding shall bear interest thereon at a per annum rate equal to **Two and Three-Tenths Percent (2.30%)** above the One-Month LIBOR Rate (as hereinafter defined).

Principal and interest shall be payable at the Lender's main office or at such other place as the Lender may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year. If any payment required to be made by the Borrower hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at then applicable rate during such extension. If interest is not paid as and when it is due, it shall be added to the principal, become and be treated as a part thereof, and shall thereafter bear like interest.

Upon written or telephonic notice which shall be received by the Lender at or before 1:00 p.m. Central time on a Business Day, the Borrower may draw this loan by requesting an Advance. The draw may be made on the day notice is received by the Lender, provided however, that if the Lender shall not have received notice at or before 1:00 p.m. Central time on the day such request is made, such draw may, at the Lender's option, be made on the next Business Day.

"One Month LIBOR Rate" shall mean a fluctuating rate of interest as of and adjusted on each Business Day that is equal from time to time the rate per annum determined by the Lender equal to the

Sugarloaf Holdings CR125253

London interbank offered rate for an interest period of one month as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in U.S. dollars with a term equivalent to such interest period appearing on the applicable page or screen at Bloomberg.com (or, in the event such rate does not appear on a Bloomberg.com page or screen, on the appropriate page or screen of such other information service that publishes such rate as shall be selected by Lender from time to time in its reasonable discretion) at approximately 11:00 a.m., London time on that day (or, if such day is not a Business Day, the immediately preceding Business Day); provided that, except as set forth below,  in no event shall the One-Month LIBOR Rate be less than zero; and provided, further, that the One-Month LIBOR Rate may be adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs on that day (or, if such day is not a Business Day, the immediately preceding Business Day). Notwithstanding the foregoing, the prohibition on the One-Month LIBOR Rate being less than zero shall not apply to interest accruing on any portion of the principal outstanding under this Note that is subject to an interest rate derivative agreement, such as a swap, cancellable swap, cap, corridor, or collar.

"Business Day" shall mean a day, other than a Saturday or Sunday, on which the Lender is open for business for the funding of corporate loans, and, with respect to a LIBOR Rate or One Month LIBOR Rate, a day on which dealings are carried on in the London interbank market and banks are open for business in London.

During any period of time in which interest on the Note is accruing on the basis of the One-Month LIBOR Rate the Borrower shall, upon the Lender's request, promptly pay to and reimburse the Lender for all costs incurred and payments made by the Lender by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Lender or as a result of the Lender's compliance with any directive or requirement of any regulatory authority pertaining or relating to funds used by the Lender in quoting and determining the One-Month LIBOR Rate.

In the event that the effective interest rate applicable to the Borrower's loan evidenced hereby shall cease to be published or has become unlawful or infeasible by reason of the Lender's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule regulation, guideline or order, the Lender, it is sole discretion shall designate a new base, reference or other rate for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto. The Lender shall be entitled to fund all or any portion of the Note in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as set forth herein without regard to the manner in which the Lender actually funded the Note.

At the option of the Lender, this Note shall become immediately due and payable upon default of any liability, obligation, covenant or undertaking of the Borrower hereunder or the occurrence at any time of an Event of Default under the Loan Agreement.

Any payments received by the Lender on account of this Note shall, at the Lender's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance, then any fees, or charges then owed to the Lender by the Borrower; with payments being applied to installments remaining due in such order and amounts as the Lender may determine in its discretion. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Lender may determine. The Borrower hereby authorizes the Lender to charge any deposit account which the Borrower may maintain with the Lender for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

Sugarloaf Holdings CR125253

2

**The Borrower represents to the Lender that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**

The Borrower grants to the Lender a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Lender to the Borrower and any cash, securities, instruments or other property of the Borrower in the possession of the Lender, whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Lender at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and any other party obligated on account of this Note by contract, by operation of law or otherwise (the Borrower and each Borrower, if more than one, and each such other party, an "Obligor"), regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of protest and all other notices and demands of every kind in connection with the delivery, acceptance, performance or enforcement of this Note, all suretyship defenses of any kind, in each case that would otherwise be available in connection with this Note including, without limitation, any right (whether now or hereafter existing) to require the holder hereof to first proceed against the Borrower, or any other party obligated on account of this Note, for any security, and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower waives and terminates any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws, including without limitation, Utah Code 78-23-4 and hereby agrees not to file a declaration of homestead under Utah Code 78-23-4.

The Borrower shall indemnify, defend and hold the Lender and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower or by any other person (as well as from attorneys' reasonable fees and expenses in connection therewith) on account of the Lender's relationship with the Borrower (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Lender.

The Borrower agrees to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 5.0% plus the rate provided for herein. If any payment due under this Note is unpaid for 15 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Lender's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and upon its heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any Obligor are joint and several; provided, however, the release by the Lender of the Borrower or any one or more Obligors shall

Sugarloaf Holdings CR125253

not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any Obligor are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Lender. Each reference in this Note to the Borrower and each Borrower, if more than one, and Obligor, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Lender of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Lender of any collateral shall not release any person obligated on account of this Note.

The Borrower authorizes the Lender to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

This Note shall be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer of agent of the Borrower or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Lender at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

The Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, address shown below or as notified to the Lender and (ii) by serving the same upon the Borrower(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower.

**THE BORROWER AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER TO THE LENDER, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED. THE BORROWER AND THE LENDER EACH CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

Sugarloaf Holdings CR125253

Executed as of **June 15, 2017**.

Borrower:

Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager

1471 N. 900 West
Lehi, Utah
84043

Sugarloaf Holdings CR125253

5

Crop Line of Credit Note(3)

# Exhibit C

4836-7704-4088, v. 1

## LIVESTOCK OPERATING LINE OF CREDIT NOTE

**June 15, 2017**

**$1,100,000.00**

For value received, the undersigned **Sugarloaf Holdings, LLC, a Utah limited liability company** (the "Borrower"), promises to pay to the order of Bank of the West (together with its successors and assigns, the "Lender"), the principal amount of up to **One Million, One Hundred Thousand Dollars and Zero Cents ($1,100,000.00)** on or before **August 15, 2018** (the "Expiration Date"), as set forth below.

On terms and conditions as set forth herein, the Borrower may request advances (each an "Advance") from time to time from the date hereof to the Expiration Date up to the dollar amount of this Note (the "Livestock Operating Line of Credit") subject to Borrower's repayment obligations set forth in the Loan Agreement (defined below) if the Loan-to-Livestock Collateral Value Ratio (as defined in the Covenants Section of the Loan Agreement) is not maintained. Within the foregoing limits, the Borrower may borrow, partially or wholly prepay, and reborrow as described herein. Proceeds of the Livestock Operating Line of Credit shall be used cattle purchases. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of the Borrower (i) when credited to any deposit account of the Borrower maintained with the Lender or (ii) when paid in accordance with the Borrower's written instructions. Subject to the requirements herein, and provided such request is made in a timely manner as provided below, Advances shall be made by the Lender under the Livestock Operating Line of Credit.

This Note is entered into in connection with one or more certain Loan and Security Agreements or Loan Agreements, dated of even date herewith (each a "Loan Agreement" and collectively, the "Loan Agreements") between the Borrower and the Lender, and any capitalized terms not defined herein shall have the meanings given to them in the Loan Agreements.

The Borrower hereby promises and agrees to pay interest in arrears on all Advances on the fifteenth calendar day of each September, December, March and June commencing on September 15, 2017. On the Expiration Date, the Borrower hereby promises and agrees to pay to the Lender in full the aggregate unpaid principal amount outstanding, together with all accrued and unpaid interest and all other fees and charges owing to the Lender under this Note.

The aggregate principal balance outstanding shall bear interest thereon at a per annum rate equal to **Two and Three-Tenths Percent (2.30%)** above the One-Month LIBOR Rate (as hereinafter defined).

Principal and interest shall be payable at the Lender's main office or at such other place as the Lender may designate in writing in immediately available funds in lawful money of the United States of America without set-off, deduction or counterclaim. Interest shall be calculated on the basis of actual number of days elapsed and a 360-day year. If any payment required to be made by the Borrower hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at then applicable rate during such extension. If interest is not paid as and when it is due, it shall be added to the principal, become and be treated as a part thereof, and shall thereafter bear like interest.

Upon written or telephonic notice which shall be received by the Lender at or before 1:00 p.m. Central time on a Business Day, the Borrower may draw this loan by requesting an Advance. The draw may be made on the day notice is received by the Lender, provided however, that if the Lender shall not have received notice at or before 1:00 p.m. Central time on the day such request is made, such draw may, at the Lender's option, be made on the next Business Day.

Sugarloaf Holdings CR125253

"One Month LIBOR Rate" shall mean a fluctuating rate of interest as of and adjusted on each Business Day that is equal from time to time the rate per annum determined by the Lender equal to the London interbank offered rate for an interest period of one month as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in U.S. dollars with a term equivalent to such interest period appearing on the applicable page or screen at Bloomberg.com (or, in the event such rate does not appear on a Bloomberg.com page or screen, on the appropriate page or screen of such other information service that publishes such rate as shall be selected by Lender from time to time in its reasonable discretion) at approximately 11:00 a.m., London time on that day (or, if such day is not a Business Day, the immediately preceding Business Day); provided that, except as set forth below, in no event shall the One-Month LIBOR Rate be less than zero; and provided, further, that the One-Month LIBOR Rate may be adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs on that day (or, if such day is not a Business Day, the immediately preceding Business Day). Notwithstanding the foregoing, the prohibition on the One-Month LIBOR Rate being less than zero shall not apply to interest accruing on any portion of the principal outstanding under this Note that is subject to an interest rate derivative agreement, such as a swap, cancellable swap, cap, corridor, or collar.

"Business Day" shall mean a day, other than a Saturday or Sunday, on which the Lender is open for business for the funding of corporate loans, and, with respect to a LIBOR Rate or One Month LIBOR Rate, a day on which dealings are carried on in the London interbank market and banks are open for business in London.

During any period of time in which interest on the Note is accruing on the basis of the One-Month LIBOR Rate the Borrower shall, upon the Lender's request, promptly pay to and reimburse the Lender for all costs incurred and payments made by the Lender by reason of any future assessment, reserve, deposit or similar requirement or any surcharge, tax or fee imposed upon the Lender or as a result of the Lender's compliance with any directive or requirement of any regulatory authority pertaining or relating to funds used by the Lender in quoting and determining the One-Month LIBOR Rate.

Borrower may prepay amounts outstanding under this Note in whole or in part provided Borrower has given Lender not less than 5 Business Days prior written notice of Borrower's intention to make such prepayment and pays to Lender the Prepayment Fee (defined below) due as a result. The Prepayment Fee shall also be paid, if Lender, for any other reason, including acceleration or foreclosure, receives all of any portion of the LIBOR Rate Advance prior to its scheduled payment date. "Prepayment Fee" is the positive amount, if any, equal to the present value of (i) the amount of interest that would have been paid through the end of the current Interest Period on the principal amount being repaid at the LIBOR Rate and minus (ii) the amount of interest Lender would earn if the amount of such prepayment of principal was used to purchase a(n) LIBOR Rate contract having a maturity date most closely matching with the last day of the relevant Interest Period and such contract was held by Lender until the last day of the relevant Interest Period. The rate used in the present value calculation shall be the rate of interest offered on the LIBOR Rate contract having a maturity most closely matching with the last day of the relevant Interest Period. The time period used in the present value calculation shall be a fraction, the numerator of which is the number of days in the period between the date of prepayment and the last date of the relevant Interest Period, and the denominator of which shall be 360 days.

In the event that the effective interest rate applicable to the Borrower's loan evidenced hereby shall cease to be published or has become unlawful or infeasible by reason of the Lender's compliance with any new law, rule, regulation, guideline or order, or any new interpretation of any present law, rule regulation, guideline or order, the Lender, it is sole discretion shall designate a new base, reference or other rate for general commercial loan reference purposes, it being understood that such rate is a reference rate, not necessarily the lowest, established from time to time, which serves as the basis upon which effective interest rates are calculated for loans making reference thereto. The Lender shall be entitled to fund all or any portion of the Note in any manner it may determine in its sole discretion, but all calculations and transactions hereunder shall be conducted as set forth herein without regard to the manner in which the Lender actually funded the Note.

Sugarloaf Holdings CR125253

2

At the option of the Lender, this Note shall become immediately due and payable upon default of any liability, obligation, covenant or undertaking of the Borrower hereunder or the occurrence at any time of an Event of Default under the Loan Agreement.

Any payments received by the Lender on account of this Note shall, at the Lender's option, be applied first, to accrued and unpaid interest; second, to the unpaid principal balance, then any fees, or charges then owed to the Lender by the Borrower; with payments being applied to installments remaining due in such order and amounts as the Lender may determine in its discretion. Notwithstanding the foregoing, any payments received after the occurrence and during the continuance of an Event of Default shall be applied in such manner as the Lender may determine. The Borrower hereby authorizes the Lender to charge any deposit account which the Borrower may maintain with the Lender for any payment required hereunder without prior notice to the Borrower.

If pursuant to the terms of this Note, the Borrower is at any time obligated to pay interest on the principal balance at a rate in excess of the maximum interest rate permitted by applicable law for the loan evidenced by this Note, the applicable interest rate shall be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.

**The Borrower represents to the Lender that the proceeds of this Note will not be used for personal, family or household purposes or for the purpose of purchasing or carrying margin stock or margin securities within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.**

The Borrower grants to the Lender a continuing lien on and security interest in any and all deposits or other sums at any time credited by or due from the Lender to the Borrower and any cash, securities, instruments or other property of the Borrower in the possession of the Lender, whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of the Borrower to the Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of the Borrower to the Lender at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender.

No delay or omission on the part of the Lender in exercising any right hereunder shall operate as a waiver of such right or of any other right of the Lender, nor shall any delay, omission or waiver on any one occasion be deemed a bar to or waiver of the same or any other right on any future occasion. The Borrower and any other party obligated on account of this Note by contract, by operation of law or otherwise (the Borrower and each Borrower, if more than one, and each such other party, an "Obligor"), regardless of the time, order or place of signing, waive presentment, demand, protest, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of protest and all other notices and demands of every kind in connection with the delivery, acceptance, performance or enforcement of this Note, all suretyship defenses of any kind, in each case that would otherwise be available in connection with this Note including, without limitation, any right (whether now or hereafter existing) to require the holder hereof to first proceed against the Borrower, or any other party obligated on account of this Note, for any security, and assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral, and to the addition or release of any other party or person primarily or secondarily liable and waives all recourse to suretyship and guarantor defenses generally, including any defense based on impairment of collateral. To the maximum extent permitted by law, the Borrower waives and terminates any homestead rights and/or exemptions respecting any premises under the provisions of any applicable homestead laws, including without limitation, Utah Code 78-23-4 and hereby agrees not to file a declaration of homestead under Utah Code 78-23-4.

The Borrower shall indemnify, defend and hold the Lender and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless against any claim brought or threatened against any Indemnitee by the Borrower or by any other person (as well as from attorneys' reasonable fees and

Sugarloaf Holdings CR125253

expenses in connection therewith) on account of the Lender's relationship with the Borrower (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's selection, but at the expense of the Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Lender.

The Borrower agrees to pay, upon demand, costs of collection of all amounts under this Note including, without limitation, principal and interest, or in connection with the enforcement of, or realization on, any security for this Note, including, without limitation, to the extent permitted by applicable law, reasonable attorneys' fees and expenses. Upon the occurrence and during the continuance of an Event of Default, interest shall accrue at a rate per annum equal to the aggregate of 5.0% plus the rate provided for herein. If any payment due under this Note is unpaid for 15 days or more, the Borrower shall pay, in addition to any other sums due under this Note (and without limiting the Lender's other remedies on account thereof), a late charge equal to 5.0% of such unpaid amount.

This Note shall be binding upon the Borrower and upon its heirs, successors, assigns and legal representatives, and shall inure to the benefit of the Lender and its successors, endorsees and assigns.

The liabilities of the Borrower and each Borrower, if more than one, and any Obligor are joint and several; provided, however, the release by the Lender of the Borrower or any one or more Obligors shall not release any other person obligated on account of this Note. Any and all present and future debts of the Borrower to any Obligor are subordinated to the full payment and performance of all present and future debts and obligations of the Borrower to the Lender. Each reference in this Note to the Borrower and each Borrower, if more than one, and Obligor, is to such person individually and also to all such persons jointly. No person obligated on account of this Note may seek contribution from any other person also obligated, unless and until all liabilities, obligations and indebtedness to the Lender of the person from whom contribution is sought have been irrevocably satisfied in full. The release or compromise by the Lender of any collateral shall not release any person obligated on account of this Note.

· The Borrower authorizes the Lender to complete this Note if delivered incomplete in any respect. A photographic or other reproduction of this Note may be made by the Lender, and any such reproduction shall be admissible in evidence with the same effect as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

This Note shall be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

Any notices under or pursuant to this Note shall be deemed duly received and effective if delivered in hand to any officer of agent of the Borrower or Lender, or if mailed by registered or certified mail, return receipt requested, addressed to the Borrower or Lender at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

The Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Note. The Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. The Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to the Borrower's, address shown below or as notified to the Lender and (ii) by serving the same upon the Borrower(s) in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Borrower.

**THE BORROWER AND THE LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN**

Sugarloaf Holdings CR125253

4

CONNECTION WITH THIS NOTE, ANY OF THE OBLIGATIONS OF THE BORROWER TO THE LENDER, AND ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREES NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN, WAIVED.  THE BORROWER AND THE LENDER EACH CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

Executed as of **June 15, 2017**.

Borrower:

Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager

1471 N. 900 West
Lehi, Utah
84043

Sugarloaf Holdings CR125253

Livestock Operating Line of Credit Note(2)

# Exhibit D

4836-7704-4088, v. 1

## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement") is entered into as of **June 15, 2017**, between **Sugarloaf Holdings, LLC, a Utah limited liability company**, with its chief executive office located at **1471 N. 900 West, Lehi, Utah  84043** (the "Borrower") and Bank of the West, a California banking corporation, with an address of 6873 N West Avenue, Suite 102, Fresno, CA  93711 (the "Lender").

FOR VALUE RECEIVED, and in consideration of the granting by the Lender of financial accommodations to or for the benefit of Borrower, including without limitation respecting the Obligations (as hereinafter defined), Borrower represents to and agrees with the Lender, as of the date hereof and as of the date of each loan, credit and/or other financial accommodation, as follows:

## 1.    THE LOAN

1.1      Loan(s).  Lender agrees, from time to time, in its sole discretion, to make one or more revolving loans, non-revolving loans or term loans (collectively, the "Loans") to or for the account of Borrower, upon Borrower's request therefor, in such amounts as shall be mutually agreed upon, subject to the terms and conditions set forth herein; provided there is no continuing uncured Event of Default (as hereinafter defined).  Loans shall be evidenced by one or more notes issued by Borrower in favor of the Lender (collectively, and each a "Note").  This Agreement, each Note and any and all other documents, substitutions, modifications, extensions, amendments or renewals executed and delivered in connection with any of the foregoing are collectively hereinafter referred to as the "Loan Documents".

1.2      Loan Account(s).  One or more accounts shall be opened on the books of Lender in which a record will be kept of all Loans, and all payments thereon and other appropriate debits and credits as provided by the Loan Documents.

1.3      Interest.  Interest respecting the Loan(s) will be charged to Borrower on the principal amount from time to time outstanding at the interest rate specified in the Note(s) in accordance with the terms of the Note(s).

1.4      Repayment.  All loans and advances made respecting any Loan shall be payable to Lender on or before the Expiration Date of the respective Note.

1.5      Authorized Persons; Advances.  Any person duly authorized in writing by Borrower, or in the absence of such a writing, the manager or managing member of Borrower, or any person otherwise authorized in this paragraph, may request discretionary Loans hereunder, either orally or otherwise, but the Lender at its option may require that all requests for Loans hereunder shall be in writing.  The Lender shall incur no liability to Borrower in acting upon any request referred to herein which the Lender believes in good faith to have been made by an authorized person or persons.  Each Loan hereunder may be credited by Lender to any deposit account of Borrower with Lender or with any other bank with which Borrower maintains a deposit account, or may be paid to Borrower (or as Borrower instructs) or may be applied to any Obligations, as Lender may in each instance elect.

1.6      Periodic Statement.  At the option of the Lender, Lender will render to Borrower a statement of the Loan accounts, showing all applicable credits and debits.  Each statement shall be considered correct and to have been accepted by Borrower and shall be conclusively binding upon Borrower in

respect of all charges, debits and credits of whatsoever nature contained therein respecting the Loans, and the closing balance shown therein, unless Borrower notifies Lender in writing of any discrepancy within 30 days from the mailing by Lender to Borrower of any such statement.

## 2.    GRANT OF SECURITY INTEREST

2.1        Grant of Security Interest.  In consideration of the Lender's extending credit and other financial accommodations to or for the benefit of Borrower, Borrower hereby grants to the Lender a security interest in, a lien on and pledge and assignment of the Collateral (as hereinafter defined).  The security interest granted by this Agreement is given to and shall be held by the Lender as security for the payment and performance of all Obligations, including, without limitation, all amounts outstanding pursuant to the Loan Documents.

2.2        Definitions.  The following definitions shall apply to this Agreement:

(a)      "Code" shall mean the Utah Uniform Commercial Code, Section 70A-1-101 et.seq. as amended from time to time.

(b)      "Collateral" shall mean all of Borrower's present and future right, title and interest in and to any and all of the personal property of Borrower whether such property is now existing or hereafter created, acquired or arising and wherever located from time to time, including without limitation:

(i)        accounts;

(ii)       chattel paper;

(iii)      goods;

(iv)      inventory;

(v)       equipment;

(vi)      farm products;

(vii)     instruments;

(viii)    investment property;

(ix)      documents;

(x)       commercial tort claims;

(xi)      deposit accounts;

(xii)     letter-of-credit rights;

(xiii)    general intangibles;

(xiv)    supporting obligations; and

(xv)     records of, accession to and proceeds and products of the foregoing.

(c)      "Debtors" shall mean Borrower's customers who are indebted to Borrower.

Sugarloaf Holdings CR125253

2

(d)   "Obligation(s)" shall mean, without limitation, all loans, advances, indebtedness, notes, liabilities, rate swap transactions, basis swaps, forward rate transactions, commodity swaps, commodity options, equity or equity index swaps, equity or equity index options, bond options, interest rate options, foreign exchange transactions, cap transactions, floor transactions, collar transactions, forward transactions, currency swap transactions, cross-currency rate swap transactions, currency options (provided, however, that if and only if Borrower is not an "eligible contract participant" (as defined in the Commodity Exchange Act (7 U.S.C. § 1 et seq.) and any applicable rules, as amended), then to the extent applicable law prohibits such Borrower from entering into an agreement to secure any obligations in respect of a "swap" (as defined in the Commodity Exchange Act and any applicable rules, as amended, and referred to herein as a "Swap"), Obligations shall not include obligations of Borrower to Lender under any Swap) and amounts, liquidated or unliquidated, owing by Borrower to the Lender at any time, of each and every kind, nature and description, whether arising under this Agreement or otherwise, and whether secured or unsecured, direct or indirect (that is, whether the same are due directly by Borrower to the Lender; or are due indirectly by Borrower to the Lender as endorser, guarantor or other surety, or as borrower of obligations due third Persons which have been endorsed or assigned to the Lender, or otherwise), absolute or contingent, due or to become due, now existing or hereafter arising or contracted, including, without limitation, payment when due of all amounts outstanding respecting any of the Loan Documents.  Said term shall also include all interest and other charges chargeable to Borrower or due from Borrower to the Lender from time to time and all costs and expenses referred to in this Agreement.

(e)   "Person" or "party" shall mean individuals, partnerships, corporations, limited liability companies and all other entities.

All words and terms used in this Agreement other than those specifically defined herein shall have the meanings accorded to them in the Code.

2.3      Ordinary Course of Business.  The Lender hereby authorizes and permits Borrower to hold, process, sell, use or consume in the manufacture or processing of finished goods, or otherwise dispose of inventory for fair consideration, all in the ordinary course of Borrower's business, excluding, without limitation, sales to creditors or in bulk or sales or other dispositions occurring under circumstances which would or could create any lien or interest adverse to the Lender's security interest or other right hereunder in the proceeds resulting therefrom.  The Lender also hereby authorizes and permits Borrower to receive from the Debtors all amounts due as proceeds of the Collateral at Borrower's own cost and expense, and also liability, if any, subject to the direction and control of the Lender at all times; and the Lender may at any time, without cause or notice, and whether or not an Event of Default has occurred or demand has been made, terminate all or any part of the authority and permission herein or elsewhere in this Agreement granted to Borrower with reference to the Collateral, and notify Debtors to make all payments due as proceeds of the Collateral to the Lender.   Until Lender shall otherwise notify Borrower, all proceeds of and collections of Collateral shall be retained by Borrower and used solely for the ordinary and usual operation of Borrower's business. From and after notice by Lender to Borrower, all proceeds of and collections of the Collateral shall be held in trust by Borrower for Lender and shall not be commingled with Borrower's other funds or deposited in any Lender account of Borrower; and Borrower agrees to deliver to Lender on the dates of receipt thereof by Borrower, duly endorsed to Lender or to bearer, or assigned to Lender, as may be appropriate, all proceeds of the Collateral in the identical form received by Borrower.

2.4      Allowances.  Absent an Event of Default Borrower may grant such allowances or other adjustments to Debtors (exclusive of extending the time for payment of any item which shall not be done without first obtaining the Lender's written consent in each instance) as Borrower may reasonably deem to accord with sound business practice, including, without limiting the generality of the foregoing, accepting the return of all or any part of the inventory.

Sugarloaf Holdings CR125253

2.5      Records. Borrower shall hold its books and records relating to the Collateral segregated from all Borrower's other books and records in a manner satisfactory to the Lender; and shall deliver to the Lender from time to time promptly at its request all invoices, original documents of title, contracts, chattel paper, instruments and any other writings relating thereto, and other evidence of performance of contracts, or evidence of shipment or delivery of the merchandise or of the rendering of services; and Borrower will deliver to the Lender promptly at the Lender's request from time to time additional copies of any or all of such papers or writings, and such other information with respect to any of the Collateral and such schedules of inventory, schedules of accounts and such other writings as the Lender may in its sole discretion deem to be necessary or effectual to evidence any loan hereunder or the Lender's security interest in the Collateral.

2.6      Legends. Borrower shall promptly make, stamp or record such entries or legends on Borrower's books and records or on any of the Collateral (including, without limitation, chattel paper) as Lender shall request from time to time, to indicate and disclose that Lender has a security interest in such Collateral.

2.7      Inspection. The Lender, or its representatives, at any time and from time to time, shall have the right at the sole cost and expense of Borrower, and Borrower will permit the Lender and/or its representatives: (a) to examine, check, make copies of or extracts from any of Borrower's books, records and files (including, without limitation, orders and original correspondence); (b) to perform field exams or otherwise inspect and examine the Collateral and to check, test or appraise the same as to quality, quantity, value and condition; and (c) to verify the Collateral or any portion or portions thereof or Borrower's compliance with the provisions of this Agreement.

## 3.      REPRESENTATIONS AND WARRANTIES

3.1      Organization and Qualification. Borrower is a duly organized and validly existing limited liability company under the laws of the State of its formation, with the exact legal name set forth in the first paragraph of this Agreement. Borrower is in good standing under the laws of said State, has the power to own its property and conduct its business as now conducted and as currently proposed to be conducted, is duly qualified to do business under the laws of each state where the nature of the business done or property owned requires such qualification, and, where necessary to maintain Borrower's rights and privileges, has complied with the fictitious name statute of every jurisdiction in which Borrower is doing business.

3.2      Reliance. Each warranty, representation, covenant, obligation and agreement contained in this Agreement shall be conclusively presumed to have been relied upon by the Lender regardless of any investigation made or information possessed by the Lender and shall be cumulative and in addition to any other warranties, representations, covenants and agreements which Borrower now or hereafter shall give, or cause to be given, to the Lender.

3.3      Related Parties. Borrower has no interest in any entities other than as previously specifically consented to in writing by the Lender, if any, and Borrower has never consolidated, merged or acquired substantially all of the assets of any other Person other than as previously specifically consented to in writing by the Lender, if any.

3.4      Limited Liability Company Records. Borrower's certificate of organization, articles of organization or other charter document and all amendments thereto have been duly filed and are in proper order. All members of Borrower are properly reflected on all books and records of Borrower, including but not limited to its operating agreement, minute books, bylaws and books of account, all of which are accurate and up to date and will be so maintained.

3.5      Title to Properties; Absence of Liens. Borrower has good and clear record and marketable title to all of its properties and assets, and all of its properties and assets including the Collateral are free and clear of all mortgages, liens, pledges, charges, encumbrances and setoffs, other than the security

4

interest therein granted to the Lender and those mortgages, deeds of trust, leases of personal property and security interests previously specifically consented to in writing by the Lender.

3.6      Places of Business. Borrower's chief executive office is correctly stated in the preamble to this Agreement, and Borrower shall, during the term of this Agreement, keep the Lender currently and accurately informed in writing of each of its other places of business, and shall not change the location of such chief executive office or open or close, move or change any existing or new place of business without giving the Lender at least 30 days prior written notice thereof.

3.7      Valid Obligations. The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action and each represents a legal, valid and binding obligation of Borrower and is fully enforceable according to its terms, except as limited by equity or laws relating to the enforcement of creditors' rights.

3.8      Fictitious Trade Styles. There are no fictitious trade styles, fictitious trade names, assumed business names or trade names (defined herein as "Trade Name") used by Borrower in connection with its business operations. Borrower shall notify the Lender not less than 30 days prior to effecting any change in the matters described herein or prior to using any other Trade Name at any future date, indicating the Trade Name and State(s) of its use.

3.9      Conflicts. There is no provision in Borrower's organizational or charter documents, if any, or in any indenture, contract or agreement to which Borrower is a party which prohibits, limits or restricts the execution, delivery or performance of the Loan Documents.

3.10     Governmental Approvals. The execution, delivery and performance of the Loan Documents does not require any approval of or filing with any governmental agency or authority.

3.11     Litigation, etc. Except as otherwise disclosed to Lender in writing, there are no actions, claims or proceedings pending or to the knowledge of Borrower threatened against Borrower which might materially adversely affect the ability of Borrower to conduct its business or to pay or perform the Obligations.

3.12     Accounts and Contract Rights. All accounts arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a Debtor, and are not and will not be subject to any discount (except such cash or trade discount as may be shown on any invoice, contract or other writing delivered to the Lender). No contract right, account, general intangible or chattel paper is or will be represented by any note or other instrument, and, unless the Lender agrees otherwise, no contract right, account or general intangible is, or will be represented by any conditional or installment sales obligation or other chattel paper, except such instruments or chattel paper as have been or immediately upon receipt by Borrower will be delivered to the Lender (duly endorsed or assigned), such delivery, in the case of chattel paper, to include all executed copies except those in the possession of the installment buyer and any security for or guaranty of any of the Collateral shall be delivered to the Lender immediately upon receipt thereof by Borrower, with such assignments and endorsements thereof as the Lender may request.

3.13     Title to Collateral. At the date hereof Borrower is (and as to Collateral that Borrower may acquire after the date hereof, will be) the lawful owner of the Collateral, and the Collateral and each item thereof is, will be and shall continue to be free of all restrictions, liens, encumbrances or other rights, title or interests (other than the security interest therein granted to the Lender), credits, defenses, recoupments, set-offs or counterclaims whatsoever. Borrower has and will have full power and authority to grant to the Lender a security interest in the Collateral and Borrower has not transferred, assigned, sold, pledged, encumbered, subjected to lien or granted any security interest in, and will not transfer, assign, sell (except sales or other dispositions in the ordinary course of business in respect to inventory as expressly permitted in this Agreement), pledge, encumber, subject to lien or grant any security interest in any of the Collateral (or any of Borrower's right, title or interest therein), to any Person other than the

Lender. The Collateral is and will be valid and genuine in all respects. Borrower will warrant and defend the Lender's right to and interest in the Collateral against all claims and demands of all Persons whatsoever.

3.14 Location of Collateral. Except for sale, processing, use, consumption or other disposition in the ordinary course of business, Borrower will keep all farm products consisting of crops, livestock or feed, inventory and equipment only at locations specified in this Agreement or specified to the Lender in writing. Borrower shall, during the term of this Agreement, keep its records concerning the Collateral, including originals of all chattel paper (unless Lender requires Borrower to deliver originals of chattel paper to Lender), at the address set forth in this Agreement, and shall keep the Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights, respectively, are kept, and shall not remove such records or any of them to another location without giving the Lender at least 30 days prior written notice thereof.

3.15 Third Parties. The Lender shall not be deemed to have assumed any liability or responsibility to Borrower or any third Person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to Borrower by the Lender (which shall automatically be deemed to be without recourse to the Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and the Lender, by accepting such security interest in the Collateral, or by releasing any Collateral to Borrower, shall not be deemed to have assumed any obligation or liability to any supplier or Debtor or to any other third party, and Borrower agrees to indemnify and defend the Lender and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

3.16 Payment of Accounts. Each account or other item of Collateral, other than inventory and equipment, will be paid in full on or before the date shown as its due date in the schedule of Collateral, in the copy of the invoice(s) relating to the account or other Collateral or in contracts relating thereto. Upon any suspension of business, assignment or trust mortgage for the benefit of creditors, dissolution, petition in receivership or under any chapter of the Bankruptcy Code as amended from time to time by or against any Debtor, any Debtor becoming insolvent or unable to pay its debts as they mature or any other act of the same or different nature amounting to a business failure, Borrower will immediately notify the Lender thereof.

3.17 Water. As of the date of this Agreement, sufficient water is available and is projected to be available, from verifiable surface and ground water sources as described in the most recent budget submitted by Borrower to Lender, if Borrower is required to submit a budget, or to conduct operations materially similar to prior years' operations as evidenced by information provided by any Borrower to the Lender. Borrower has filed with all governmental agencies, all notices and other documents required under Federal, state and local laws and regulations in connection with the supply of water for and use of water in Borrower's operations.

3.18 Taxes. Borrower has filed all Federal, state and other tax returns required to be filed (except for such returns for which current and valid extensions have been filed), and all taxes, assessments and other governmental charges due from Borrower have been fully paid. Borrower has established on its books reserves adequate for the payment of all Federal, state and other tax liabilities (if any).

3.19 Use of Proceeds. No portion of any loan is to be used for (i) the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. 221 and 224 or (ii) primarily personal, family or household purposes. The Collateral is not used or acquired primarily for personal, family or household purposes.

3.20 Environmental. As of the date hereof neither Borrower nor any of Borrower's agents, employees or independent contractors (1) have caused or are aware of a release or threat of release of Hazardous Materials (as defined herein) on any of the premises or personal property owned or controlled

Sugarloaf Holdings CR125253

6

by Borrower ("Controlled Property") or any property abutting Controlled Property ("Abutting Property"), which could give rise to liability under any Environmental Law (as defined herein) or any other Federal, state or local law, rule or regulation; (2) have arranged for the transport of or transported any Hazardous Materials in a manner as to violate, or result in potential liabilities under, any Environmental Law; (3) have received any notice, order or demand from the Environmental Protection Agency or any other Federal, state or local agency under any Environmental Law; (4) have incurred any liability under any Environmental Law in connection with the mismanagement, improper disposal or release of Hazardous Materials; or (5) are aware of any inspection or investigation of any Controlled Property or Abutting Property by any Federal, state or local agency for possible violations of any Environmental Law.

To the best of Borrower's knowledge, neither Borrower, nor any prior owner or tenant of any Controlled Property, committed or omitted any act which caused the release of Hazardous Materials on such Controlled Property which could give rise to a lien thereon by any Federal, state or local government. No notice or statement of claim or lien affecting any Controlled Property has been recorded or filed in any public records by any Federal, state or local government for costs, penalties, fines or other charges as to such property. All notices, permits, licenses or similar authorizations, if any, required to be obtained or filed in connection with the ownership, operation, or use of the Controlled Property, including without limitation, the past or present generation, treatment, storage, disposal or release of any Hazardous Materials into the environment, have been duly obtained or filed.

Borrower agrees to indemnify and hold the Lender harmless from all liability, loss, cost, damage and expense, including attorney fees and costs of litigation, arising from any and all of its violations of any Environmental Law (including those arising from any lien by any Federal, state or local government arising from the presence of Hazardous Materials) or from the presence of Hazardous Materials located on or emanating from any Controlled Property or Abutting Property whether existing or not existing and whether known or unknown at the time of the execution hereof and regardless of whether or not caused by, or within the control of Borrower. Borrower further agrees to reimburse Lender upon demand for any costs incurred by Lender in connection with the foregoing. Borrower agrees that its obligations hereunder shall be continuous and shall survive the repayment of all debts to Lender and shall continue so long as a valid claim may be lawfully asserted against the Lender. Borrower agrees to conduct its operations and keep and maintain all of its property in compliance with all applicable Environmental Laws and, upon the written request of the Lender, Borrower shall submit to the Lender, at Borrower's sole cost and expense, at reasonable intervals, a report providing the status of any environmental, health or safety compliance, hazard or liability.

The term "Hazardous Materials" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives.

The term "Environmental Law" means any present and future Federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Materials, relating to liability for or costs of remediation or prevention of releases of Hazardous Materials or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues:    the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Materials Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy

Sugarloaf Holdings CR125253

Act; and the River and Harbors Appropriation Act.

## 4.    COVENANTS

4.1        Payments and Performance.  Borrower will duly and punctually pay all Obligations becoming due to the Lender and will duly and punctually perform all Obligations on its part to be done or performed under this Agreement.

4.2        Books and Records; Inspection.  Borrower will at all times keep proper books of account in which full, true and correct entries will be made of its transactions in accordance with generally accepted accounting principles, consistently applied and which are, in the opinion of a Certified Public Accountant acceptable to Lender, adequate to determine fairly the financial condition and the results of operations of Borrower.  Borrower will at all reasonable times make its books and records available in its offices for inspection, examination and duplication by the Lender and the Lender's representatives and will permit inspection of the Collateral and all of its properties by the Lender and the Lender's representatives.  Borrower will from time to time furnish the Lender with such information and statements as the Lender may request in its sole discretion with respect to the Obligations or the Lender's security interest in the Collateral.  Borrower shall, during the term of this Agreement, keep the Lender currently and accurately informed in writing of each location where Borrower's records relating to its accounts and contract rights are kept, and shall not remove such records to another location without giving the Lender at least 30 days prior written notice thereof.

4.3        Financial Statements of Sugarloaf Holdings, LLC.  Sugarloaf Holdings, LLC will deliver or cause to be delivered to Lender in form and detail satisfactory to Lender:

   (a)     Not later than 120 days after the end of Sugarloaf Holdings, LLC's fiscal year, a copy of the annual financial report of Sugarloaf Holdings, LLC, or such year, compiled by a firm of certified public accountants acceptable to Lender.

   (b)     Not later than 30 days after filing, a copy of Sugarloaf Holdings, LLC's federal income tax returns filed for such year.

   (c)     Not later than 60 days after the end of each fiscal year, a twelve month projection of the Sugarloaf Holdings, LLC's operations, including livestock and crop budgets in form and substance satisfactory to the Lender.

4.4        Financial Statements of Gray Holdings Corp..  Borrower will cause Gray Holdings Corp. to deliver to Lender in form and detail satisfactory to Lender:

   (a)     Not later than 120 days after the end of Gray Holdings Corp.'s fiscal year, a copy of the annual financial report of Gray Holdings Corp. for such year, or if an individual, Gray Holdings Corp.'s personal financial statement.

   (b)     Not later than 30 days after filing, a copy of Gray Holdings Corp.'s federal income tax returns filed for such year.

4.5        Financial Statements of David J. Gray.  Borrower will cause David J. Gray to deliver to Lender in form and detail satisfactory to Lender:

   (a)     Not later than 120 days after the end of each calendar year, a copy of the annual financial report of David J. Gray for such year, or if an individual, David J. Gray's personal financial statement.

   (b)     Not later than 30 days after filing, a copy of David J. Gray's federal income tax returns filed for such year.

Sugarloaf Holdings CR125253

4.6      Financial Statements of Pahvant Equity, LLC.  Borrower will cause Pahvant Equity, LLC to deliver to Lender in form and detail satisfactory to Lender:

(a)      Not later than 120 days after the end of Pahvant Equity, LLC's fiscal year, a copy of the annual financial report of Pahvant Equity, LLC for such year, or if an individual, Pahvant Equity, LLC's personal financial statement.

(b)      Not later than 30 days after filing, a copy of Pahvant Equity, LLC's federal income tax returns filed for such year.

4.7      Additional Financial Information.  Borrower will furnish to Lender:

(a)      not later than 30 days after the end of each quarter, Borrower's livestock position report as of the end of such quarter, in the form attached hereto as Exhibit "A" and incorporated herein by reference;

(b)      from time to time, such financial data and information about Borrower as Lender may reasonably request; and

(c)      any financial data and information about any guarantors of the Obligations as Lender may reasonably request.

4.8      Conduct of Business.  Borrower will maintain its existence in good standing and comply with all laws and regulations of the United States and of any state or states thereof and of any political subdivision thereof, and of any governmental authority which may be applicable to it or to its business; provided that this covenant shall not apply to any tax, assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained.

4.9      Notice to Debtors.  Borrower agrees, at the request of the Lender, to notify all or any of the Debtors in writing of the Lender's security interest in the Collateral in whatever manner the Lender requests and, hereby authorizes the Lender to notify all or any of the Debtors of the Lender's security interest in Borrower's accounts at Borrower's expense.

4.10     Contact with Accountant.  Borrower hereby authorizes the Lender to directly contact and communicate with any accountant employed by Borrower in connection with the review and/or maintenance of Borrower's books and records or preparation of any financial reports delivered by or at the request of Borrower to Lender.

4.11     Operating and Deposit Accounts.  Borrower shall maintain its primary business depository relationship with the Lender, including general, operating and administrative deposit accounts and cash management services.

4.12     Evidence  of Water Availability.  At such times as the Lender may request, Borrower to deliver to the Lender a certificate stating that the amount of water available and projected to be available is sufficient to conduct operations as described in the most recent budget submitted by Borrower to Lender, if Borrower is required to submit a budget materially similar to prior years' operations, as evidenced by information provided by Borrower to the Lender. Such certificate shall be signed, at the Lender's option, either (i) by Borrower or by an independent third party, such as an officer of Borrower's water district or other supplier of water, or (ii) by a water resources engineer's determination of a dependable yield of water rights compared to crop water demand.

4.13     Lender's Right to Direct Proceeds Payments to Lender.  Immediately upon request by Lender, which request may be made at any time at Lender's sole discretion, and continuing until notified otherwise by Lender, Borrower shall instruct any dairy, packing plant, or other buyer or processor in the ordinary course of business of farm products produced by Borrower to make all future payments for

Sugarloaf Holdings CR125253

product purchased by, or delivered to, such processor or buyer in the ordinary course of business directly to Lender as directed by Lender. Thereafter, and until Lender notifies Borrower otherwise, Borrower shall not accept any payment made by a buyer or processor in the ordinary course of business of Borrower's farm products. Any such payment received by Borrower contrary to Lender's instructions shall be held in trust by Borrower for the benefit of Lender, and shall be immediately delivered or paid to Lender.

4.14     Taxes. Borrower will promptly pay all real and personal property taxes, assessments and charges and all franchise, income, unemployment, retirement benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent; provided that this covenant shall not apply to any tax assessment or charge which is being contested in good faith and with respect to which reserves have been established and are being maintained. The Lender may, at its option, from time to time, discharge any taxes, liens or encumbrances of any of the Collateral, and Borrower will pay to the Lender on demand or the Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.15     Maintenance. Borrower will keep and maintain the Collateral and its other properties, if any, in good repair, working order and condition. Borrower will immediately notify the Lender of any loss or damage to or any occurrence which would adversely affect the value of any Collateral. The Lender may, at its option, from time to time, take any other action that the Lender may deem proper to repair, maintain or preserve any of the Collateral, and Borrower will pay to the Lender on demand or the Lender in its sole discretion may charge to Borrower all amounts so paid or incurred by it.

4.16     Insurance. Borrower will maintain in force property and casualty insurance on all Collateral and any other property of Borrower, if any, against risks customarily insured against by companies engaged in businesses similar to that of Borrower containing such terms and written by such companies as may be satisfactory to the Lender, such insurance to be payable to the Lender as its interest may appear in the event of loss and to name the Lender as insured pursuant to a standard loss payee clause; no loss shall be adjusted thereunder without the Lender's approval; and all such policies shall provide that they may not be canceled without first giving at least 30 days written notice of cancellation to the Lender. In the event that Borrower fails to provide evidence of such insurance, the Lender may, at its option, secure such insurance and charge the cost thereof to Borrower. At the option of the Lender, all insurance proceeds received from any loss or damage to any of the Collateral shall be applied either to the replacement or repair thereof or as a payment on account of the Obligations. From and after the occurrence of an Event of Default, the Lender is authorized to cancel any insurance maintained hereunder and apply any returned or unearned premiums, all of which are hereby assigned to the Lender, as a payment on account of the Obligations.

4.17     Notification of Default. Immediately upon becoming aware of the existence of any condition or event which constitutes an Event of Default, or any condition or event which would upon notice or lapse of time, or both, constitute an Event of Default, Borrower shall give Lender written notice thereof specifying the nature and duration thereof and the action being or proposed to be taken with respect thereto.

4.18     Material Notices. Borrower shall give the Lender prompt written notice of any and all (i) litigation, arbitration or administrative proceedings to which Borrower is a party or which affects the Collateral; (ii) other matters which have resulted in, or might result in a material adverse change in the Collateral or the financial condition or business operations of Borrower, and (iii) any enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened against Borrower or any of its properties.

4.19     Pension Plans. With respect to any pension or benefit plan maintained by Borrower, or to which Borrower contributes ("Plan"), the benefits under which are guarantied, in whole or in part, by the Pension Benefit Guaranty Corporation created by the Employee Retirement Income Security Act of 1974, P.L. 93-406, as amended ("ERISA") or any governmental authority succeeding to any or all of the functions of the Pension Benefit Guaranty Corporation ("Pension Benefit Guaranty Corporation"), Borrower will (a) fund each Plan as required by the provisions of Section 412 of the Internal Revenue

Sugarloaf Holdings CR125253

Code of 1986, as amended; (b) cause each Plan to pay all benefits when due; (c) furnish Lender (i) promptly with a copy of any notice of each Plan's termination sent to the Pension Benefit Guaranty Corporation (ii) no later than the date of submission to the Department of Labor or to the Internal Revenue Service, as the case may be, a copy of any request for waiver from the funding standards or extension of the amortization periods required by Section 412 of the Internal Revenue Code of 1986, as amended and (iii) notice of any Reportable Event as such term is defined in ERISA; and (d) subscribe to any contingent liability insurance provided by the Pension Benefit Guaranty Corporation to protect against employer liability upon termination of a guarantied pension plan, if available to Borrower.

4.20     Definitions and/or Financial Covenants. The following Definitions will apply to this Agreement and Borrower will at all times or during or at the end of any fiscal period (as applicable) comply with all of the financial covenants in this section, if any.

(a)     Definitions.

(i)     "Current Portion of Long-Term Debt Prior Period" shall mean, for any period, the prior year-end scheduled principal or capital lease payments required to be paid during the applicable period.

(ii)     "Cash Flow" shall mean the sum of Net Income and exclusive of extraordinary gains plus depreciation and amortization expense minus dividends and distributions.

(iii)     "Current Assets" shall mean current assets as determined in accordance with GAAP, less all amounts due from affiliates, officers or employees.

(iv)     "Current Liabilities" shall mean current liabilities as in accordance with GAAP, including any negative cash balance on Borrower's financial statements.

(v)     "Debt" shall mean all liabilities of Borrower, or any Borrower, as applicable, less Subordinated Liabilities, if any.

(vi)     "GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States.

(vii)     "Liabilities" shall mean (a) all indebtedness for borrowed money or for the deferred purchase price of property or services, and all obligations under leases which are or should be, under GAAP, recorded as capital leases, in respect of which a Person is directly or contingently liable as borrower, guarantor, endorser or otherwise, or in respect of which a Person otherwise assures a creditor against loss, (b) all obligations for borrowed money or for the deferred purchase price of property or services secured by (or for which the holder has an existing right, contingent or otherwise, to be secured by) any lien upon property (including without limitation accounts receivable and contract rights) owned by a Person, whether or not such Person has assumed or become liable for the payment thereof, and (c) all other liabilities and obligations which would be classified in accordance with GAAP as liabilities on a balance sheet or to which reference should be made in footnotes thereto.

(viii)     "Net Income" shall mean, for any period, all income actually paid in cash or accrued less all expenses and other charges for such period, determined in accordance with GAAP.

(ix)     "Permitted Liens" shall mean: (i) liens and security interests securing Total Funded Indebtedness owed by Borrower to the Lender; (ii) liens for taxes, assessments or similar charges not yet due; (iii) liens of materialmen, mechanics, warehousemen, or carriers or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (iv) purchase money liens or purchase money security interests upon or in any property acquired or held by any Borrower in the ordinary course of business to secure Senior

11

Sugarloaf Holdings CR125253

Funded Indebtedness outstanding on the date hereof or permitted to be incurred herein; (v) liens and security interests which, as of the date hereof, have been disclosed to and approved by the Lender in writing; and (vi) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

(x)      "Subordinated Liabilities" shall mean as of the date of determination thereof, all Liabilities which have been subordinated in writing to the obligations owing to the Lender on terms and conditions acceptable to the Lender.

(xi)     "Senior Funded Indebtedness" shall mean, as of the date of determination thereof, all borrowed money as reflected in the most recent financial statements in the form required by this Agreement, if any, excluding all such borrowed money that has been subordinated to the satisfaction of Lender.

(xii)    "Effective Tangible Net Worth" shall mean Borrower's stated net worth plus Subordinated Liabilities but less all intangible assets of Borrower (i.e. goodwill, trademarks, patents, copyrights, organization expense, covenants not to compete and other similar intangibles items including, but not limited to, investments and/or advances in all amounts due from affiliates, officers or employees).

(xiii)   "Total Funded Indebtedness" shall mean, as of the date of determination thereof, all borrowed money as reflected in the most recent financial statements in the form required by this Agreement, if any.

(xiv)    "Working Capital" shall mean the sum of Current Assets minus the sum of Current Liabilities.

(b)    Working Capital.  Borrower shall maintain a minimum Working Capital of not less than **$500,000.00**.

(c)    Debt to Effective Tangible Net Worth.  Borrower shall maintain a ratio of Debt to Effective Tangible Net Worth of not more than **2.50** to 1.0.

(d)    Cash Flow to Current Portion of Long-Term Debt.  Borrower shall maintain a ratio of Cash Flow to Current Portion of Long-Term Debt Prior Period of not less than **1.25** to 1.0, measured at each fiscal year-end.

4.21    Limitations on Senior Funded Indebtedness.  Borrower shall not, after the date hereof, create, incur or assume, directly or indirectly, any additional Senior Funded Indebtedness other than Senior Funded Indebtedness owed or to be owed to Lender.

4.22    Loans or Advances.  Borrower shall not make any loans or advances to any individual, partnership, corporation, limited liability company, trust, or other organization or Person, including without limitation its officers and employees; provided, however, that Borrower may make advances to such employees, including its members, officers, with respect to expenses incurred or to be incurred by such employees in the ordinary course of business which expenses are reimbursable by Borrower; and provided further, however, that Borrower may extend credit in the ordinary course of business in accordance with customary trade practices.

4.23    Investments.  Borrower shall not make investments in, or advances to, any individual, partnership, corporation, limited liability company, trust or other organization or Person other than as previously specifically consented to in writing by the Lender.  Borrower will not purchase or otherwise invest in or hold securities, nonoperating real estate or other nonoperating assets or purchase all or

Sugarloaf Holdings CR125253

substantially all the assets of any entity other than as previously specifically consented to in writing by the Lender.

4.24      Mergers and Consolidation.  Borrower shall not liquidate or dissolve, merge or consolidate with or into, or acquire any other business organization.

4.25      Loan-to-Livestock Collateral Value Ratio.  Borrower agrees that so long as there are any outstanding balances under any livestock note provided to Borrower by the Lender under this Agreement, the ratio of the sum of combined outstanding balances under such note(s) plus all amounts due others for livestock to the Livestock Collateral Value shall not be greater than 65% (the "Loan-to-Livestock Collateral Value Ratio").   To the extent that such Loan-to-Livestock Collateral Value Ratio is not maintained, Borrower shall promptly, upon the Lender's request, make a payment to the Lender in an amount sufficient to reduce the outstanding principal balance under such livestock note(s) so that a Loan-to-Livestock Collateral Value Ratio no greater than 65% is reinstated and maintained. The term "Livestock Collateral Value" shall mean the value of the livestock in which the Lender has a security interest, such value to be determined by the Lender in its sole discretion based upon Borrower's position reports submitted to Lender and/or appraisal satisfactory to the Lender.

4.26      Repurchase Member Interest. Borrower shall not purchase or repurchase, in whole or in part, any member's interest.

4.27      LLC Withdrawal and Distribution. Borrower shall not permit the withdrawal of any member or make any distribution (in cash, in kind or otherwise) to any members.

4.28      Capital Expenditures.  Except for the purchase of breeding stock, Borrower shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary and usual course of business for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in Borrower's business, provided, however, that so long as no Event of Default shall have occurred and be continuing or would occur after giving effect to the following expenditures, Borrower may make capital expenditures in the ordinary course of business in an amount not to exceed **$300,000.00** during any fiscal year.

4.29      Sale of Assets.  Borrower shall not sell, lease or otherwise dispose of any of its assets, except in the ordinary course of business and except for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in Borrower's business, provided that full, fair and reasonable consideration is received therefor; provided, however, in no event shall Borrower sell, lease or otherwise dispose of any equipment purchased with the proceeds of any loans made by the Lender.

4.30      Liens and Encumbrances.  Borrower shall not create, assume or permit to exist any security interest, encumbrance, mortgage, deed of trust, or other lien (including, but not limited to, a lien of attachment, judgment or execution) affecting any of Borrower's properties, or execute or allow to be filed any financing statement or continuation thereof affecting any of such properties, except for Permitted Liens or as otherwise provided in this Agreement.

4.31      Other Business.  Borrower shall not engage in any business other than the business in which it is currently engaged or a business reasonably allied thereto.

4.32      Change of Name, etc.  Borrower shall not change its legal name or the State or the type of its formation, without giving the Lender at least 30 days prior written notice thereof.

4.33      Compensation of Employees.   Borrower shall compensate its employees for services rendered at an hourly rate at least equal to the minimum hourly rate prescribed by any applicable federal or state law or regulation.

Sugarloaf Holdings CR125253

4.34     Payment of Obligations and Taxes. Borrower shall make timely payment of all assessments and taxes and all of its liabilities and obligations including, but not limited to, trade payables, unless the same are being contested in good faith by appropriate proceedings with the appropriate court or regulatory agency. For purposes hereof, Borrower's issuance of a check, draft or similar instrument without delivery to the intended payee shall not constitute payment.

4.35     Location of Livestock. The livestock is not now and shall not at any time hereafter be kept with a bailee or similar party without the Lender's prior written consent.

4.36     Care and Preservation of the Livestock. Borrower shall:

(i)     Feed, care for, attend to, inoculate, water and perform or cause to be performed any other act or acts appropriate or necessary to care for, maintain, preserve and protect the livestock.

(ii)    Milk, shear and perform or cause to be performed such other acts as are related to the livestock or to the products of the livestock (including, but not limited to, processing, preserving, protecting and storing such products.

(iii)   Not commit or suffer to be committed any damage to or destruction of the livestock.

(iv)    Permit the Lender and any of its agents, employees or representatives to enter upon the premises where the livestock is located at any reasonable time and from time to time for the purpose of examining and inspecting the livestock.

(v)     Upon the Lender's request therefore, provide Lender with copies of all bills of sale for the livestock.

4.37     Inventory.

(i)     Except as provided herein below, Borrower's inventory shall, at all times, be in Borrower's physical possession, or other location(s) acceptable to Lender, and shall not be held by others on consignment, sale on approval, or sale or return.

(ii)    Borrower shall keep correct and accurate records.

(iii)   All inventory shall be of good and merchantable quality, free from defects.

(iv)    The inventory shall not at any time or times hereafter be stored with a bailee, warehouseman or similar party without the Lender's prior written consent and, in such event, Borrower will concurrently therewith cause any such bailee, warehouseman or similar party to issue and deliver to the Lender, in form acceptable to the Lender, warehouse receipts in the Lender's name evidencing the storage of inventory.

(v)     Borrower shall, at any reasonable time and from time to time, allow Lender to have the right, upon demand, to inspect and examine inventory and to check and test the same as to quality, quantity, value and condition and Borrower agrees to reimburse the Lender for the Lender's reasonable costs and expenses in so doing.

4.38     Location and Maintenance of Equipment.

(i)     Borrower's equipment (the "Equipment") shall at all times be in Borrower's physical possession or other location(s) acceptable to Lender and shall not be held for sale or lease.

Sugarloaf Holdings CR125253

(ii)     Borrower shall not secrete, abandon or remove, or permit the removal of, the Equipment, or any part thereof, from Borrower's physical possession or other location(s) acceptable to Lender or remove or permit to be removed any accessories now or hereafter placed upon the Equipment.

(iii)    Upon the Lender's demand, Borrower shall immediately provide the Lender with a complete and accurate description of the Equipment including, as applicable, the make, model, identification number and serial number of each item of Equipment. In addition, Borrower shall immediately notify the Lender of the acquisition of any new or additional Equipment or the replacement of any existing Equipment and shall supply the Lender with a complete description of any such additional or replacement Equipment.

(iv)    Borrower shall, at Borrower's sole cost and expense, keep and maintain the Equipment in a good state of repair and shall not destroy, misuse, abuse, illegally use or be negligent in the care of the Equipment or any part thereof. Borrower shall not remove, destroy, obliterate, change, cover, paint, deface or alter the name plates, serial numbers, labels or other distinguishing numbers or identification marks placed upon the Equipment or any part thereof by or on behalf of the manufacturer, any dealer or rebuilder thereof, or the Lender. Borrower shall not be released from any liability to the Lender hereunder because of any injury to or loss or destruction of the Equipment. Borrower shall allow the Lender and its representatives free access to and the right to inspect the Equipment at all times and shall comply with the terms and conditions of any leases covering the real property on which the Equipment is located and any orders, ordinances, laws, regulations or rules of any federal, state or municipal agency or authority having jurisdiction of such real property or the conduct of the business of the Persons having control or possession of the Equipment.

(v)     The Equipment is not now and shall not at any time hereafter be so affixed to the real property on which it is located as to become a fixture or a part thereof. The Equipment is now and shall at all times hereafter be and remain personal property of Borrower.

4.39    Post-Close Environmental Covenants. Not later than 120 days after the date of this Agreement, Borrower shall, at Borrower's sole cost, engage an environmental consulting firm approved by Lender to conduct a Phase II subsurface investigation sufficient to determine the presence of environmental contamination in the vicinity of the underground storage tank (the "UST") located on the Controlled Property (the "Investigation"), which shall comply with the following requirements

(a)     Prior to conducting the Investigation, Borrower shall furnish to Lender a description of the scope of the proposed Investigation, including a map of proposed sampling locations, and the qualifications of the environmental consulting firm selected by Borrower, for review by Lender. Lender's approval of the selected environmental investigation firm and the map of propose sampling locations must be approved by Lender prior to commencement of the Investigation to assure that the proposed work satisfies Lender's requirements:

(b)     Management of the environmental investigation firm shall be the responsibility of Borrower

(c)     If the UST and dispenser will no longer be used, Borrower must empty any remaining product and remove them in accordance with applicable regulatory requirements, in which case, the Investigation may be conducted in the tank excavation pit and surrounding area after the UST, dispenser and any associated piping have been removed.

(d)     The Investigation must include the following, in addition to any other conditions required by Lender following its review of the proposed Investigation:

(i)      The scope of work must include subsurface sampling in the immediate vicinity of the UST, dispenser, and associated piping.

Sugarloaf Holdings CR125253

15

(ii)     Soil samples must be collected in native soil from each boring at a shallow depth just below the feature or area of interest, and must also be collected from a deeper depth in the same boring. Grab groundwater samples must be collected if groundwater is encountered during soil sampling.

(iii)    Soil samples must be analyzed for petroleum hydrocarbons and volatile organic compounds ("VOCs"). Stepwise analysis may be employed to hold the deeper soil samples in reserve at the lab, and analyze them only if shallow soil samples contain contaminants (appropriate sample holding time criteria must met).

(iv)    A final summary report describing rationale for boring locations, sample depths, sampling methods, soil and groundwater results, and a map showing sample locations must be submitted to and approved by Lender. If contamination is found, the report shall include estimated costs and timing for any remediation necessary to obtain agency case closure under the oversight of the applicable environmental agency, with the goal to obtain a case closure/ No Further Action letter.

(e)   Borrower shall take such additional action within such timeframe(s) as Lender may reasonably require following its review of the findings of the Investigation.

4.40    Post Closing Covenants Regarding Evidence of Water Availability.  Not later than one (1) year after the date of this Agreement, Borrower shall, at Borrower's sole expense:

(a)   provide evidence satisfactory to Lender that either, (i) the Utah Department of Water Resources (the "Department") has agreed to allow water obtained from the Chalk Creek Irrigation Company may be used as re-charge water and then pumped out of the aquifer from Borrower's new wells pursuant to groundwater rights owned by Borrower; or (ii) in the event the Department does not agree to the actions identified in (a)(i), construct a reservoir to store water obtained from the Chalk Creek Irrigation Company and shall pump such water directly from the reservoir into the irrigation mainline rather than drawn from the aquifer;

(b)   file a new combined water right and/or transfer of water identifying the groundwater rights and rights to water from the Chalk Creek Irrigation Company as being comingled or just combined groundwater rights separately across the property as shown with the pivots in place; and

(c)   record in the county land records easements reasonably acceptable to Lender for transportation of water from the well identified by Borrower as well #6 to the well identified by Borrower as well #7, and from well #7 to the pivot identified by Borrower as pivot #12.

## 5.    DEFAULT

5.1       Default.  "Event of Default" shall mean the occurrence of one or more of any of the following events:

(a)   default of any liability, obligation, covenant or undertaking of Borrower or any guarantor of the Obligations to the Lender, hereunder or otherwise, including, without limitation, failure to pay in full and when due any installment of principal or default of Borrower or any guarantor of the Obligations under any other Loan Document or any other agreement with the Lender continuing for 5 days with respect to the payment of interest, or continuing for 30 days with respect to any other default;

(b)   failure of Borrower or any guarantor of the Obligations to maintain or cause to maintain aggregate collateral security value satisfactory to the Lender;

Sugarloaf Holdings CR125253

(c)   default of any material liability, obligation or undertaking of Borrower or any guarantor of the Obligations to any other party;

(d)   if any statement, representation or warranty heretofore, now or hereafter made by Borrower or any guarantor of the Obligations in connection with this Agreement or in any supporting financial statement of Borrower or any guarantor of the Obligations shall be determined by the Lender to have been false or misleading in any material respect when made;

(e)   if Borrower or any guarantor of the Obligations is a corporation, trust, partnership or limited liability company, the liquidation, termination or dissolution of any such organization, or the merger or consolidation of such organization into another entity, or Borrower ceasing to carry on actively its present business or the appointment of a receiver for its property;

(f)   the death of Borrower or any guarantor of the Obligations and, if Borrower or any guarantor of the Obligations is a partnership or limited liability company, the death of any partner or member;

(g)   for a corporation, there shall occur a sale, transfer, disposition or encumbrance (whether voluntary or involuntary), or an agreement shall be entered into to do so, with respect to more than 10% of the issued and outstanding capital stock of Borrower;

(h)    for a general partnership, limited partnership, or limited liability partnership, there shall occur a change in any general partner or a change affecting the control of Borrower; or for a limited liability company, there shall occur a change in any manager or member or a change affecting the control of Borrower;

(i)   Borrower or any guarantor shall:  (i) become insolvent or be unable to pay its debts as they mature; (ii) make an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its properties and assets; (iii) file a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; (iv) file an answer admitting the material allegations of an involuntary petition relating to bankruptcy or reorganization or join in any such petition; (v) become or be adjudicated a bankrupt; (vi) apply for or consent to the appointment of, or consent that an order be made, appointing any receiver, custodian or trustee, for itself or any of its properties, assets or businesses; or (vii) in an involuntary proceeding, any receiver, custodian or trustee shall have been appointed for all or substantial part of Borrower's or guarantor's properties, assets or businesses and shall not be discharged within 30 days after the date of such appointment;

(j)   the service upon the Lender of a writ in which the Lender is named as trustee of Borrower or any guarantor of the Obligations;

(k)   a judgment or judgments for the payment of money shall be rendered against Borrower or any guarantor of the Obligations, and any such judgment shall remain unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

(l)   any levy, lien (including mechanics lien), seizure, attachment, execution or similar process shall be issued or levied on any of the property of Borrower or any guarantor of the Obligations;

(m)   any subordination agreement or any other Loan Document shall be revoked or limited or its enforceability or validity shall be contested by any signatory thereto, by operation of law, legal proceeding or otherwise;

(n)   the termination or revocation of any guaranty of the Obligations;

Sugarloaf Holdings CR125253

17

(o)     water is or is projected to be insufficient in amount or unsuitable in quality, as determined by the Lender in either case, to conduct operations as described in the most recent budget provided by Borrower to Lender if required or in projections or by information provided by Borrower to the Lender; or

(p)     the occurrence of such a change in the condition or affairs (financial or otherwise) of Borrower or any guarantor of the Obligations, or the occurrence of any other event or circumstance, such that the Lender, in its sole discretion, deems that it is insecure or that the prospects for timely or full payment or performance of any obligation of Borrower or any guarantor of the Obligations to the Lender has been or may be impaired.

5.2     Acceleration. If an Event of Default shall occur, at the election of the Lender, all Obligations shall become immediately due and payable without notice or demand, except with respect to Obligations payable on DEMAND, which shall be due and payable on DEMAND, whether or not an Event of Default has occurred.    In addition, regardless of whether the Lender has declared all Obligations to be immediately due and payable, Lender may exercise any action set forth below.

The Lender is hereby authorized, at its election, after an Event of Default or after Demand, without any further demand or notice except to such extent as notice may be required by applicable law, to take possession and/or sell or otherwise dispose of all or any of the Collateral at public or private sale; and the Lender may also exercise any and all other rights and remedies of a secured party under the Code or which are otherwise accorded to it in equity or at law, all as Lender may determine, and such exercise of rights in compliance with the requirements of law will not be considered adversely to affect the commercial reasonableness of any sale or other disposition of the Collateral. If notice of a sale or other action by the Lender is required by applicable law, unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Borrower agrees that 10 days written notice to Borrower, or the shortest period of written notice permitted by such law, whichever is smaller, shall be sufficient notice; and that to the extent permitted by law, the Lender, its officers, attorneys and agents may bid and become purchasers at any such sale, if public, and may purchase at any private sale any of the Collateral that is of a type customarily sold on a recognized market or which is the subject of widely distributed standard price quotations. Any sale (public or private) shall be without warranty and free from any right of redemption, which Borrower shall waive and release after default upon the Lender's request therefor, and may be free of any warranties as to the Collateral if Lender shall so decide.    No purchaser at any sale (public or private) shall be responsible for the application of the purchase money.  Any balance of the net proceeds of sale remaining after paying all Obligations of Borrower to the Lender shall be returned to such other party as may be legally entitled thereto; and if there is a deficiency, Borrower shall be responsible for repayment of the same, with interest.   Upon demand by the Lender, Borrower shall assemble the Collateral and make it available to the Lender at a place designated by the Lender which is reasonably convenient to the Lender and Borrower.  Borrower hereby acknowledges that the Lender has extended credit and other financial accommodations to Borrower upon reliance of Borrower's granting the Lender the rights and remedies contained in this Agreement including without limitation the right to take immediate possession of the Collateral upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND and Borrower hereby acknowledges that the Lender is entitled to equitable and injunctive relief to enforce any of its rights and remedies hereunder or under the Code and Borrower hereby waives any defense to such equitable or injunctive relief based upon any allegation of the absence of irreparable harm to the Lender.

The Lender shall not be required to marshal any present or future security for (including but not limited to this Agreement and the Collateral subject to the security interest created hereby), or guarantees of, the Obligations or any of them, or to resort to such security or guarantees in any particular order; and all of its rights hereunder and in respect of such securities and guaranties shall be cumulative and in addition to all other rights, however existing or arising. To the extent that it lawfully may do so, Borrower hereby agrees that it will not invoke and irrevocably waives the benefits of any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Lender's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or guaranteed. Except as

18

Sugarloaf Holdings CR125253

required by applicable law, the Lender shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

5.3      Cease Extending Credit.  The Lender may cease making advances or otherwise extending credit to or for the account of Borrower under this Agreement or under any other agreement now existing or hereafter entered into between Borrower and the Lender.

5.4      Termination.  The Lender may terminate this Agreement as to any future obligation of the Lender without affecting Borrower's obligations to the Lender or the Lender's rights and remedies under this Agreement or under any other document, instrument or agreement.

5.5      Possession of the Livestock.  Without obligation to do so, the Lender may, enter upon the premises where the livestock is located and, using any and all of Borrower's equipment, machinery, tools, farming implements and supplies, and improvements located on the premises: (i) feed, care for, attend to, inoculate, water and perform any other act or acts necessary or appropriate to care for, maintain, preserve and protect the livestock (using any water located in, on or adjacent to the premises); (ii) milk, shear and perform such other acts as are related to the products of the livestock (including, but not limited to, processing, preserving and protecting such products); (iii) remove the livestock and the products thereof from the premises upon which the livestock and the products thereof are located; and (iv) appraise, store, prepare for public or private sale, exhibit, market and sell the livestock and the products thereof; provided that Borrower hereby agrees that, if such Borrower is the owner of record of the premises upon which the livestock and the products thereof are located, the Lender shall not be responsible or liable for returning the premises to their condition immediately preceding the use of the premises as provided herein or for doing such acts as may be necessary to permit future livestock to be maintained on the premises.

5.6      Application of Proceeds.  All amounts received by the Lender as proceeds from the disposition or liquidation of the Collateral shall be applied to Borrower's indebtedness to the Lender as follows:  first, to the costs and expenses of collection, enforcement, protection and preservation of the Lender's lien in the Collateral, including court costs and reasonable attorneys' fees, whether or not suit is commenced by the Lender; next, to those costs and expenses incurred by the Lender in protecting, preserving, enforcing, collecting, liquidating, selling or disposing of the Collateral; next, to the payment of accrued and unpaid interest on all of the Obligations; next, to the payment of the outstanding principal balance of the Obligations; and last, to the payment of any other indebtedness owed by Borrower to the Lender.  Any excess Collateral or excess proceeds existing after the disposition or liquidation of the Collateral will be returned or paid by the Lender to Borrower.

If any non-cash proceeds are received in connection with any sale of Collateral, the Lender shall not apply such non-cash proceeds to the Obligations unless and until such proceeds are converted to cash.

5.7      Power of Attorney.  Borrower hereby irrevocably constitutes and appoints the Lender as Borrower's true and lawful attorney, with full power of substitution, at the sole cost and expense of Borrower but for the sole benefit of the Lender, upon the occurrence of an Event of Default or after DEMAND with respect to Obligations payable on DEMAND, to convert the Collateral into cash, including, without limitation, completing the manufacture or processing of work in process, and the sale (either public or private) of all or any portion or portions of the inventory and other Collateral; to enforce collection of the Collateral, either in its own name or in the name of Borrower, including, without limitation, executing releases or waivers, compromising or settling with any Debtors and prosecuting, defending, compromising or releasing any action relating to the Collateral; to receive, open and dispose of all mail addressed to Borrower and to take therefrom any remittances or proceeds of Collateral in which the Lender has a security interest; to notify Post Office authorities to change the address for delivery of mail addressed to Borrower to such address as the Lender shall designate; to endorse the name of Borrower in favor of the Lender upon any and all checks, drafts, money orders, notes, acceptances or other

Sugarloaf Holdings CR125253

instruments of the same or different nature; to sign and endorse the name of Borrower on and to receive as secured party any of the Collateral, any invoices, freight or express receipts, or bills of lading, storage receipts, warehouse receipts, or other documents of title of the same or different nature relating to the Collateral; to sign the name of Borrower on any notice of the Debtors or on verification of the Collateral; and to sign, if necessary, and file or record on behalf of Borrower any financing or other statement in order to perfect or protect the Lender's security interest. The Lender shall not be obliged to do any of the acts or exercise any of the powers hereinabove authorized, but if the Lender elects to do any such act or exercise any such power, it shall not be accountable for more than it actually receives as a result of such exercise of power, and it shall not be responsible to Borrower except for its own gross negligence or willful misconduct. All powers conferred upon the Lender by this Agreement, being coupled with an interest, shall be irrevocable so long as any Obligation of Borrower or any guarantor or surety to the Lender shall remain unpaid or the Lender is obligated under this Agreement to extend any credit to Borrower.

5.8      Nonexclusive Remedies.   All of the Lender's rights and remedies not only under the provisions of this Agreement but also under any other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Lender at such time or times and in such order of preference as the Lender in its sole discretion may determine. No course of dealing and no delay or omission on the part of Lender in exercising any right hereunder shall operate as a waiver of such right or any other right and waiver on any one or more occasions shall not be construed as a bar to or waiver of any right or remedy of Lender on any future occasion.

## 6.      MISCELLANEOUS

6.1      Waivers.   Borrower waives notice of intent to accelerate, notice of acceleration, notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations, and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof.

6.2      Waiver of Homestead.   To the maximum extent permitted under applicable law, Borrower hereby waives and terminates any homestead rights and/or exemptions respecting any of its property under the provisions of any applicable homestead laws, including without limitation, Utah Code 78-23-4 and hereby agrees not to file a declaration of homestead under Utah Code 78-23-4.

6.3      Deposit Collateral.   Borrower hereby grants to the Lender a continuing lien and security interest in any and all deposits or other sums at any time credited by or due from the Lender to Borrower and any cash, securities, instruments or other property of Borrower in the possession of the Lender, including all accounts Borrower holds jointly with others, whether for safekeeping or otherwise, or in transit to or from the Lender (regardless of the reason the Lender had received the same or whether the Lender has conditionally released the same) as security for the full and punctual payment and performance of all of the liabilities and obligations of Borrower to the Lender and such deposits and other sums may be applied or set off against such liabilities and obligations of Borrower to the Lender at any time, whether or not such are then due, whether or not demand has been made and whether or not other collateral is then available to the Lender.

6.4      Assignment of Borrower's Rights in the Livestock.   If the livestock or any portion or portions thereof become infected by disease or are destroyed by order of any local, state or federal authority, and, by reason thereof, Borrower is entitled to be indemnified by such authority, such Borrower hereby assigns to the Lender any and all such sums due from such authority, and the Lender is hereby authorized to receive, collect and sue for the same, and such Borrower hereby orders and directs that any such sums be paid directly to the Lender.

6.5      Disposal of Documents.   All documents, schedules, invoices or other papers received by the Lender from Borrower may be destroyed or disposed of 6 months after receipt by the Lender.

6.6        Telephone Recording. Borrower agrees that the Lender may electronically record all telephone conversations between Borrower and the Lender with respect to any transaction and that any such recording may be submitted in evidence in any arbitration or other legal proceeding. Such recording shall be deemed to be conclusive evidence as to the terms of any transaction in the event of a dispute.

6.7        Indemnification. Borrower shall indemnify, defend and hold the Lender and its directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless of and from any claim brought or threatened against any Indemnitee by Borrower, any guarantor or endorser of the Obligations, or any other Person (as well as from reasonable attorneys' fees and expenses in connection therewith) on account of the Lender's relationship with Borrower, or any guarantor or endorser of the Obligations (each of which may be defended, compromised, settled or pursued by the Lender with counsel of the Lender's election, but at the expense of Borrower), except for any claim arising out of the gross negligence or willful misconduct of the Lender. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Lender in favor of Borrower.

6.8        Fees. Borrower will reimburse to the Lender the amount of all escrow, recordation and appraisal fees, title guaranty or insurance premiums, closing costs and all other out-of-pocket expenses incurred by the Lender. Any such fees, premiums, costs or out-of-pocket expenses not paid prior to or at closing shall be paid within 30 of days of receipt of invoice from Lender.

6.9        Costs and Expenses. Borrower shall pay to the Lender on demand any and all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements, court costs, litigation and other expenses) incurred or paid by the Lender in establishing, maintaining, protecting or enforcing any of the Lender's rights or the Obligations, including, without limitation, any and all such costs and expenses incurred or paid by the Lender in defending the Lender's security interest in, title or right to the Collateral or in collecting or attempting to collect or enforcing or attempting to enforce payment of the Obligations.

6.10       Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which shall constitute but one agreement.

6.11       Severability. If any provision of this Agreement or portion of such provision or the application thereof to any Person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement (or the remainder of such provision) and the application thereof to other Persons or circumstances shall not be affected thereby.

6.12       Headings. The headings herein set forth are solely for the purpose of identification and have no legal significance.

6.13       Conflicting Provisions.   To the extent the provisions contained in this Agreement are inconsistent with those contained in any other document, instrument or agreement executed pursuant hereto, the terms and provisions contained herein shall control.  Otherwise, such provisions shall be considered cumulative.

6.14       Complete Agreement. This Agreement and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter. This Agreement may be amended only by an instrument in writing signed by Borrower and Lender.

6.15       Accuracy of Financial Statements. All financial statements, information and other data which may have been or which may hereafter be submitted by Borrower to the Lender are true, accurate and correct and have been or will be prepared in accordance with generally accepted accounting principles consistently applied and accurately represent the financial condition or, as applicable, the other information disclosed therein.  Since the most recent submission of such financial information or data to

the Lender, Borrower represents and warrants that no material adverse change in Borrower's financial condition or operations has occurred which has not been fully disclosed to the Lender in writing.

6.16      Binding Effect of Agreement. This Agreement shall be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Lender shall be entitled to rely thereon) until released in writing by the Lender. The Lender may transfer and assign this Agreement and deliver the Collateral to the assignee, who shall thereupon have all of the rights of the Lender; and the Lender shall then be relieved and discharged of any responsibility or liability with respect to this Agreement and the Collateral. Borrower may not assign or transfer any of its rights or obligations under this Agreement. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

6.17      Further Assurances. Borrower will from time to time execute and deliver to Lender such documents, and take or cause to be taken, all such other or further action, as Lender may request in order to effect and confirm or vest more securely in Lender all rights contemplated by this Agreement and the other Loan Documents (including, without limitation, to correct clerical errors) or to vest more fully in or assure to the Lender the security interest in the Collateral granted to the Lender by this Agreement or to comply with applicable statute or law and to facilitate the collection of the Collateral (including, without limitation, the execution of stock transfer orders and stock powers, endorsement of promissory notes and instruments and notifications to obligors on the Collateral). To the extent permitted by applicable law, Borrower authorizes the Lender to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed at any time in any jurisdiction. Lender may at any time and from time to time file financing statements, continuation statements and amendments thereto which contain any information required by the Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower. Borrower agrees to furnish any such information to Lender promptly upon request. In addition, Borrower shall at any time and from time to time take such steps as Lender may reasonably request for Lender (i) to obtain an acknowledgment, in form and substance satisfactory to Lender, of any bailee having possession of any of the Collateral that the bailee holds such Collateral for Lender, (ii) to obtain "control" (as defined in the Code) of any Collateral comprised of deposit accounts, electronic chattel paper, letter of credit rights or investment property, with any agreements establishing control to be in form and substance satisfactory to Lender, and (iii) otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and the preservation of its rights therein. Borrower hereby constitutes Lender its attorney-in-fact to execute, if necessary, and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Agreement terminates in accordance with its terms, all Obligations are irrevocably paid in full and the Collateral is released.

6.18      Terms of Agreement. This Agreement shall continue in full force and effect so long as any Obligations or obligation of Borrower to Lender shall be outstanding, or the Lender shall have any obligation to extend any financial accommodation hereunder, and is supplementary to each and every other agreement between Borrower and Lender and shall not be so construed as to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower under any such agreement, nor shall any contemporaneous or subsequent agreement between Borrower and the Lender be construed to limit or otherwise derogate from any of the rights or remedies of Lender or any of the liabilities, obligations or undertakings of Borrower hereunder, unless such other agreement specifically refers to this Agreement and expressly so provides.

6.19      Notices. Any notice under or pursuant to this Agreement shall be a signed writing or other authenticated record (within the meaning of Article 9 of the Code). Any notices or other documents sent under or pursuant to this Agreement shall be deemed duly received and effective if delivered in hand to any officer or agent of Borrower or Lender, or if mailed by registered or certified mail, return receipt

Sugarloaf Holdings CR125253

requested, addressed to Borrower at 1471 N. 900 West, Lehi, Utah 84043 or Lender at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

6.20      Governing Law.  This Agreement shall be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

6.21      Reproductions.  This Agreement and all documents which have been or may be hereinafter furnished by Borrower to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

6.22      Jurisdiction and Venue.  Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Agreement.  Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.  Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to Borrower's address shown in this Agreement or as notified to the Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

6.23      **JURY WAIVER.   BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

Executed as of **June 15, 2017**.

Borrower:
Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager


Accepted: Bank of the West

By: _____
Name: Amber Neimeyer
Title:  Vice President


Sugarloaf Holdings CR125253

Loan and Security Agreement - Obligor 1(4)                    23

requested, addressed to Borrower at 1471 N. 900 West, Lehi, Utah 84043 or Lender at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

6.20     Governing Law. This Agreement shall be governed by federal law applicable to the Lender and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

6.21     Reproductions. This Agreement and all documents which have been or may be hereinafter furnished by Borrower to the Lender may be reproduced by the Lender by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

6.22     Jurisdiction and Venue. Borrower irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Agreement. Borrower irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum. Borrower hereby consents to any and all process which may be served in any such suit, action or proceeding, (i) by mailing a copy thereof by registered and certified mail, postage prepaid, return receipt requested, to Borrower's address shown in this Agreement or as notified to the Lender and (ii) by serving the same upon Borrower in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Borrower.

6.23     **JURY WAIVER.   BORROWER AND LENDER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. BORROWER CERTIFIES THAT NEITHER THE LENDER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

Executed as of **June 15, 2017**.

Borrower:
Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager

Accepted: Bank of the West

By: _____
Name: Amber Neimeyer
Title:  Vice President

Exhibit "A"

| | Livestock Position Report | | | | |
|---|---|---|---|---|---|
| | Bank of the West | | | | |
| | Sugarloaf Holdings, LLC ("Borrower") | | | | |
| | 05/31/17 | | Prepared By: | Bank - CLOSING | |
| | | | | (if other than signer below) | |
| | | # of Head | Value | Advance Rate | |
| | Livestock | 1,514 | $1,357,925 | 65% | $882,651 |
| | Total Livestock Inventory (see attached reports) | 1,514 | $1,357,925 | | $882,651 |
| | Accounts Receivable < 30 days (see attached report) | | $0 | 85% | $0 |
| | Checkbook Balance | | $0 | 100% | $0 |
| | Commodity Account (net liquidating value of attached commodity statements) | | $0 | 100% | $0 |
| | Less: Accounts Payable (see attached report for detail) | | $0 | 100% | $0 |
| | Total Collateral Value (Lines 1 thru 11) | | $1,357,925 | | |
| | Total Collateral Position (Lines 1 thru 11) | | | | $882,651 |
| | Beginning Loan Balance | | | | $477,488 |
| | Plus: Accrued Interest (verify with Bank) | | | | $0 |
| | Plus: Other | | | | $0 |
| | Less: Payments in Transit | | | | $0 |
| | Loan Balance Adjusted | | | | $477,488 |
| | Collateral Position Excess/(Deficit) (Line 8 minus Line 9) | | | | $405,163 |
| | Collateral Margin (Line 7 minus Line 9) | | | | $880,437 |
| | Loan-to-Collateral Position | | 54.10% | (Line 9 divided by Line 8) | |

Sugarloaf Holdings CR125253

# Exhibit E

4836-7704-4088, v. 1

**Return To:**
Theresa Millier
Bank of the West
CBG-LMO Fresno
6873 N. West Avenue, Suite 102
Fresno, California 93711

**Prepared By:**
Theresa Millier
Bank of the West
CBG-LMO Fresno
6873 N. West Avenue, Suite 102
Fresno, California 93711
Phone: 559-440-4586

**Tax Serial Number(s):** 5888-2, 5889, 5896, 5898, 5899-A, 5918-A, 5918-A-1, 5918-A-3, 5918-A-4, 5919-A, 5919-A-1, 5919-A-2, 5920, 5921, 5922, 5928, 5933, 5936, 5937, 5938-1, 5940, 5957-1, 5958, 5963, 5965, 5966, 5968, 5969, 5970, 5970-1, 5971, 5972, 5974, 5975, 5978, 5979, 5980, 5981, 5985, 5986, 5988, 5993, 6688, 6727, 6729, 6729-1, 6731, 6731-1, 6733, 6766, 6767, 6773, 6773-1, 6773-2, 6774, 6784, 6785, 6786, 6787, 6793, 6793-1, 6793-2, 6798, 6798-2-2, 6798-3-1-1, 6802, 6802-1, 6804, 6804-1, 6804-3-1, 6804-2, 6807-7, 6822, 6823, 6824, 6827, 6829

**00199887**
B: 628 P: 489    Fee $174.00
Connie Hansen, Millard Recorder    Page 1 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Juab Title & Abstract Co.
PO Box 246 Nephi, UT. 84648
(435) 623-0387    Order No. 36133

STATE OF UTAH _____    SPACE ABOVE THIS LINE FOR RECORDING DATE

### DEED OF TRUST, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS

This DEED OF TRUST, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS (this "Deed of Trust") is entered into as of **June 15, 2017**, among **Sugarloaf Holdings, LLC**, a **Utah** limited liability company, with an address of **1471 N. 900 West, Lehi, Utah 84043** (the "Trustor") and Bank of the West, with an address of 6873 N. West Avenue, Suite 102, Fresno, California, 93711 (the "Trustee") for the use and benefit of Bank of the West, a California banking corporation, with an address of 6873 N West Avenue, Suite 102, Fresno, CA 93711 (the "Beneficiary"), and the Beneficiary.

The real property which is the subject matter of this Deed of Trust encumbers certain real property located in Millard County, Utah (the Address(es)") and is more specifically described in the attached Exhibit A.

### 1.    DEED OF TRUST, OBLIGATIONS AND FUTURE ADVANCES

1.1    Deed of Trust.  For valuable consideration paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Trustor hereby irrevocably and unconditionally mortgages, grants, bargains, transfers, sells, conveys, sets over and assigns to the

Sugarloaf Holdings CR125253

00199887
B: 628 P: 490    Fee $174.00
Connie Hansen, Millard Recorder    Page 2 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Trustee and its successors and assigns, IN TRUST, for the benefit and security of the Beneficiary forever, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION, the "Property" described below, to secure the prompt payment and performance of the Obligations (as hereinafter defined), including without limitation, all amounts due and owing to the Beneficiary and all obligations respecting the **Term Note**, in the original principal amount of **$9,565,400.00** dated **June 15, 2017**, by **Sugarloaf Holdings, LLC** in favor of the Beneficiary (the "Note"; and collectively, along with this Deed of Trust and all other agreements, documents, certificates and instruments delivered in connection therewith, the "**Loan Documents**"), and any substitutions, modifications, extensions or amendments to any of the Loan Documents.

The amount of principal obligations outstanding and evidenced by the Loan Documents and secured by this Deed of Trust total **$9,565,400.00**. as of the date of this Deed of Trust (the "Amount"), but this Deed of Trust shall nevertheless secure payment and performance of all Obligations including, without limitation, any other liabilities and future advances, direct or indirect, absolute or contingent, now existing or hereafter arising from Trustor to Beneficiary.

1.2    Security Interest in Property.  As continuing security for the Obligations the Trustor hereby pledges, assigns and grants to the Trustee and its successors and assigns, IN TRUST, for the benefit and security of the Beneficiary, a security interest in all of the Property constituting personal property or fixtures. This Deed of Trust is and shall be deemed to be a security agreement and financing statement pursuant to the terms of the Uniform Commercial Code of Utah (the "Uniform Commercial Code") as to any and all personal property and fixtures and as to all such property the Trustee and its successors and assigns, IN TRUST, for the benefit and security of the Beneficiary shall have the rights and remedies of a secured party under the Uniform Commercial Code in addition to its rights hereunder. This Deed of Trust constitutes a financing statement filed as a fixture filing under Section 70A-9a-502(3) of the Uniform Commercial Code covering any Property which now is or later may become a fixture.

1.3    Collateral Assignment of Leases and Rents.  The Trustor hereby irrevocably and unconditionally assigns to the Trustee, and their successors and assigns, IN TRUST, for the benefit and security of the Beneficiary, as collateral security for the Obligations all of the Trustor's rights and benefits under any and all Leases (as hereinafter defined) and any and all rents and other amounts now or hereafter owing with respect to the Leases or the use or occupancy of the Property. This collateral assignment shall be absolute and effective immediately, but the Trustor shall have a license, revocable by the Beneficiary, to continue to collect rents owing under the Leases until an Event of Default (as hereinafter defined) occurs and the Beneficiary exercises its rights and remedies to collect such rents as set forth herein.

1.4    Conditions to Grant.  The Trustee shall have and hold the above granted Property unto and to the use and benefit of the Beneficiary, and its successors and assigns forever; provided, however, the conveyances, grants and assignments contained in this Deed of Trust are upon the express condition that, if Trustor shall irrevocably pay and perform the Obligations in full, including, without limitation, all principal, interest and premium thereon and other charges, if applicable, in accordance with the terms and conditions in the Loan Documents and this Deed of Trust shall pay and perform all other Obligations as set forth in this Deed of Trust and shall abide by and comply with each and every covenant and condition set forth herein and in the Loan Documents, the conveyances, grants and assignments contained in this Deed of Trust be appropriately released and discharged.

1.5    Property.  The term "Property," as used in this Deed of Trust, shall mean that certain parcel of land and the fixtures, structures and improvements and all personal property constituting fixtures, as that term is defined in the Uniform Commercial Code, now or hereafter thereon located at the Address(es), as more particularly described in Exhibit A attached hereto, together with: (i) all rights now or hereafter existing, belonging, pertaining or appurtenant thereto; (ii) all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); (iii) all judgments, awards of damages and settlements hereafter made as a result or in lieu of any Taking, as hereinafter defined; (iv) all of the rights and benefits of the Trustor under any present or future leases and agreements relating to the Property, including, without limitation, rents, issues and profits, or the use or occupancy thereof together with any extensions and renewals thereof, specifically excluding all duties or obligations of the Trustor of any kind arising thereunder (the "Leases"); and (v) all contracts, permits and licenses respecting the use, operation or maintenance of the Property.

Sugarloaf Holdings CR125253

2

00199887
B: 628 P: 491   Fee $174.00
Connie Hansen, Millard Recorder   Page 3 of 21
06/20/2017 04:37:19 PM   By JUAB TITLE & ABSTRACT CO

1.6   Obligations. The term "Obligation(s)," as used in this Deed of Trust, shall mean all amounts outstanding when due pursuant to the terms of any of the Loan Documents. Said term shall also include all interest and other charges chargeable to the Trustor or due from the Trustor to the Beneficiary from time to time and all advances, costs and expenses referred to in this Deed of Trust, including without limitation the costs and expenses (including reasonable attorney's fees) of enforcement of the Beneficiary's rights hereunder or pursuant to any document or instrument executed in connection herewith. In addition, Obligations shall also include any amounts due and owing, directly or indirectly, to Lender in connection with any rate swap transactions, basis swaps, forward rate transactions, commodity swaps, commodity options, equity or equity index swaps, equity or equity index options, bond options, interest rate options, foreign exchange transactions, cap transactions, floor transactions, collar transactions, forward transactions, currency swap transactions, cross-currency rate swap transactions or currency options, whether now existing or hereafter entered in connection with any indebtedness evidenced by any of the Loan Documents, all of which shall be deemed additional interest or a related expense (in the sole discretion of Lender) due in connection with such underlying indebtedness.

1.7   Future Advances. It is the express intention of the Trustor that this Deed of Trust secure payment and performance of all of the Obligations, whether now existing or hereinafter incurred by reason of future advances by the Beneficiary or otherwise, and regardless of whether such Obligations are or were contemplated by the parties at the time of the granting of this Deed of Trust. Notice of the continuing grant of this Deed of Trust shall not be required to be stated on the face of any document evidencing any of the Obligations, nor shall such documents be required to otherwise specify that they are secured hereby.

## 2.   REPRESENTATIONS, WARRANTIES, COVENANTS

2.1   Representations and Warranties. The Trustor represents and warrants that:

(a)   This Deed of Trust has been duly executed and delivered by the Trustor and is the legal, valid and binding obligation of the Trustor enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally;

(b)   The Trustor is the sole legal owner of the Property, holding good and marketable fee simple title to the Property, subject to no liens, encumbrances, leases, security interests or rights of others, other than as set forth in detail in Exhibit B hereto (the "Permitted Encumbrances");

(c)   The Trustor is the sole legal owner of the entire lessor's interest in Leases, if any, with full power and authority to encumber the Property in the manner set forth herein, and the Trustor has not executed any other assignment of Leases or any of the rights or rents arising thereunder;

(d)   As of the date hereof, there are no Hazardous Substances (as hereinafter defined) in, on or under the Property, except as disclosed in writing to and acknowledged by the Beneficiary; and

(e)   Each Obligation is a commercial obligation and does not represent a loan used for personal, family or household purposes and is not a consumer transaction.

2.2   Recording; Further Assurances. The Trustor covenants that it shall, at its sole cost and expense and upon the request of the Beneficiary, cause this Deed of Trust, and each amendment, modification or supplement hereto, to be recorded and filed in such manner and in such places, and shall at all times comply with all such statutes and regulations as may be required by law in order to establish, preserve and protect the interest of the Beneficiary in the Property and the rights of the Beneficiary under this Deed of Trust. Trustor will from time to time execute and deliver to the Beneficiary such documents, and take or cause to be taken, all such other or further action, as the Beneficiary may request in order to effect and confirm or vest more securely in the Beneficiary all rights contemplated by this Deed of Trust (including, without limitation, to correct clerical errors) or to vest more fully in, or assure to the Beneficiary the security interest in, the Property or to comply with applicable statute or law. To the extent permitted by applicable law, Trustor authorizes the Beneficiary to file financing statements, continuation statements or amendments, and any such financing statements, continuation statements or amendments may be filed

Sugarloaf Holdings CR125253

3

00199887
B: 628 P: 492    Fee $174.00
Connie Hansen; Millard Recorder    Page 4 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

at any time in any jurisdiction. The Beneficiary may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Property as defined in this Deed of Trust and which contain any other information required by Article 9 of the Uniform Commercial Code for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Trustor is an organization, the type of organization and any organization identification number issued to Trustor; Trustor also authorizes the Beneficiary to file financing statements describing any agricultural liens or other statutory liens held by the Beneficiary. Trustor agrees to furnish any such information to the Beneficiary promptly upon request. In addition, Trustor shall at any time and from time to time, take such steps as the Beneficiary may reasonably request for the Beneficiary (i) to obtain an acknowledgment, in form and substance satisfactory to the Beneficiary, of any bailee having possession of any of the Property that the bailee holds such Property for the Beneficiary, and (ii) otherwise to insure the continued perfection and priority of the Beneficiary's security interest in any of the Property and the preservation of its rights therein. Trustor hereby constitutes the Beneficiary its attorney-in-fact to execute and file all filings required or so requested for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed; and such power, being coupled with an interest, shall be irrevocable until this Deed of Trust terminates in accordance with its terms, all Obligations are paid in full and the Property is released.

2.3    Restrictions on the Trustor. The Trustor covenants that it will not, nor will it permit any other person to, directly or indirectly, without the prior written approval of the Beneficiary in each instance:

(a)    Sell, convey, assign, transfer, mortgage, pledge, hypothecate, lease or dispose of all or any part of any legal or beneficial interest in the Trustor or the Property or any part thereof or permit any of the foregoing, except as expressly permitted by the terms of this Deed of Trust;

(b)    Permit the use, generation, treatment, storage, release or disposition of any oil or other material or substance constituting hazardous waste or hazardous materials or substances under any applicable Federal or state law, regulation or rule ("Hazardous Substances"); or

(c)    Permit to be created or suffer to exist any mortgage, lien, security interest, attachment or other encumbrance or charge on the Property or any part thereof or interest therein (except for the Permitted Encumbrances), including, without limitation, (i) any lien arising under any Federal, state or local statute, rule, regulation or law pertaining to the release or cleanup of Hazardous Substances and (ii) any mechanics' or materialmen's lien. The Trustor further agrees to give the Beneficiary prompt written notice of the imposition, or notice, of any lien referred to in this Section and to take any action necessary to secure the prompt discharge or release of the same. The Trustor agrees to defend its title to the Property and the Beneficiary's interest therein against the claims of all persons and, unless the Beneficiary requests otherwise, to appear in and diligently contest, at the Trustor's sole cost and expense, any action or proceeding that purports to affect the Trustor's title to the Property or the priority or validity of this Deed of Trust or the Beneficiary's interest hereunder.

2.4    Operation of Property. The Trustor covenants and agrees as follows:

(a)    The Trustor will not permit the Property to be used for any unlawful or improper purpose, will at all times comply with all Federal, state and local laws, ordinances and regulations, and the provisions of any Lease, easement or other agreement affecting all or any part of the Property, and will obtain and maintain all governmental or other approvals relating to the Trustor, the Property or the use thereof, including without limitation, any applicable zoning or building codes or regulations and any laws or regulations relating to the handling, storage, release or cleanup of Hazardous Substances, and will give prompt written notice to the Beneficiary of (i) any violation of any such law, ordinance or regulation by the Trustor or relating to the Property, (ii) receipt of notice from any Federal, state or local authority alleging any such violation and (iii) the presence or release on the Property of any Hazardous Substances;

(b)    The Trustor will at all times keep the Property insured for such losses or damage, in such amounts and by such companies as may be required by law and which the Beneficiary may require, provided that, in any case, the Trustor shall maintain: (i) physical hazard insurance on an "all risks" basis in an amount not less than 100% of the full replacement cost of the

Sugarloaf Holdings CR125253

4

00199887
B: 628 P: 493     Fee $174.00
Connie Hansen, Millard Recorder      Page 5 of 21
06/20/2017 04:37:19 PM   By JUAB TITLE & ABSTRACT CO

Property; (ii) flood insurance if and as required by applicable Federal law and as otherwise required by the Beneficiary; (iii) comprehensive commercial general liability insurance; (iv) rent loss and business interruption insurance; and (v) such other insurance as the Beneficiary may require from time to time, including builder's risk insurance in the case of construction loans. All policies regarding such insurance shall be issued by companies licensed to do business in the state where the policy is issued and also in the state where the Property is located, be otherwise acceptable to the Beneficiary, provide deductible amounts acceptable to the Beneficiary, name the Beneficiary as mortgagee, loss payee and additional insured, and provide that no cancellation or material modification of such policies shall occur without at least 30 days prior written notice to the Beneficiary. Such policies shall include (i) a mortgage endorsement determined by the Beneficiary in good faith to be equivalent to the "standard" mortgage endorsement so that the insurance, as to the interest of the Beneficiary, shall not be invalidated by any act or neglect of the Trustor or the owner of the Property, any foreclosure or other proceedings or notice of sale relating to the Property, any change in the title to or ownership of the Property, or the occupation or use of the Property for purposes more hazardous than are permitted at the date of inception of such insurance policies; (ii) a replacement cost endorsement; (iii) an agreed amount endorsement; (iv) a contingent liability from operation endorsement; and (v) such other endorsements as the Beneficiary may request. The Trustor will furnish to the Beneficiary upon request such original policies, certificates of insurance or other evidence of the foregoing as are acceptable to the Beneficiary. The terms of all insurance policies shall be such that no coinsurance provisions apply, or if a policy does contain a coinsurance provision, the Trustor shall insure the Property in an amount sufficient to prevent the application of the coinsurance provisions;

(c)   Trustor will not enter into or modify the Leases in any material respect without the prior written consent of the Beneficiary, execute any assignment of the Leases except in favor of the Beneficiary, or accept any rentals under any Lease for more than one month in advance and will at all times perform and fulfill every term and condition of the Leases;

(d)   Trustor will at all times (i) maintain complete and accurate records and books regarding the Property in accordance with generally accepted accounting principles and (ii) permit the Beneficiary and the Beneficiary's agents, employees and representatives, at such reasonable times as the Beneficiary may request, to enter and inspect the Property and such books and records; and

(e)   Trustor will at all times keep the Property in good and first-rate repair and condition (damage from casualty not excepted) and will not commit or permit any strip, waste, impairment, deterioration or alteration of the Property or any part thereof.

2.5   Payments. The Trustor covenants to pay when due: all Federal, state, municipal, real property and other taxes, betterment and improvement assessments and other governmental levies, water rates, sewer charges, insurance premiums and other charges on the Property, this Deed of Trust or any Obligation secured hereby that could, if unpaid, result in a lien on the Property or on any interest therein. If and when requested by the Beneficiary, the Trustor shall deposit from time to time with the Beneficiary sums determined by the Beneficiary to be sufficient to pay when due the amounts referred to in this Section. The Trustor shall have the right to contest any notice, lien, encumbrance, claim, tax, charge, betterment assessment or premium filed or asserted against or relating to the Property; provided that it contests the same diligently and in good faith and by proper proceedings and, at the Beneficiary's request, provides the Beneficiary with adequate cash security, in the Beneficiary's reasonable judgment, against the enforcement thereof. The Trustor shall furnish to the Beneficiary the receipted real estate tax bills or other evidence of payment of real estate taxes for the Property within 30 days prior to the date from which interest or penalty would accrue for nonpayment thereof. The Trustor shall also furnish to the Beneficiary evidence of all other payments referred to above within fifteen (15) days after written request therefor by the Beneficiary. If Trustor shall fail to pay such sums, the Beneficiary may, but shall not be obligated to, advance such sums. Any sums so advanced by the Beneficiary shall be added to the Obligations, shall bear interest at the highest rate specified in any note evidencing the Obligations, and shall be secured by the lien of this Deed of Trust.

Sugarloaf Holdings CR125253

5

00199887
B: 628 P: 494      Fee $174.00
Connie Hansen, Millard Recorder      Page 6 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

2.6     Notices; Notice of Default.  The Trustor will deliver to the Beneficiary, promptly upon receipt of the same, copies of all notices or other documents it receives that affect the Property or its use, or claim that the Trustor is in default in the performance or observance of any of the terms hereof or that the Trustor or any tenant is in default of any terms of the Leases.  The Trustor further agrees to deliver to the Beneficiary written notice promptly upon the occurrence of any Event of Default hereunder or event that with the giving of notice or lapse of time, or both, would constitute an Event of Default hereunder.

2.7     Takings.  In case of any condemnation or expropriation for public use of, or any damage by reason of the action of any public or governmental entity or authority to, all or any part of the Property (a "Taking"), or the commencement of any proceedings or negotiations that might result in a Taking, the Trustor shall immediately give written notice to the Beneficiary, describing the nature and extent thereof. The Beneficiary may, at its option, appear in any proceeding for a Taking or any negotiations relating to a Taking and the Trustor shall immediately give to the Beneficiary copies of all notices, pleadings, determinations and other papers relating thereto.  The Trustor shall in good faith and with due diligence and by proper proceedings file and prosecute its claims for any award or payment on account of any Taking.  The Trustor shall not settle any such claim without the Beneficiary's prior written consent.  The Trustor shall hold any amounts received with respect to such awards or claims, by settlement, judicial decree or otherwise, in trust for the Beneficiary and immediately pay the same to the Beneficiary.  The Trustor authorizes any award or settlement due in connection with a Taking to be paid directly to the Beneficiary in amounts not exceeding the Obligations.  The Beneficiary may apply such amounts to the Obligations in such order as the Beneficiary may determine.

2.8     Insurance Proceeds.  The proceeds of any insurance resulting from any loss with respect to the Property shall be paid to the Beneficiary and, at the option of the Beneficiary, be applied to the Obligations in such order as the Beneficiary may determine; provided, however, that if the Beneficiary shall require repair of the Property, the Beneficiary may release all or any portion of such proceeds to the Trustor for such purpose.  Any insurance proceeds paid to the Trustor shall be held in trust for the Beneficiary and promptly paid to it.

## 3.     CERTAIN RIGHTS OF THE BENEFICIARY

3.1     Legal Proceedings.  The Beneficiary shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding that, in the Beneficiary's reasonable judgment, might affect the Property or any of the rights created or secured by this Deed of Trust.  The Beneficiary shall have such right whether or not there shall have occurred an Event of Default hereunder.

3.2     Appraisals/Assessments.  The Beneficiary shall have the right, at the Trustor's sole cost and expense, to obtain appraisals, environmental site assessments or other inspections of the portions of the Property that are real estate at such times as the Beneficiary deems necessary or as may be required by applicable law, or its prevailing credit or underwriting policies.

3.3     Financial Statements.  The Beneficiary shall have the right, at the Trustor's sole cost and expense, to require delivery of financial statements in form and substance acceptable to the Beneficiary from the Trustor or any guarantor of any of the Obligations and the Trustor hereby agrees to deliver such financial statements and/or cause any such guarantor to so deliver any such financial statement when required by the Beneficiary.

3.4     Substitution of Trustee.  The Beneficiary may from time to time, without notice to the Trustor or Trustee and with or without cause and with or without the resignation of Trustee, substitute a successor or successors to the Trustee named herein or acting hereunder.  Upon such appointment, the successor trustee shall be vested with all title, powers and duties conferred upon the Trustee named herein or acting hereunder.  Each such appointment and substitution shall be made by a writing executed by Beneficiary and when duly recorded in the appropriate office of the County Recorder of each county in which the Property is situated shall be conclusive proof of proper appointment of such successor Trustee.  The procedure herein provided for substitution of the Trustee shall be conclusive of all other provisions for substitution, statutory or otherwise.

Sugarloaf Holdings CR125253

00199887
B: 628 P: 495 Fee $174.00
Connie Hansen, Millard Recorder Page 7 of 21
06/20/2017 04:37:19 PM By JUAB TITLE & ABSTRACT CO

## 4. DEFAULTS AND REMEDIES

**4.1 Events of Default.** "Event of Default" shall mean default of any liability, obligation, covenant or undertaking of the Trustor or the occurrence of an event of default under this Deed of Trust or any of the other Loan Documents including without limitation under any note evidencing any of the Obligations and, with respect to any Obligation due and payable on DEMAND, the failure of any such Obligation to be paid upon DEMAND.

**4.2 Remedies.** On the occurrence of any Event of Default the Beneficiary may, at any time thereafter, at its option and, to the extent permitted by applicable law, without notice, exercise any or all of the following remedies:

(a) Declare the Obligations due and payable, and the Obligations shall thereupon become immediately due and payable, without presentment, protest, demand or notice of any kind, all of which are hereby expressly waived by the Trustor except for Obligations due and payable on demand, which shall be due and payable on demand whether or not an event of default has occurred hereunder;

(b) Direct the Trustee to, or enter, take possession of, manage and operate the Property (including all personal property and all records and documents pertaining thereto) and any part thereof and exclude the Trustor therefrom, take all actions it deems necessary or proper to preserve the Property and operate the Property as a mortgagee in possession with all the powers as could be exercised by a receiver or as otherwise provided herein or by applicable law; provided, however, the entry by the Beneficiary upon the Property for any reason shall not cause the Trustee or the Beneficiary to be a mortgagee in possession, except upon the express written declaration of the Beneficiary;

(c) With or without taking possession, receive and collect all rents, income, issues and profits ("Rents") from the Property (including all real estate and personal property and whether past due or thereafter accruing), including as may arise under the Leases, and the Trustor appoints the Beneficiary as its true and lawful attorney with the power for the Beneficiary in its own name and capacity to demand and collect Rents and take any action that the Trustor is authorized to take under the Leases. The Beneficiary shall (after payment of all costs and expenses incurred) apply any Rents received by it to the Obligations in such order as the Beneficiary determines, or in accordance with any applicable statute, and the Trustor agrees that exercise of such rights and disposition of such funds shall not be deemed to cure any default or constitute a waiver of any foreclosure once commenced nor preclude the later commencement of foreclosure for breach thereof. The Beneficiary shall be liable to account only for such Rents actually received by the Beneficiary. Lessees under the Leases are hereby authorized and directed, following notice from the Beneficiary, to pay all amounts due the Trustor under the Leases to the Beneficiary, whereupon such lessees shall be relieved of any and all duty and obligation to the Trustor with respect to such payments so made;

(d) In addition to any other remedies, to sell the Property or any part thereof or interest therein pursuant to exercise of its power of sale set out in Section 57-1-23 of the Utah Code or otherwise at public auction on terms and conditions as the Beneficiary may determine, or otherwise foreclose this Deed of Trust in any manner permitted by law, and upon such sale the Trustor shall execute and deliver such instruments as the Beneficiary may request in order to convey and transfer all of the Trustor's interest in the Property, and the same shall operate to divest all rights, title and interest of the Trustor in and to the Property. In the event this Deed of Trust shall include more than one parcel of property or subdivision (each hereinafter called a "portion"), the Beneficiary shall, in its sole and exclusive discretion and to the extent permitted by applicable law, be empowered to foreclose upon any such portion without impairing its right to foreclose subsequently upon any other portion or the entirety of the Property from time to time thereafter. In addition, the Beneficiary may in its sole and exclusive discretion subordinate this Deed of Trust to one or more Leases for the sole purpose of preserving any such Lease in the event of a foreclosure;

(e) Cause one or more environmental assessments to be taken, arrange for the cleanup of any

Sugarloaf Holdings CR125253

00199887
B: 628 P: 496   Fee $174.00
Connie Hansen, Millard Recorder   Page 8 of 21
06/20/2017 04:37:19 PM   By JUAB TITLE & ABSTRACT CO

Hazardous Substances or otherwise cure the Trustor's failure to comply with any statute, regulation or ordinance relating to the presence or cleanup of Hazardous Substances, and the Trustor shall provide the Beneficiary or its agents with access to the Property for such purposes; provided that the exercise of any of such remedies shall not be deemed to have relieved the Trustor from any responsibility therefor or given the Beneficiary "control" over the Property or cause the Beneficiary to be considered to be a mortgagee in possession, "owner" or "operator" of the Property for purposes of any applicable law, rule or regulation pertaining to Hazardous Substances; and

(f)   Take such other actions or proceedings as the Beneficiary deems necessary or advisable to protect its interest in the Property and ensure payment and performance of the Obligations, including, without limitation, appointment of a receiver (and the Trustor hereby waives any right to object to such appointment) and exercise of any of the Beneficiary's remedies provided herein or in any other document evidencing, securing or relating to any of the Obligations or available to a secured party under the Uniform Commercial Code, Chapter 1 of Title 57 of the Utah Code, or under other applicable law.

In addition, the Trustee and the Beneficiary shall have all other remedies provided by applicable law, including, without limitation, the right to pursue a judicial sale of the Property or any portion thereof by deed, assignment or otherwise.

The Trustor agrees and acknowledges that the acceptance by the Trustee or the Beneficiary of any payments from either the Trustor or any guarantor after the occurrence of any Event of Default, the exercise by the Trustee or the Beneficiary of any remedy set forth herein or the commencement, discontinuance or abandonment of foreclosure proceedings against the Property shall not waive the Trustee's or the Beneficiary's subsequent or concurrent right to foreclose or operate as a bar or estoppel to the exercise of any other rights or remedies of the Trustee or the Beneficiary. The Trustor agrees and acknowledges that the Trustee or the Beneficiary, by making payments or incurring costs described herein, shall be subrogated to any right of the Trustor to seek reimbursement from any third parties, including, without limitation, any predecessor in interest to the Trustor's title or other party who may be responsible under any law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances.

4.3   Advances. If the Trustor fails to pay or perform any of its obligations respecting the Property, the Beneficiary may in its sole discretion do so without waiving or releasing Trustor from any such obligation. Any such payments may include, but are not limited to, payments for taxes, assessments and other governmental levies, water rates, insurance premiums, maintenance, repairs or improvements constituting part of the Property. Any amounts paid by the Beneficiary hereunder shall be, until reimbursed by the Trustor, part of the Obligations and secured by this Deed of Trust, and shall be due and payable to the Beneficiary, on demand, together with interest thereon to the extent permitted by applicable law, at the highest rate permitted under any of the notes evidencing the Obligations.

4.4   Cumulative Rights and Remedies. All of the foregoing rights, remedies and options (including without limitation the right to enter and take possession of the Property, the right to manage and operate the same, and the right to collect Rents, in each case whether by a receiver or otherwise) are cumulative and in addition to any rights the Beneficiary might otherwise have, whether at law or by agreement, and may be exercised separately or concurrently and none of which shall be exclusive of any other. The Trustor further agrees that the Trustee and the Beneficiary may exercise any or all of its rights or remedies set forth herein without having to pay the Trustor any sums for use or occupancy of the Property.

4.5   Trustor's Waiver of Certain Rights. To the extent permitted by applicable law, the Trustor hereby waives the benefit of all present and future laws (i) providing for any appraisal before sale of all or any portion of the Property or (ii) in any way extending the time for the enforcement of the collection of the Obligations or creating or extending a period of redemption from any sale made hereunder.

4.6   Transfer of Title. Upon the completion of any sale or sales of any Property, Trustee shall execute and deliver to the accepted purchaser or purchasers a good and sufficient deed of conveyance or

Sugarloaf Holdings CR125253

8

00199887
B: 628 P: 497    Fee $174.00        Page 9 of 21
Connie Hansen, Millard Recorder
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

assignment and transfer, lawfully conveying, assigning, and transferring the Property sold, but without any covenant or warranty, express or implied.

4.7   Effect of Sale. Any sale or sales made by virtue of or under this Deed of Trust, whether under any power of sale herein granted or through judicial proceedings, shall, to the fullest extent permitted by law, operate to divest all right, title, estate, interest, claim, and demand whatsoever, either at law or in equity, of Trustor in and to the property so sold, or any part thereof from, through or under Trustor, its successors and assigns.  The receipt by Trustee of such purchase money shall be full and sufficient discharge to any purchaser of the Property or any part thereof sold as aforesaid for the purchase money; and no purchaser or his representatives, grantees or assigns after paying such purchase money, shall be bound to see to the application of such purchase money upon or for any trust or purpose of this Deed of Trust, or in any manner whatsoever be answerable for any loss, misapplication or non-application of any such purchase money or be bound to inquire as to the authorization, necessity, expedience or regularity of any such sale.

4.8   Reconveyance. Upon written request of the Beneficiary and surrender of this Deed of Trust and any Notes to Trustee for cancellation or endorsement, and upon payment of its fees and charges, Trustee shall reconvey, without warranty, all or any part of the Property then subject to this Deed of Trust.  Any reconveyance, whether full or partial, shall be made to the person or persons legally entitled thereto, and the recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.

## 5.   MISCELLANEOUS

5.1   Costs and Expenses. To the extent permitted by applicable law, the Trustor shall pay to the Trustee and the Beneficiary, on demand, all reasonable expenses (including attorneys' fees and expenses and reasonable consulting, accounting, appraisal, brokerage and similar professional fees and charges) incurred by the Trustee and the Beneficiary in connection with the Trustee's and the Beneficiary's interpretation, recordation of this Deed of Trust, exercise, preservation or enforcement of any of its rights, remedies and options set forth in this Deed of Trust and in connection with any litigation, proceeding or dispute whether arising hereunder or otherwise relating to the Obligations, together with interest thereon to the extent permitted by applicable law, until paid in full by the Trustor at the highest rate set forth in any of the notes evidencing the Obligations. Any amounts owed by the Trustor hereunder shall be, until paid, part of the Obligations and secured by this Deed of Trust, and the Beneficiary shall be entitled, to the extent permitted by law, to receive and retain such amounts in any action for a deficiency against or redemption by the Trustor, or any accounting for the proceeds of a foreclosure sale or of insurance proceeds.

5.2   Indemnification Regarding Leases. The Trustor hereby agrees to defend, and does hereby indemnify and hold the Beneficiary, Trustee, and each of their respective directors, officers, employees, agents and attorneys (each an "Indemnitee") harmless from all losses, damages, claims, costs or expenses (including attorneys' fees and expenses) resulting from the assignment of the Leases and from all demands that may be asserted against such Indemnitees arising from any undertakings on the part of the Beneficiary to perform any obligations under the Leases. It is understood that the assignment of the Leases shall not operate to place responsibility for the control or management of the Property upon the Beneficiary or any Indemnitee or make them liable for performance of any of the obligations of the Trustor under Leases, respecting any condition of the Property or any other agreement or arrangement, written or oral, or applicable law.

5.3   Indemnification Regarding Hazardous Substances. The Trustor hereby agrees to defend, and does hereby indemnify and hold harmless each Indemnitee from and against any and all losses, damages, claims, costs or expenses, including, without limitation, litigation costs and attorneys' fees and damages, claims, costs or expenses of any environmental engineering or cleanup firm incurred by such Indemnitee and arising out of or in connection with the Property or resulting from the application of any current or future law, regulation or ordinance relating to the presence or cleanup of Hazardous Substances on or affecting the Property.  The Trustor agrees its obligations hereunder shall be continuous and shall survive termination or discharge of this Deed of Trust and/or the repayment of all debts to the Beneficiary including repayment of all Obligations.

Sugarloaf Holdings CR125253

00199887
B: 628 P: 498    Fee $174.00
Connie Hansen, Millard Recorder        Page 10 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

5.4    Indemnitee's Expenses. If any Indemnitee is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Deed of Trust or the Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use thereof by the Trustor or other person or entity, then the Trustor shall indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. The within indemnification shall survive payment of the Obligations, and/or any termination, release or discharge executed by the Beneficiary in favor of the Trustor.

5.5    Waivers. The Trustor waives notice of nonpayment, demand, presentment, protest or notice of protest of the Obligations and all other notices, consents to any renewals or extensions of time of payment thereof, and generally waives any and all suretyship defenses and defenses in the nature thereof. No delay or omission of the Beneficiary in exercising or enforcing any of its rights, powers, privileges, remedies, immunities or discretion (all of which are hereinafter collectively referred to as "the Beneficiary's rights and remedies") hereunder shall constitute a waiver thereof; and no waiver by the Beneficiary of any default of the Trustor hereunder or of any demand shall operate as a waiver of any other default hereunder or of any other demand. No term or provision hereof shall be waived, altered or modified except with the prior written consent of the Beneficiary, which consent makes explicit reference to this Deed of Trust. Except as provided in the preceding sentence, no other agreement or transaction, of whatsoever nature, entered into between the Beneficiary and the Trustor at any time (whether before, during or after the effective date or term of this Deed of Trust) shall be construed as a waiver, modification or limitation of any of the Beneficiary's rights and remedies under this Deed of Trust (nor shall anything in this Deed of Trust be construed as a waiver, modification or limitation of any of the Beneficiary's rights and remedies under any such other agreement or transaction) but all the Beneficiary's rights and remedies not only under the provisions of this Deed of Trust but also under any such other agreement or transaction shall be cumulative and not alternative or exclusive, and may be exercised by the Beneficiary at such time or times and in such order of preference as the Beneficiary in its sole discretion may determine.

5.6    Waiver of Homestead. To the maximum extent permitted under applicable law, the Trustor hereby waives and terminates any homestead rights and/or exemptions respecting the Property under the provisions of any applicable homestead laws, including without limitation, Utah Code 78-23-4 and hereby agrees not to file a declaration of homestead under Utah Code 78-23-4.

5.7    Joint and Several. If there is more than one Trustor, each of them shall be jointly and severally liable for payment and/or performance of all obligations secured by this Deed of Trust and the term "Trustor" shall include each as well as all of them.

5.8    Severability. If any provision of this Deed of Trust or portion of such provision or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Deed of Trust (or the remainder of such provision) and the application thereof to other persons or circumstances shall not be affected thereby.

5.9    Complete Agreement. This Deed of Trust and the other Loan Documents constitute the entire agreement and understanding between and among the parties hereto relating to the subject matter hereof, and supersedes all prior proposals, negotiations, agreements and understandings among the parties hereto with respect to such subject matter.

5.10    Binding Effect of Agreement. This Deed of Trust shall run with the land and be binding upon and inure to the benefit of the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, and shall remain in full force and effect (and the Beneficiary shall be entitled to rely thereon) until all Obligations are fully and indefeasibly paid. The Beneficiary may transfer and assign this Deed of Trust and deliver any collateral to the assignee, who shall thereupon have all of the rights of the Beneficiary; and the Beneficiary shall then be relieved and discharged of any responsibility or liability with respect to this Deed of Trust and such collateral. Except as expressly provided herein or in the other Loan Documents, nothing, expressed or implied, is intended to confer upon any party, other than the parties hereto, any rights, remedies, obligations or liabilities under or by reason of this Deed of Trust or the other Loan Documents.

Sugarloaf Holdings CR125253

5.11    Notices.  Any notices under or pursuant to this Deed of Trust shall be deemed duly received and effective if delivered in hand to any officer or agent of the Trustor or Beneficiary, or if mailed by registered or certified mail, return receipt requested, addressed to the Trustor or Beneficiary at the address set forth in the Loan Agreement or as any party may from time to time designate by written notice to the other party.

5.12    Governing Law.  This Deed of Trust shall be governed by federal law applicable to the Beneficiary and, to the extent not preempted by federal law, the laws of the State of Utah without giving effect to the conflicts of laws principles thereof.

5.13    Reproductions.  This Deed of Trust and all documents which have been or may be hereinafter furnished by the Trustor to the Beneficiary may be reproduced by the Beneficiary by any photographic, photostatic, microfilm, xerographic or similar process, and any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).

5.14    Jurisdiction and Venue.  The Trustor irrevocably submits to the nonexclusive jurisdiction of any Federal or state court sitting in Utah, over any suit, action or proceeding arising out of or relating to this Deed of Trust.  The Trustor irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that the same has been brought in an inconvenient forum.  The Trustor hereby consents to process being served in any such suit, action or proceeding (i) by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the Trustor's address set forth herein or such other address as has been provided in writing to the Beneficiary and (ii) in any other manner permitted by law, and agrees that such service shall in every respect be deemed effective service upon the Trustor.

5.15    JURY WAIVER.  THE TRUSTOR AND THE BENEFICIARY EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS DEED OF TRUST, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE, OR HAS NOT BEEN WAIVED.  THE TRUSTOR CERTIFIES THAT NEITHER THE BENEFICIARY NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE BENEFICIARY WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.

**00199887**
B: 628 P: 499     Fee $174.00
Connie Hansen, Millard Recorder     Page 11 of 21
06/20/2017 04:37:19 PM     By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

EXECUTED as of the date first above written.

Trustor:
Sugarloaf Holdings, LLC

By: _____
David J. Gray, Manager

STATE OF UTAH
COUNTY OF __Juab_____, SS.

The foregoing instrument was acknowledged before me this 16 day of __June_____, 2017, by David J. Gray, Manager of Sugarloaf Holdings, LLC, a Utah Limited Liability Company, on behalf of such Limited Liability Company.

> PAUL SPERRY
> NOTARY PUBLIC·STATE OF UTAH
> COMMISSION# 683714
> COMM. EXP. 07-20-2019

_____, NOTARY PUBLIC
MY COMMISSION EXPIRES: 7-20-2019 _____

Paul Sperry
TYPE OR PRINT NAME

# 00199887

B: 628 P: 500      Fee $174.00
Connie Hansen, Millard Recorder      Page 12 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

12

Deed of Trust 1

EXHIBIT "A"

Property Description

Parcel No. 5888-2: The Southeast quarter of the Southwest quarter of Section 4, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5889: The South half of the Northwest quarter and the Southwest quarter of the Southwest quarter and the North half of the Southwest quarter of Section 4, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5896: The South half of the Southwest quarter and the South half of the Southeast quarter and the Northwest quarter of the Southeast quarter of Section 8, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5898: The North half of the Northwest quarter and the Southeast quarter of the Northwest quarter and the Northeast quarter of the Southwest quarter and the South half of the Southwest quarter and the Southwest quarter of the Southeast quarter and the South half of the Northeast quarter of Section 9, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 5899-A: The North half of the Southeast quarter and the Southeast quarter of the Southeast quarter of Section 9, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 5918-A: All of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

LESS THE FOLLOWING: Commencing at the Northeast corner of Section 16, Township 19 South Range 5 West, Salt Lake Base and Meridian, thence South 1320 feet, thence East 6504 feet, thence North 1320 feet to the place of beginning.

LESS THE FOLLOWING: Commencing 1320 feet North and 4267 feet West from the Southeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 1320 feet, thence West 1013 feet, thence South 1320 feet, thence East 1013 feet to the place of beginning.

LESS THE FOLLOWING: Commencing 1320 feet North and 3254 feet West of the Southeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 1320 feet, thence West 1013 feet, thence South 1320 feet, thence East 1013 feet to the place of beginning.

LESS THE FOLLOWING: Commencing at a point 6268 feet West and 1320 feet South of the Northeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence West 1223 feet, thence North 1320 feet, thence West 96 feet, thence South 2640 feet, thence East 1324 feet, thence North 1320 feet to the point of beginning.

Parcel No. 5918-A-1: Beginning 3664 feet West of the Northeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, continuing along the section line 1601.48. feet, more or less, to the Northwest corner of said section, thence South along the Westerly boundary of said section to the Southwest corner of the Northwest quarter of the Northwest quarter, thence East 1601.48 feet, more or less, thence North 1320 feet, more or less, to the point of beginning.

Parcel No. 5918-A-3: Beginning 1320 feet North and 4267 feet West of the Southeast corner of Section 16,

**00199887**
B: 628 P: 501     Fee $174.00
Connie Hansen  Millard Recorder     Page 13 of 21
06/20/2017 04:37:19 PM     By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

Township 19 South, Range 5 West, Salt lake Base and Meridian, thence North 1320 feet, thence West 1013 feet, thence South 1320 feet, thence East 1013 feet to the point of beginning.

Parcel No. 5918-A-4: Beginning 1320 feet North and 3254 feet West of the Southeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 1320 feet, thence West 1013 feet, thence South 1320 feet, thence East 1013 feet to the point of beginning.

Parcel No. 5919-A: The Northeast quarter of the Southeast quarter of Section 17, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5919-A-1: The Northeast quarter of the Northeast quarter of Section 17, Township 19 South, Range 5 West, Salt Lake Base and Meridian. LESS and excepting the West 96 feet.

Parcel No. 5919-A-2: Beginning 5266 feet West and 1320 feet South of the Northeast corner of Section 16, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence West 1228 feet, thence North 1320 feet, thence West 96 feet, thence South 2640 feet, thence East 1324 feet, thence North 1320 feet to the point of beginning. Embraces a portion of Section 17, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5920: The South half of the Northwest quarter, the North half of the Southwest quarter, the Southwest quarter of the Southeast quarter and the South half of the Southwest quarter of Section 17, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5921: The Northwest quarter of the Southeast quarter of Section 17, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5922: The East half of Section 18, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5928: The East half of the Southeast quarter of Section 20, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5933: The Southeast quarter of the Northeast quarter of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5936: The South half of the North half of the Southeast quarter of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian. LESS: The road right-of-way.

Parcel No. 5937: Beginning at the Southeast corner of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 80 rods, thence West 130 rods, thence South 80 rods, thence East 130 rods to the point of beginning.

Parcel No. 5938-1: The South half of the Southwest quarter of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian. Also beginning at the Southwest corner of the Southeast quarter of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 80 rods, thence East 30 rods, thence South 80 rods, thence West 30 rods to the point of beginning.

Parcel No. 5940: The Northwest quarter of the Southwest quarter of Section 21, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5957-1: That portion of the Northwest quarter of the Southeast quarter and the Southwest quarter of the Northeast quarter of Section 25, Township 19 South, Range 5 West, Salt Lake Base and Meridian, lying West of the State Road right-of-way.

Parcel No. 5958: The North half of the Southwest quarter of Section 25, Township 19 South, Range 5

## 00199887

B: 628 P: 502    Fee $174.00
Connie Hansen, Millard Recorder    Page 14 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

West, Salt Lake Base and Meridian.

Parcel No. 5963:  The East half of the Southeast quarter and the Southwest quarter of the Southeast quarter and the South half of the Southwest quarter and beginning 12 rods South of the Northeast corner of the Northwest quarter of the Southeast quarter of Section 26, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence South 68 rods, thence West 110 rods, thence North 58°17′ East 129.33 rods to the point of beginning.

ALSO:  Beginning at the Southwest corner of the Northwest quarter of the Southwest quarter of Section 26, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence East 80 rods, thence North 12 chains 14 feet, thence West 80 rods, thence South 12 chains 14 feet to the point of beginning.

Parcel 5965:  The Southwest quarter of the Northwest quarter and beginning at the Northwest corner of the Southwest quarter of Section 26, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence South 31 rods 5 links, thence East 80 rods, thence North 31 rods 5 links, thence West 80 rods to the point of beginning.

Parcel No. 5966:  The North half of the Southwest quarter, the Northwest quarter, and the North half of the Northeast quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

ALSO, beginning at the Northwest corner of the Southwest quarter of the Northeast quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence South 11.43 chains, thence South 60°40′ East 9.57 chains, thence North 42°40′ East 7.33 chains, thence East 60.86 rods, thence North 43 rods, thence West 114 rods to beginning. LESS Millard County Road.

Parcel No. 5968:  Beginning 2 rods North of the Southeast corner of the Northeast quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence North 26.5 rods, thence South 70°15′ West 58 rods, thence South 25° East 42 rods, thence East 39 rods, thence North 31.5 rods to the point of beginning.

Parcel No. 5969:  Beginning at the Southeast corner of the North half of the Southeast quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian, thence West 40 chains, thence North 28.57 chains, thence South 60°40′ East 9.57 chains, thence North 42°40′ East 7.33 chains, thence East 9.34 chains, thence South 25°30′ East 7.50 chains, thence South 25° East 10.50 chains, thence East 9.25 chains, thence South 12.50 chains to the point of beginning.

Parcel No. 5970:  The South half of the Southeast quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5970-1:  The South half of the Southwest quarter of Section 27, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 5971:  The Northeast quarter and the North half of the Southeast quarter of Section 28, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5972:  The South half of the Southeast quarter and the South half of the Southwest quarter of Section 28, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5974:  The North half of the Northwest quarter of Section 28, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 5975:  The North half of the Northeast quarter of Section 29, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**00199887**
B: 628 P: 503      Fee $174.00
Connie Hansen, Millard Recorder        Page 15 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

15

**Parcel No. 5978:** The East half of the Northeast quarter of Section 33, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5979:** The Northwest quarter of the Northeast quarter of Section 33, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5980:** The Southwest quarter of the Northeast quarter and the Southeast quarter of the Northwest quarter and the North half of the Northwest quarter of the Southeast quarter and the North half of the Northeast quarter of the Southwest quarter of Section 33, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5981:** The South half of the Northeast quarter of the Southwest quarter and the Northwest quarter of the Southwest quarter and the South half of the Southeast quarter and the South half of the Northwest quarter of the Southeast quarter of Section 33, Township 19 South, Range 5 West, Salt Lake Base and Meridian. LESS: The County Road conveyed by Warranty Deed recorded on August 21, 1956, as Entry No. 89709, in Book 35 at Page 168 of official records.

**Parcel No. 5985:** The West half of the Northwest quarter of Section 33, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5986:** The Northeast quarter of the Northeast quarter of Section 34, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5988:** The Northeast quarter of the Northeast quarter of Section 35, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 5993:** The Northwest quarter of the Northwest quarter of Section 35, Township 19 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 6688:** The North half of the Northwest quarter of Section 4, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 6727:** The East half of the Northeast quarter of Section 20, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 6729:** The Northeast quarter of the Southeast quarter of Section 20, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 6729-1:** The Southeast quarter of the Southeast quarter of Section 20, Township 20 South, Range 5 West, Salt lake Base and Meridian.

**Parcel No. 6731:** The Northwest quarter of the Southeast quarter and the Northeast quarter of the Southwest quarter of Section 20, Township 20 South, Range 5 West, Salt lake Base and Meridian.

**Parcel No. 6731-1:** The Southwest quarter of the Southeast quarter and the Southeast quarter of the Southwest quarter of Section 20, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

**Parcel No. 6733:** The South half of the North half of Section 21, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

**Parcel No. 6766:** Beginning at the Southwest corner of the Northwest quarter of Section 25, Township 20

**00199887**
B: 628 P: 504    Fee $174.00
Connie Hansen, Millard Recorder    Page 16 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

South, Range 5 West, Salt Lake Base and Meridian, thence North 106 rods, thence East 160 rods, thence South 106 rods, thence West 160 rods to the point of beginning.

Parcel No. 6767: Beginning at the Northeast corner of the Northwest quarter of Section 25, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence South 54 rods, thence West 160 rods, thence North 54 rods, thence East 160 rods to the point of beginning.

Parcel No. 6773: The Southeast quarter of the Southwest quarter of Section 26, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Less the Southeast quarter of the Southeast quarter of the Southwest quarter of Section 26, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6773-1: The North half of the Southwest quarter of Section 26, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6773-2: The Southeast quarter of the Southeast quarter of the Southwest quarter of Section 26, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6774: The Southwest quarter of the Southwest quarter of Section 26, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6784: The Northeast quarter of the Southeast quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6785: The Northwest quarter of the Southeast quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6786: The East half of the Southeast quarter of the Southeast quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6787: The West half of the Southeast quarter of the Southeast quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6793: The South half of the South half of the Southwest quarter of the Northwest quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6793-1: The North half of the South half of the Southwest quarter of the Northwest quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6793-2: The North half of the Southwest quarter of the Northwest quarter of Section 27, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6798: The South half of the North half of the Southeast quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

LESS: Beginning at the Southeast corner of the Northeast quarter of the Southeast quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence West 1216 feet, thence North 358 feet, thence East 1216 feet, thence South 358 feet to the point of beginning.

**00199887**

B: 628 P: 505      Fee $174.00
Connie Hansen, Millard Recorder      Page 17 of 21
06/20/2017 04:37:19 PM      By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

LESS: Beginning North 1°23'41" West 1874.08 feet from the Southeast corner of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence South 89°44'52" West 681.94 feet, thence North 107.77 feet, thence North 89°44'52" East 318 feet, thence North 34.46 feet along an existing fence line, thence North 88°30'23" East 365.21 feet along an existing fence line, thence South 0°26'13" West 150 feet to the point of beginning.

LESS: Beginning on the East section line at a point located 358 feet North of the Southeast corner of the Northeast quarter of the Southeast quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence West 1260 feet, more or less, along a fence line to a fence corner, thence North 315 feet, more or less, along a fence line to a fence corner, thence East 880 feet, more or less, along a fence line to a fence corner, thence North 35 feet along a fence line to a fence corner, thence East 380 feet, more or less, along a fence line to the East line of Section 28, thence South 350 feet, more or less, along the section line to the point of beginning.

Excepting therefrom that portion lying within the boundaries of the state road right-of-way.

Parcel No. 6798-2-2: Beginning at the center quarter corner of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence North 00°43'08" East 259.90 feet along the quarter section line to a 1362.28 feet radius curve to the left and fence line, radius point bears North 38°03'50" East 1362.28 feet, thence Southeasterly along said radius and fence line through a central angle of 77°21'59" a distance of 1839.48 feet (chord bears North 89°22'51" East 1702.89 feet), thence South 39°39'05" East 33.92 feet along fence line, thence South 49°46'12" West 497.55 feet along fence line to fence corner, thence South 00°03'32" East 600.86 feet along a fence line to the South boundary of North half of the North half of the Southeast quarter of said Section 28, thence North 89°37'53" West 1358.68 feet along said South boundary to the Southwest corner of said North half of the North half of the Southeast quarter, thence North 00°43'08" East along quarter section line 663.55 feet to point of beginning.

Also beginning at a point North 00°57'21" East 1975.40 feet along the section line and bearing West 710.01 feet and to a fence corner and South 389.84 feet along a fence line from the Southeast corner of Northeast quarter of the Southeast quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence West 50 feet, thence South 50 feet, thence East 50 feet to fence line, thence North 50 feet along fence line to point of beginning.

Together with an easement for the purpose of ingress and egress as appurtenant to Parcel No. 6798-22 over and across the following description:

Beginning at a point South 389.84 feet along fence line and West 50 feet from the above fence corner which is North 00°57'21" East 1975.40 feet along section line and bearing West 710.01 feet from the Southeast corner of the Northeast quarter of the Southeast quarter of said Section 28, thence West 221.89 feet, thence South 49°26'12" West 76.89 feet, thence East 280.30 feet, thence North 50 feet to point of beginning.

Parcel No. 6798-3-1-1: Beginning at a point North 1975.40 feet along the section line from the Southeast corner of Northeast quarter of the Southeast quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence bearing West along fence line 648.38 feet to fence corner, thence South 33°25'08" West 111.90 feet along fence line, thence South 42°18'03" West 386.90 feet along fence line, thence North 39°44'36" West 33.96 feet along fence line to a 1362.28 feet radius curve to the left, radius point bears North 30°18'09" West 1362.28 feet, thence Northeasterly along arc of said curve thorough a central angle of 49°30'02" a distance of 1176.94 feet to the North boundary of Southeast quarter of the Northeast quarter of said Section 28, (chord bears North 25°56'50" East 1140.676 feet), thence South 89°26'39" East 504.24 feet along said boundary to the Northeast corner of said Southeast quarter of the Northeast quarter, thence South 00°57'42" West 667.45 feet along section line to the point of beginning.

**00199887**
B: 628 P: 506          Fee $174.00
Connie Hansen, Millard Recorder          Page 18 of 21
06/20/2017 04:37:19 PM     By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

Parcel No. 6802: The South three quarters of the Southwest quarter of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6802-1: Beginning at the West quarter corner of Section 28, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence North 00°31'44" East 317.45 feet along section line to a 1362.28 feet radius curve to the left and a fence line, radius point bears North 40°40'58" East 1362.28 feet, thence Southwesterly along the arc and fence line of said curve through a central angle of 115°44'33" a distance of 2751.93 feet to the intersection with a 1362.28 feet radius curve to the left and fence line (chord bears North 72°48'41" East 2307.308 feet), radius point bears North 76°48'36" East 1362.28 feet, thence Southwesterly along the arc and fence line through a central angle of 38°34'00" a distance of 916.97 feet to the quarter section line (chord bears South 32°39'09" East 899.758 feet, thence South 00°43'08" West 259.90 feet along quarter section line to center quarter corner of said Section 28, thence South 00°43'08" West 663.55 feet along quarter section line to Southeast corner of the North half of the North half of the Southwest quarter of Section 28, thence North 89°35'31" West 2687.35 feet along South boundary of said North half of the North half of the Southwest quarter to section line, thence North 00°32'15" East 662.54 feet along section line to the point of beginning.

Parcel No. 6804: The South three-quarters of the Southeast quarter of Section 29, Township 20 South, Range 5 West, Salt lake Base and Meridian.

LESS: Beginning at a point North 89°14'18" West 276.32 feet along the section line from the Southeast corner of Section 29, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence North 51°35'14" West 68.83 feet, thence North 43°11'49" West 330.41 feet, thence North 59°34'26" West 513.55 feet, thence North 80°17'47" West 509.57 feet, thence South 82°54'43" West 376.38 feet, thence South 69°51'33" West 389.04 feet, thence South 55°47'50" West 523.50 feet to the West boundary of the Southwest quarter of the Southeast quarter of said Section 29, thence South 00°45'04" West 123.13 feet along said boundary to the South quarter corner of said Section 29, thence South 89°14'18" East 2398.75 feet along section line to the point of beginning.

Parcel Nos. 6804-1 and 6804-3-1: The Northeast quarter of Section 29, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

LESS AND EXCEPTING THEREFROM: Beginning at a point North 00°31'44" East 317.45 feet to a 1362.28 feet radius curve to the right and a fence line from the East quarter corner of Section 29, Township 20 South, Range 5 West, Salt Lake Base and Meridian, radius point bears North 40°40'58" East 1362.28 feet, thence Northwesterly along the arc and fence line of said curve through a central angle of 99°41'32" a distance of 2370.31 feet to the Section line, thence South 00°31'44" West 2082.423 feet along the section line to the point of beginning, which the last call is also the chord bearing and distance.

Parcel No. 6804-2: The North half of the North half of Southeast quarter of Section 29, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Parcel No. 6807-7: Beginning at the Northeast corner of Section 32, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence South 00°53'12" West 203.45 feet along the Section line, thence South 87°48'07" West 140.45 feet, thence North 29°34'02" West 224 feet, thence North 51°35'14" West 28.42 feet to the North boundary of said Section 32, thence South 89°14'18" East 276.32 feet along said North boundary to the point of beginning.

Parcel No. 6822: The North half of the North half of Section 34, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6823: The South half of the North half of Section 34, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

00199887
B: 628 P: 507      Fee $174.00      Page 19 of 21
Connie Hansen, Millard Recorder   By JUAB TITLE & ABSTRACT CO
06/20/2017 04:37:19 PM

Sugarloaf Holdings CR125253

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6824:  The North half of the Southwest quarter and the Northwest quarter of the Southeast quarter of Section 34, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the boundaries of the State Road right-of-way.

Parcel No. 6827:  The Northeast quarter of Section 35, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom the following described property:  Beginning at the Southwest corner of the Northeast quarter of Section 35, Township 20 South, Range 5 West, Salt Lake Base and Meridian, thence North 13 rods, thence East 90 rods, thence Southeasterly 42 rods, more or less, to a point on the South line of the Northeast quarter of Section 35, being 130 rods East of the point of beginning, thence West 130 rods to the point of beginning.

Excepting therefrom that portion lying within the County Road.

Parcel No. 6829:  The Northwest quarter of Section 35, Township 20 South, Range 5 West, Salt Lake Base and Meridian.

Excepting therefrom that portion lying within the County Road.

-0-0-0-0-

# 00199887

B: 628 P: 508      Fee $174.00
Connie Hansen, Millard Recorder      Page 20 of 21
06/20/2017 04:37:19 PM      By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

EXHIBIT "B"

**Permitted Encumbrances**

Exceptions:  5, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19 and 20 through 28 of the Commitment For Title
Insurance,  No. 36133 dated May 16, 2017 issued by First American Title Insurance Company.

**00199887**
B: 628 P: 509      Fee $174.00
Connie Hansen, Millard Recorder          Page 21 of 21
06/20/2017 04:37:19 PM    By JUAB TITLE & ABSTRACT CO

Sugarloaf Holdings CR125253

# **Exhibit F**

4836-7704-4088, v. 1

# Utah DEPARTMENT of Commerce

Division Of Corporations

# **Record of Filing**

| | | |
|---|---|---|
| **File Number:**520980201732 | **Record Date:**06-21-2017 10:04 | **Type:**UCC |
| **Old File Number:**N/A | **Lapse Date:**06-21-2022 23:59 | **Status:**ACTIVE |

**Filer:**

    CT LIEN SOLUTIONS
    P.O. BOX 29071
    GLENDALE, CALIFORNIA 91209-9071

**Collateral Description:**
Action: NONE
Description:
COLLATERAL: SHALL MEAN ALL OF DEBTOR'S PRESENT AND FUTURE RIGHT, TITLE AND INTEREST IN AND
TO ANY AND ALL OF THE PERSONAL PROPERTY OF DEBTOR WHETHER SUCH PROPERTY IS NOW EXISTING OR
HEREAFTER CREATED, ACQUIRED OR ARISING AND WHEREVER LOCATED FROM TIME TO TIME, INCLUDING
WITHOUT LIMITATION: (I) ACCOUNTS; (II) CHATTEL PAPER; (III) GOODS; (IV) INVENTORY; (V)
EQUIPMENT; (VI) FARM PRODUCTS; (VII) INSTRUMENTS; (VIII) INVESTMENT PROPERTY; (IX)
DOCUMENTS; (X) COMMERCIAL TORT CLAIMS; (XI) DEPOSIT ACCOUNTS; (XII) LETTER-OF-CREDIT RIGHTS;
(XIII) GENERAL INTANGIBLES; (XIV) SUPPORTING OBLIGATIONS; AND (XV) RECORDS OF, ACCESSION TO
AND PROCEEDS AND PRODUCTS OF THE FOREGOING.

**Debtor:**
SUGARLOAF HOLDINGS, LLC                                              FEIN: null
1471 NORTH 900 WEST                                         Jurisdiction: null
LEHI, UTAH 84043                                         Organization Id: null
Trust: No                                             Organization Type: NONE
**Secured Party:**
BANK OF THE WEST
6873 N. WEST AVENUE
SUITE 102
FRESNO, CALIFORNIA 93711
**Transaction Detail:**
Form Type: UCC 1 FILING STATEMENT                    Transaction Cost: $12.00
Effective Date: 06-21-2017 10:04                        Receipt Number: 777
Submitter Ref: UT-0-59412739                            Alt Designation: NONE
Web Transaction ID: 170621-66053-1078529

**Additional Description:**

**FILLING APPROVED - 0**
THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES, MADE BY THE DIVISION YOU MUST CONTACT THE
DIVISION, AT NO COST, WITHIN 30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.

# Utah DEPARTMENT of Commerce

**Division Of Corporations**

# Record of Filing

| | | |
|---|---|---|
| **File Number:** 524660201733 | **Record Date:** 08-14-2017 08:07 | **Type:** UCC |
| **Old File Number:** N/A | **Lapse Date:** 08-14-2022 23:59 | **Status:** ACTIVE |

**Filer:**

   CT LIEN SOLUTIONS
   P.O. BOX 29071
   GLENDALE, CALIFORNIA 91209-9071

Amendment Type: TERMINATION BY SECURED PARTY

**Transaction Detail:**

| | |
|---|---|
| Form Type: UCC 3 AMENDMENT | Transaction Cost: $0.00 |
| Effective Date: 01-08-2018 11:33 | Receipt Number: 777 |
| Submitter Ref: UT-0-62210076 | Alt Designation: NONE |
| Web Transaction ID: 180108-97025-1147609 | |

**Additional Description:**

**FILING APPROVED - 0**

THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD. PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION. IF YOU FIND ANY DISCREPANCIES, MADE BY THE DIVISION YOU MUST CONTACT THE
DIVISION, AT NO COST, WITHIN 30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.



Division Of Corporations

# Record of Filing

**File Number:** 524660201733          **Record Date:** 08-14-2017 08:07          **Type:** UCC
**Old File Number:** N/A                **Lapse Date:** 08-14-2022 23:59          **Status:** ACTIVE

**Filer:**

   CT LIEN SOLUTIONS
   P.O. BOX 29071
   GLENDALE, CALIFORNIA 91209-9071

**Collateral Description:**
Action: NONE
Description:
ALL EQUIPMENT, GENERAL INTANGIBLES AND ALL MODIFICATIONS AND ATTACHMENTS THERETO AND
REPLACEMENTS THEREFOR NOW AND HEREAFTER COVERED BY A SCHEDULE TO THE MASTER EQUIPMENT
FINANCING AGREEMENT DATED AS OF JUNE 22, 2017 BETWEEN BANK OF THE WEST AS CREDITOR AND
SUGARLOAF HOLDINGS, LLC AS DEBTOR AND ALL ADDITIONAL COMMITMENTS RELATED THERETO. EQUIPMENT:
PIVOT / IRRIGATION EQUIPMENT TOGETHER WITH ALL REPLACEMENTS, PARTS, REPAIRS, ADDITIONS,
ACCESSIONS AND ACCESSORIES INCORPORATED THEREIN OR AFFIXED OR ATTACHED THERETO AND ANY AND
ALL PROCEEDS OF THE FOREGOING, INCLUDING, WITHOUT LIMITATION, INSURANCE RECOVERIES.

**Debtor:**
SUGARLOAF HOLDINGS, LLC                                              FEIN: null
1471 NORTH 900 WEST                                        Jurisdiction: null
LEHI, UTAH 84043                                       Organization Id: null
Trust: No                                           Organization Type: NONE
**Secured Party:**
BANK OF THE WEST
12677 ALCOSTA BLVD SUITE 200
NC-B15-2H-K
SAN RAMON, CALIFORNIA 94583
**Transaction Detail:**
Form Type: UCC 1 FILING STATEMENT                  Transaction Cost: $12.00
Effective Date: 08-14-2017 08:07                   Receipt Number: 777
Submitter Ref: UT-0-60190480                       Alt Designation: NONE
Web Transaction ID: 170814-24505-1093655

**Additional Description:**
**FILLING APPROVED - 0**

THE DATA LISTED ABOVE IS A 'NON-CERTIFIED' RECORD.PLEASE TAKE THE TIME TO REVIEW ALL OF THE
INFORMATION.IF YOU FIND ANY DISCREPANCIES, MADE BY THE DIVISION YOU MUST CONTACT THE
DIVISION, AT NO COST, WITHIN 30 DAYS OF RECEIVING THIS ACKNOWLEDGEMENT.

# **Exhibit G**

4836-7704-4088, v. 1

**David Billings**

| | |
|---|---|
| **From:** | Gary Winger <gwinger@kmclaw.com> |
| **Sent:** | Friday, August 31, 2018 2:48 PM |
| **To:** | 'Salisbury, James' |
| **Cc:** | Gerald H. Suniville; David Billings |
| **Subject:** | RE: Follow-up |

It is my understanding that there were about 15 truck loads.  I do not know how many cows that is but I will find out.

Kirton | McConkie
Gary Winger
Attorney
o 801-328-3600
d 801-323-5908

-----Original Message-----
From: Salisbury, James [mailto:James.Salisbury@bankofthewest.com]
Sent: Friday, August 31, 2018 2:45 PM
To: Gary Winger
Subject: RE: Follow-up

That means not very many were shipped.

James Salisbury
Vice President
_____
Bank of the West SAD
500 Capitol Mall, Suite 1200
Sacramento, CA 95814
T 916.552.4371
james.salisbury@bankofthewest.com

-----Original Message-----
From: Gary Winger [mailto:gwinger@kmclaw.com]
Sent: Friday, August 31, 2018 1:44 PM
To: 'Gerald H. Suniville' <gsuniville@fabianvancott.com>; David Billings <dbillings@fabianvancott.com>
Cc: Salisbury, James <James.Salisbury@bankofthewest.com>
Subject: RE: Follow-up

Gerald,

I just spoke with David Gray.  Apparently he had arranged for the cows to be gathered and trucked today.  I asked him to send me the brand inspection reports from the Brand inspector.  I will send those to you as soon as I receive them.

Kirton | McConkie
Gary Winger

Attorney
o 801-328-3600
d 801-323-5908
-----Original Message-----
From: Gerald H. Suniville [mailto:gsuniville@fabianvancott.com]
Sent: Friday, August 31, 2018 2:39 PM
To: Gary Winger; David Billings
Cc: james.salisbury@bankofthewest.com
Subject: RE: Follow-up

Gary:

The number below is Sue Madsen's cell phone number; Pete Madsen's cell phone number is (435) 864-8223.  I asked Mr.
Madsen to call Mr. Gray to introduce himself and find out the particulars of Mr. Gray's timetable for the cattle roundup.
Mr. Madsen will not be directing or supervising Mr. Gray's efforts or taking any action to interfere with Mr. Gray's
efforts.  He simply will be on site on behalf of the bank to monitor the roundup and count the cows as they are rounded
up and placed on trucks for transportation.


GERALD H. SUNIVILLE
FabianVanCott
Phone: 801.574-2625
gsuniville@fabianvancott.com
www.fabianvancott.com



-----Original Message-----
From: Gary Winger <gwinger@kmclaw.com>
Sent: Friday, August 31, 2018 12:59 PM
To: Gerald H. Suniville <gsuniville@fabianvancott.com>; David Billings <dbillings@fabianvancott.com>
Cc: james.salisbury@bankofthewest.com
Subject: RE: Follow-up

Gerald,

Thank you for the email.   David has a good group of friends that are "cowboys" -- i.e., have horses and are experienced
with round-ups.   I forwarded your email to him and left him a message to call.


Kirton | McConkie
Gary Winger
Attorney
o 801-328-3600
d 801-323-5908
-----Original Message-----
From: Gerald H. Suniville [mailto:gsuniville@fabianvancott.com]
Sent: Friday, August 31, 2018 10:45 AM
To: Gary Winger; David Billings
Cc: james.salisbury@bankofthewest.com
Subject: RE: Follow-up

Gary:

Thank you for your email.  The bank is very supportive of the plan to round up all the cattle and sell them through an auction house. We do, however, have some questions regarding the timing and procedures.
First, if all the employees have been laid off, who is going to herd the cattle and over what time period?  I understand that the topography is rugged and it will take some time to round up all the cattle.  Second, at what location will the cattle be herded so as to pickup them up by a truck? Third, what is the name, address, phone number and contact persons for all auction houses that will be involved in the selling of the cattle?

For your information, the bank has hired Pete and Sue Madsen of Delta, Utah, to act as the bank's representative on the ground for the round up and counting of the cattle as they are loaded into the trucks. Their home telephone number is (435) 864-8373.  I will forward Mr. Madsen's cell phone number once I obtain that number from them.  I would ask that Mr. Gray cooperate and communicate with the Madsens in this effort to preserve the value of this portion of the bank's collateral.

For your further information, my colleague, David Billings of FabianVanCott will be handling this matter during my absence in September.  His email is dbillings@fabianvancott.com and his direct telephone number at work is (801) 323-2205.

We may have further questions or issues as we work through this process.  Thank you.


GERALD H. SUNIVILLE
FabianVanCott
Phone: 801.574-2625
gsuniville@fabianvancott.com
www.fabianvancott.com




-----Original Message-----
From: Gary Winger <gwinger@kmclaw.com>
Sent: Thursday, August 30, 2018 11:49 AM
To: Gerald H. Suniville <gsuniville@fabianvancott.com>; David Billings <dbillings@fabianvancott.com>
Cc: james.salisbury@bankofthewest.com
Subject: Follow-up

Gerald,

Thank your for the meeting today.   We appreciate the time.

After the meeting, we were discussing with David Gray the operation of the farm.   Due to the lack of funds, Sugarloaf was required to lay-off its employees.   Thus, the operation has no one to look after the cows.   Yesterday, the Sheriff called and someone had cut Sugarloaf's fences and opened gates and some of Sugarloaf's cows had gotten out and were in neighboring farms and property.   As you may know, Sugarloaf has had cows shot in the past.   One of the Sheriff's deputies is a plaintiff in the Double O'Pahvant lawsuit.   Accordingly, the Sheriff's office has not been helpful in protecting Sugarloaf's property.

With no employees, active sabotage and David residing in a different county, it is difficult to care for Sugarloaf's herd.  With David's high blood pressure (220/120) and other health issues, it makes it even more difficult to care for the herd.

Based on these factors, Sugarloaf has determined that it is going to sell the herd immediately through an auction house. The net proceeds of such sale will be remitted to the Bank.  Sugarloaf is going to try to do this as soon as possible, which may be in the next day or two.  If you have questions, please call.

Gary Winger

Sent from my iPad

----------------------------------------------------------------------

IMPORTANT NOTICE:   This message is intended only for the addressee and may contain confidential, privileged information.  If you are not the intended recipient, you may not use, copy or disclose any information contained in the message.  If you have received this message in error, please notify the sender by reply e-mail and delete the message.

# **Exhibit H**

4836-7704-4088, v. 1

11/14/2017                                  11/14/2017                                  11/14/2017

**BANK OF THE WEST**
**APPRAISAL REPORT**

SUBJECT
**Sugarloaf Holdings LLC**                                                BANK OFFICE:    **Sacramento**
**1471 North 900 West**                                          ACCOUNT OFFICER:    **Neimeyer**
**Lehi**
801-891-3370                                                              APPRAISER:    HOWISON
                                                                   APPRAISAL DATE:    11/14/2017
2255 West 3300 North, Filmore, UT.   Actual Ranch Location              LOG NUMBER:    17-0714

**CATTLE**
**APPRAISAL**

| NUMBER | | DESCRIPTION | | AVERAGE WEIGHT | COST PER POUND | VALUE/ HEAD ($) | VALUE |
|---|---|---|---|---|---|---|---|
| 700 | | Angus Cows | Farm | 1300 | $    1.00 | $1,300.00 | $910,000 |
| 780 | | Angus Cows | BLM | 1300 | $    1.00 | $1,300.00 | $1,014,000 |
| 690 | | English Cross Calves | Farm | 175 | $    3.00 | $525.00 | $362,250 |
| 780 | | English Cross Calves | BLM | 525 | $    1.65 | $866.25 | $675,675 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | $0 |
| 47 | | Red Angus Bulls | | 1500 | $    0.65 | $975.00 | $45,825 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | |
| | | | | | | $0.00 | $0 |
| 2997 | | | | | | ESTIMATED HERD VALUE | **$3,007,750** |
| | | | | | | CATTLE RECEIVABLE | |
| | | | | | | BOW LOAN | $    1,095,000 |
| Prepared By: | | | Date: | 12/16/17 | | HERD EQUITY | **$1,912,750** |
| | | | | | | LOAN TO VALUE | **36%** |

# **Exhibit I**

4836-7704-4088, v. 1

5/1/2018                    5/1/2018                    5/1/2018

**BANK OF THE WEST**
**APPRAISAL REPORT**

SUBJECT
**Sugarloaf Holdings LLC**                              BANK OFFICE:   **Sacramento**
**1471 North 900 West**                                ACCOUNT OFFICER:   **Neimeyer**
**Lehi**
801-891-3370                                           APPRAISER:   HOWISON
                                                       APPRAISAL DATE:   05/01/2018
2255 West 3300 North, Filmore, UT.  Actual Ranch Location   LOG NUMBER:   18-0213

**CATTLE APPRAISAL**

| NUMBER | | DESCRIPTION | | AVERAGE WEIGHT | COST PER POUND | VALUE/ HEAD ($) | VALUE |
|---|---|---|---|---|---|---|---|
| 346 | | Angus Cows Fall Calvers | Farm | 1300 | $ 0.92 | $1,200.00 | $415,200 |
| 614 | | Angus Cows Spring Calvers | BLM and Farm | 1300 | $ 0.92 | $1,200.00 | $736,799 |
| 300 | | English Cross Calves | BLM and Farm | 125 | $ 1.80 | $225.00 | $67,500 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | $0 |
| 33 | | Red Angus Bulls | Farm | 1500 | $ 0.65 | $975.00 | $32,175 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | $0 |
| | | | | | | $0.00 | $0 |
| 1293 | | | | | | ESTIMATED HERD VALUE | **$1,251,674** |
| | | | | | | CATTLE RECEIVABLE | |
| | | | | | | BOW LOAN | $  1,100,000 |
| | | | | | | HERD EQUITY | **$151,674** |

Prepared By:                    Date:   5/22/18

# Exhibit J

4836-7704-4088, v. 1

# APPRAISAL REPORT

**Date of inspection: August 22nd 2018**
**RE: Farming Equipment/Sugarloaf Holdings, LLC**
**Bank of the West**

| | DESCRIPTION | FMV | LIQ |
|---|---|---|---|
| 1 | 2004 Ford F-350 Power Stroke Turbo Diesel V8 King Ranch w/ 284k miles (new engine) Vin #1FTWW31P885EB43004 | $9,500.00 | $7,500.00 |
| 2 | 4 bottom plow | 600.00 | 300.00 |
| 3 | 2014 Challenger MT0645D Serial #AGCC0645EENGL1034 | 130,000.00 | 105,000.00 |
| 4 | Great Plains Turbo-Max 2400 | 54,000.00 | 45,000.00 |
| 5 | 2013 Challenger MT0645D serial #AGCC0645EDNGL1064 | 120,000.00 | 100,000.00 |
| 6 | Landoll 5211 | 52,000.00 | 39,000.00 |
| 7 | Sitrex Pro 17 Rake | 20,000.00 | 15,000.00 |
| 8 | International Feed Truck with Knight | 4,000.00 | 2,500.00 |
| 9 | Old Chevy Truck 350 | 200.00 | 100.00 |
| 10 | 2- 40-50hp pumps $650 each | 1,300.00 | 800.00 |
| 11 | 2016-2017 Challenger WR9870 Serial #AGCC98700GHS13332 with RazorBar AGCC91950GHRH4233 | 125,000.00 | 85,000.00 |
| 12 | Miller Bobcat 3 Phase Welder (on the truck bed of the King Ranch) Serial #MJ040494R $800-$400 | 2,800.00 | 1,400.00 |
| 13 | 2008 Dodge ram 3500 Heavy Duty Cummins diesel 129,672 miles Vin #3D7MX49LX9G527513 | 22,000.00 | 18,000.00 |
| 14 | UniBridge semi weigher | 6,500.00 | 3,500.00 |
| 15 | Sioux Portable loading chute | 2,400.00 | 1,200.00 |
| 16 | Silencer hydraulic cattle holder | 16,500.00 | 8,000.00 |
| 17 | Green cattle Corral paneling | 1,200.00 | 600.00 |
| 18 | 2011 C&B Quality Trailer works Vin #4JUGL3225BN036870 | 5,500.00 | 3,500.00 |
| 19 | 2003 Gooseneck Livestock Rrailer Vin #16VGX242661606024 Dual Axle | 4,800.00 | 2,900.00 |
| 20 | Misc. Tire troughs | 1,800.00 | 900.00 |



| | | | |
|---|---|---|---|
| 21 | (13)  Seven Tower Pivots Zimmatic by Lindsay model 9500 $24,000.00 each  Stainless Steel Pivot 30" centers, 6 towers S091681 Serial #'s LE4413, 42471, 42473, 42474, 42475, 42476, 42477, 42500, 42501, 425012, 42503, 42505, 42506 | 312,000.00 | 140,000.00 |
| 22 | (3) Four Tower Pivots Zimmatic by Lindsay model 9500 $13,000.00 Each Pivot 30" centers Stainless Steel | 39,000.00 | 18,000.00 |
| 23 | (1) Three Tower Pivot Zimmatic by Lindsay model 9500 Pivot 30" centers Stainless Steel | 11,000.00 | 5,500.00 |
| 24 | (2)  Six Tower Pivot Pivots Zimmatic by Lindsay model 9500 $20,000 each Pivot 30" centers, 6 towers | 40,000.00 | 18,000.00 |
| 25 | 1996 John Deere 6400 with hay forks and pallet forks & bucket has new panel | 17,000.00 | 12,000.00 |
| 26 | JCB 541-70AG+ T4IV with bucket & pallet forks, telescoping Product Identification #JCB5AD3HPH2471419 | 122,000.00 | 90,000.00 |
| 27 | Vertical feed mixer with digital scale Ndeco FS1000D | 36,000.00 | 25,000.00 |
| 28 | Land planer (orange) | 2,000.00 | 1,200.00 |
| 29 | Feed truck, 2014 box EZ Ration processor shreds hay International 4800 truck with 20k miles with live feed | 45,000.00 | 33,000.00 |
| 30 | Mil-Stak PT 2016 pull behind | 85,000.00 | 60,000.00 |
| 31 | Massey Ferguson Hay Baler 2270 with hay boss preservative applicator Serial #AGCM22700GHB04269 | 105,000.00 | 75,000.00 |
| 32 | 4 round hay bale feeders $250 each | 1,000.00 | 500.00 |
| 33 | Yellow cattle chute | 3,500.00 | 2,000.00 |



| 34 | EZ Trail 1384-B 3400 | 4,200.00 | 3,500.00 |
| 35 | Filson Calf Chute | 2,500.00 | 1,400.00 |
| 36 | Komatsu 3,507.1 PC75UU-2 serial #9278 | 18,000.00 | 14,000.00 |
| 37 | Yellow chute (portable) | 2,400.00 | 1,200.00 |
| 38 | 2012 VW Jetta Vin #3VWLL7AJ5CM386465 w/ 88,684 miles | 5,000.00 | 4,000.00 |
| | **Total Values** | **$1,430,700.00** | **$944,500.00** |



3365 West 500 South, Suite 100
Salt Lake City UT 84104
(801) 355-6655
www.salesandauction.com



# **Exhibit K**

4836-7704-4088, v. 1

# LIVESTOCK BRAND INSPECTION

**Pending Acceptance**

87-101911-00001492

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

**UDAF**

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |

Shann Finlinson

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ∀ ∀ ∀ AA ∀ ∀ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 34 | No Data |
| ∀ ∀ ∀ AA ∀ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 502 | No Data |
| | | | TOTAL | | | | 536 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | MCKEE | 0 | WY | 35 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

Page 1  Pending Acceptance
87-101911-00001492

LIVESTOCK BRAND INSPECTION
**Pending Acceptance**



87-101911-00001492

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |

Shann Finlinson

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽ ▽ ▽ AA ▽ ▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 26 | No Data |
| ▽ ▽ ▽ AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 440 | No Data |
| | | | | TOTAL | | | 466 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | Gurney 275 | A021236 | UT | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

Page 1   Pending Acceptance
87-101911-00001492

**LIVESTOCK BRAND INSPECTION**

<span style="color:red">Pending Acceptance</span>



87-101911-00001492

<span style="color:red">Transportation Copy
Leaving the State
Change of Owner</span>
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
|  |  |
|  | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ∇ ∇ ∇ AA ∇ ∇ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 24 | No Data |
| ∇ ∇ ∇ AA ∇ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 406 | No Data |
| | | | | TOTAL | | | 430 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | GURNEY 306 | A022464 | U+ | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

LIVESTOCK BRAND INSPECTION
Pending Acceptance





87-101911-00001492

Transportation Copy
Leaving the State
Change of Owner
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |

Shann Finlinson

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽ ▽ ▽ AA ▽ ▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 20 | No Data |
| ▽ ▽ ▽ AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 338 | No Data |
| | | | | TOTAL | | | 358 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | JR OKELBERRY | Z035867 | UT | 36 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be
automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit
void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if
altered.

LIVESTOCK BRAND INSPECTION

**Pending Acceptance**

87-101911-00001492

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC | OGALLALA LIVESTOCK AUCTION | OGALLALA LIVESTOCK AUCTION |
| 1471 N 900 W | | |
| LEHI, UT 84043 | OGALLALA, NE | OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

### Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ∇∇∇AA∇∇ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 18 | No Data |
| ∇∇∇AA∇ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 304 | No Data |
| | | | **TOTAL** | | | | 322 | |

### Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | OKELBERRY | 153686 | UT | 36 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

# LIVESTOCK BRAND INSPECTION
**Pending Acceptance**



**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

**87-101911-00001492**

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽▽▽AA▽▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 16 | No Data |
| ▽▽▽AA▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 269 | No Data |
| | | | | **TOTAL** | | | 285 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | Bown | A018612 | | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

LIVESTOCK BRAND INSPECTION
Pending Acceptance



87-101911-00001492

Transportation Copy
Leaving the State
Change of Owner
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |
| | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽▽▽AA▽▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 12 | No Data |
| ▽▽▽AA▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 201 | No Data |
| | | | | | TOTAL | | 213 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | PALFREYMAN | 114172 | UT | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

Page 1   Pending Acceptance
87-101911-00001492

# LIVESTOCK BRAND INSPECTION

**Pending Acceptance**



87-101911-00001492



**Transportation Copy
Leaving the State
Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |
| | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽ ▽ ▽ AA ▽ ▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 10 | No Data |
| ▽ ▽ ▽ AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 167 | No Data |
| | | | | | TOTAL | | 177 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | MONT WILLIAMS | Z021954 | UT | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

Page 1   Pending Acceptance
87-101911-00001492

# LIVESTOCK BRAND INSPECTION
**Pending Acceptance**



87-101911-00001492

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
|  | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
|  | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 8 | No Data |
|  | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 133 | No Data |
|  |  |  |  | TOTAL |  |  | 141 |  |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | MURDOCK | Z017820 | UT | 36 |

All Inspection Certificates, except for ◆Change of Ownership◆ and ◆Travel Permits◆ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

LIVESTOCK BRAND INSPECTION
**Pending Acceptance**



**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

**87-101911-00001492**

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽▽▽AA▽▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 6 | No Data |
| ▽▽▽AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 99 | No Data |
| | | | | TOTAL | | | 105 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | WES KURTZ | PAO5970 | MT | 35 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

LIVESTOCK BRAND INSPECTION

**Pending Acceptance**



**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

87-101911-00001492

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽ ▽ ▽ AA ▽ ▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 4 | No Data |
| ▽ ▽ ▽ AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 66 | No Data |
| | | | | **TOTAL** | | | 70 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | WALL | A8186 | WY | 35 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

Page 1  Pending Acceptance
87-101911-00001492

LIVESTOCK BRAND INSPECTION

**Pending Acceptance**

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116



87-101911-00001492

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | |

Shann Finlinson

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ▽ ▽ ▽ AA ▽ ▽ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 34 | No Data |
| ▽ ▽ ▽ AA ▽ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 502 | No Data |
| | | | | | TOTAL | | 536 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | Gurney | 0 | Ut | 35 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days. Yearly travel permits are good for the calendar year only. This certificate void if altered.

# LIVESTOCK BRAND INSPECTION

**Pending Acceptance**

87-101911-00001492

**Transportation Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

UDAF

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

Shann Finlinson

## Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ∇ ∇ ∇ AA ∇ ∇ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 2 | No Data |
| ∇ ∇ ∇ AA ∇ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 33 | No Data |
| | | | | | TOTAL | | 35 | |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | BAR 21 | A2409 | WY | 35 |

All Inspection Certificates, except for ♦Change of Ownership♦ and ♦Travel Permits♦ shall be automatically cancelled and void 72 hours after time of issuance. Temporary Lifetime Travel Permit void after 45 days.  Yearly travel permits are good for the calendar year only.  This certificate void if altered.

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | GURNEY 275 | A021236 | UT | 36 |
| 2018-08-31 | MCKEE | 0 | WY | 35 |
| 2018-08-31 | GURNEY | 0 | UT | 35 |




**LIVESTOCK BRAND INSPECTION**

2018-08-31

**Seller Copy**
**Leaving the State**
**Change of Owner**
State of Utah
Department of Agriculture
350 N Redwood Rd
Salt Lake City, UT 84116

87-101911-00001492

| Owner Info | Buyer | Destination |
|---|---|---|
| SUGARLOAF HOLDINGS LLC<br>1471 N 900 W<br>LEHI, UT 84043 | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE | OGALLALA LIVESTOCK AUCTION<br><br>OGALLALA, NE |

| Owner/Agent Signature | Brand Inspector Signature |
|---|---|
| | Shann Finlinson |

### Animal Species: Bovine

| BRAND #1 | LOCATIONS | VISUAL ID | SEX | COLOR | CLEARANCE | YOB | NUM | BREED |
|---|---|---|---|---|---|---|---|---|
| ∇∇∇AA∇ | LS RH RR LH RS LR | No Data | Bull | Red | No Data | No Data | 34 | No Data |
| ∇∇∇AA∇ | LS RH RR LH RS | No Data | Cow | Black | No Data | No Data | 502 | No Data |

| | TOTAL | | | | | | 536 | |

| FEES | |
|---|---|
| Inspection Fee | $536.00 |
| Beef Promotion | $804.00 |
| Predator Control | $134.00 |
| Service Fee | $20.00 |
| Total To Be Collected | $1494.00 |

## Transportation/Shipper Information

| Ship Date | Shipper | License | State | Animals Per Vehicle |
|---|---|---|---|---|
| 2018-08-31 | BAR 21 | A2409 | WY | 35 |
| 2018-08-31 | WALL | A8186 | WY | 35 |
| 2018-08-31 | WES KURTZ | PAO5970 | MT | 36 |
| 2018-08-31 | MURDOCK | Z017820 | UT | 36 |
| 2018-08-31 | MONT WILLIAMS | Z021954 | UT | 36 |
| 2018-08-31 | PALFREYMAN | 114172 | UT | 36 |
| 2018-08-31 | OLSEN | Z058039 | UT | 36 |
| 2018-08-31 | BOWN | A018612 | UT | 36 |
| 2018-08-31 | OKELBERRY | 153686 | UT | 36 |
| 2018-08-31 | JR OKELBERRY | Z035867 | UT | 36 |
| 2018-08-31 | GURNEY | A027523 | UT | 36 |
| 2018-08-31 | GURNEY 306 | A022464 | UT | 36 |

UTAH DEPARTMENT OF AGRICULTURE
**LIVESTOCK BRAND INSPECTION**

870

OWNER: _Sugar Loaf Holdings LLC_    ADDRESS: _1471 N 900 W Leh. Ut 84043_

BUYER: _____    ADDRESS: _____

SOLD TO:    ☐ _Ogallala Livestock Auction_    DESTINATION: _Ogallala, NE_

CONSIGNED TO: ☒

CARRIER: _____ LIC. NO. _____    DATE: _Thursday 8-31-18_

| Steers | Cows | Heifers | Bulls | Horses | Brand | Location | Color or Breed | Total |
|--------|------|---------|-------|--------|-------|----------|----------------|-------|
|  |  | 34 |  |  | ▽ | LR | mix | 34 |
|  | 502 |  |  |  | ▽AA | RS RH LH | mix | 502 |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  | 536 |

**LIVESTOCK INSPECTED FOR:**

☐ Change of Ownership
☒ Leaving the State
☐ Slaughter
☐ Released at no charge
☐ Yearly Travel Permit
☐ Lifetime Travel Permit
☐ Other (specify) _____

Owner Premises No. _____

GPS Coordinates: _____

TIME        MILEAGE

Owner or Agent Signature

(Driver)

Cattle Inspection    536°°
Beef Council
Predator Control    141°°
Horse Inspection    20°°
**TOTAL**    697°°

Dealer's License No.
Required by Utah
State Law

**Validation of Brand Certificates:**

All Brand Inspection certificates, except for " Change of ownership"
and " travel permits" shall be automatically cancelled and void 72
hours after time of issuance.
This certificate void if altered.

**BRAND INSPECTOR** _____

PAID BY CASH OR CHECK

# **Exhibit L**

4836-7704-4088, v. 1

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

**Ogallala**
**LIVESTOCK AUCTION MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

SELL-NO:  20                    010782

DATE    Sep  5, 2018

SOLD FOR    SUGAR LOAF HOLDINGS        1471 N 900 W        LEHI, UT  84043

| Head | Description | | | Buyer | Avg-wt | Weight | Price | Amount |
|---|---|---|---|---|---|---|---|---|
| 15 | RED | BULL | FE | 3-66X | 1378 | 20675 | 79.50C | 16,436.63 |
| 11 | RED | BULL | FE | 3-66X | 1225 | 13475 | 77.50C | 10,443.13 |
| 1 | RED | BULL | FE | 3-66X | | 1460 | 55.50C | 810.30 |
| 1 | RED | BULL | FE | 106-1 | | 1230 | 43.00C | 528.90 |
| 1 | RED | BULL | FE | 106-1 | | 1340 | 62.50C | 837.50 |
| 1 | RED | BULL | FE | 3-66X | | 1335 | 55.50C | 740.93 |
| 1 | RED | BULL | FE | 46-7X | | 1185 | 59.00C | 699.15 |
| 1 | BLK | BULL | FE | 3-66X | | 1625 | 72.00C | 1,170.00 |
| 1 | RED | BULL | FE | 106-1 | | 1180 | 52.00C | 613.60 |
| 8 | BLRD | COW | SL | 8-33 | 1209 | 9670 | 58.00C | 5,608.60 |
| OPEN; | | | | | | | | |
| 5 | BLK | COW | SL | 8-33 | 1463 | 7315 | 57.50C | 4,206.13 |
| OPEN; | | | | | | | | |
| 5 | BLK | COW | FE | 195-7 | 1068 | 5340 | 57.50C | 3,070.50 |
| OPEN; | | | | | | | | |
| 9 | BLK | COW | SL | 8-13 | 1206 | 10850 | 56.50C | 6,130.25 |
| 6 | BLRD | HFRT | FE | 195-7 | 985 | 5910 | 55.50C | 3,280.05 |
| OPEN; | | | | | | | | Continued*** |

**DEDUCTIONS**

TOTAL DEDUCTIONS

NET PROCEEDS

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

*Ogallala*
**LIVESTOCK AUCTION
MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

SELL-NO:  20                    010783

DATE    Sep  5, 2018

SOLD FOR    SUGAR LOAF HOLDINGS        1471 N 900 W            LEHI, UT  84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|------|-------------|-------|--------|--------|-------|--------|
| | | | | | | $54,575.67 |
| | BALANCE FORWARD FROM PAGE 1 | | | 1455 | 55.00C | 800.25 |
| 1 | RWF  COW    SL | 25-2 | | | | |
| OPEN; | | | | 1090 | 60.50C | 659.45 |
| 1 | BLK  COW    SL | 8-2 | | | | |
| OPEN; | | | | 1110 | 53.00C | 588.30 |
| 1 | BLK  COW    SL | 8 | | | | |
| OPEN; | | | | 1025 | 40.00C | 410.00 |
| 1 | BLK  COW    SL | 195-3 | | | | |
| OPEN; | | | | 1140 | 55.50C | 632.70 |
| 1 | BLK  COW    SL | 25-2 | | | | |
| OPEN; | | | | 1430 | 61.50C | 879.45 |
| 1 | BLK  COW    SL | 8-33 | | | | |
| OPEN; | | | | 1090 | 52.50C | 572.25 |
| 1 | BLK  COW    SL | 8-2 | | | | |
| LUMP; OPEN; | | | | 1365 | 800.00H | 800.00 |
| 2 | BLK  C&C    BR | 3-2 | 683 | | | |
| 5-6 YR OLD; | | | | 45770 | 1,310.00H | 44,540.00 |
| 34 | BLK  HFRT   BR | 277-2 | 1346 | | | Continued*** |

**DEDUCTIONS**

| | |
|---|---|
| TOTAL DEDUCTIONS | |
| NET PROCEEDS | |

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

**Ogallala**
**LIVESTOCK AUCTION MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

SELL-NO:  20            010784

DATE    Sep  5, 2018

SOLD FOR    SUGAR LOAF HOLDINGS        1471 N 900 W            LEHI, UT  84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|---|---|---|---|---|---|---|
| | | | | | | $104,458.07 |
| | BALANCE FORWARD FROM PAGE 2 | | | | | |
| | 4 YR OLD BRED RED ANGUS BULL DUE SEPT | | | | | |
| 15 | | | | | | |
| 27 | BLK HFRT BR | 46-10 | 1184 | 31960 | 1,275.00H | 34,425.00 |
| | 4 YR OLD BRED RED ANGUS BULL DUE SEPT | | | | | |
| 15 | | | | | | |
| 117 | BLK COW BR | 285 | 1467 | 171620 | 1,335.00H | 156,195.00 |
| | 5-6 YR OLD BRED RED ANGUS BULL DUE SP | | | | | |
| ET 15 | | | | | | |
| 119 | BLK COW BR | 225-7 | 1317 | 156765 | 1,335.00H | 158,865.00 |
| | 5-6 YR OLD BRED RED ANGUS BULL DUE SE | | | | | |
| PT 15 | | | | | | |
| 1 | BLK COW BR | 277-2 | | 1240 | 975.00H | 975.00 |
| | 5-6 YR OLD LUMP ON NOSE | | | | | |
| 35 | BLK COW BR | 277-3 | 1335 | 46715 | 1,200.00H | 42,000.00 |
| | 5-6 YR OLD BRED RED ANGUS BULL DUE SE | | | | | |
| PT 15 | | | | | | |
| 31 | BLK COW BR | 277-3 | 1236 | 38330 | 1,250.00H | 38,750.00 |
| | | | | | | Continued*** |

**DEDUCTIONS**

**TOTAL DEDUCTIONS**

**NET PROCEEDS**

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

*Ogallala*

**LIVESTOCK AUCTION
MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

**DATE** Sep 5, 2018

SELL-NO: 20                010785

**SOLD FOR** SUGAR LOAF HOLDINGS      1471 N 900 W        LEHI, UT  84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|------|-------------|-------|--------|--------|-------|--------|
| | BALANCE FORWARD FROM PAGE 3 | | | | | $535,668.07 |
| | 5-6 YR OLD BRED RED ANGUS BULL DUE SP ET 15 | | | | | |
| 29 | BLK  COW    BR | 225-8 | 1469 | 42590 | 1,300.00H | 37,700.00 |
| | SOLID MOUTH BRED RED ANGUS BULL DUE S EPT 15 | | | | | |
| 1 | BLK  COW    SL | 195-2 | | 1265 | 53.00C | 670.45 |
| | SOLID MOUTH; | | | | | |
| 10 | BLK  COW    BR | 225-8 | 1284 | 12835 | 1,200.00H | 12,000.00 |
| | SOLID MOUTH BRED RED ANGUS BULL DUE S EPT 15 | | | | | |
| 9 | BLK  COW    BR | 286 | 1375 | 12375 | 885.00H | 7,965.00 |
| | SHORT/SPREAD/BRKN MOUTH BRED RED ANGU S BULL DUE SPET 15 | | | | | |
| 3 | RED  HFRT    BR | 46-10 | 1455 | 4365 | 1,210.00H | 3,630.00 |
| | 4 YR OLD BRED RED ANGUS BULL DUE SEPT 15 | | | | | |
| 1 | RED  HFRT    BR | 46-10 | | 1025 | 1,175.00H | 1,175.00 |
| | | | | | | Continued*** |

**DEDUCTIONS**

**TOTAL DEDUCTIONS**

**NET PROCEEDS**

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

**Ogallala**
**LIVESTOCK AUCTION MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

DATE     Sep  5, 2018                                SELL-NO:  20                010786

SOLD FOR     SUGAR LOAF HOLDINGS      1471 N 900 W            LEHI, UT  84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|------|-------------|-------|--------|--------|-------|--------|
| | BALANCE FORWARD FROM PAGE 4 | | | | | $598,808.52 |
| | 4 YR OLD | | | | | |
| 8 | BLK   COW    BR | 46-10 | 1183 | 9465 | 1,035.00H | 8,280.00 |
| | 5-6 YR OLD BRED RED ANGUS BULL DUE SE | | | | | |
| | PT 15 | | | | | |
| 6 | BLK   COW    BR | 46-10 | 1381 | 8285 | 1,160.00H | 6,960.00 |
| | 5-6 YR OLD, SHORT TAILS | | | | | |
| 8 | BLK   HFRT   BR | 277-4 | 1353 | 10825 | 950.00H | 7,600.00 |
| | 3-6 YR OLD, LUMPS | | | | | |
| 12 | BLK   HFRT   BR | 277-4 | 1272 | 15265 | 925.00H | 11,100.00 |
| | 4-6 YR OLD, LAME | | | | | |
| 2 | BLK   COW    BR | 286 | 1158 | 2315 | 800.00H | 1,600.00 |
| | 4 YR OLD, SOLID MOUTH, LAME | | | | | |
| 5 | BLK   COW    BR | 46-10 | 1234 | 6170 | 985.00H | 4,925.00 |
| | 5-6 YR OLD, LAME, BAG, LONG TOE | | | | | |
| 1 | BLK   COW    BR | 195-2 | | 1320 | 59.50C | 785.40 |
| | 5-6 YR OLD, LUMP ON LEG | | | | | |

Payable deductions.......                                        3001.20
JOSH BOWN                                                    Continued***

**DEDUCTIONS**

TOTAL DEDUCTIONS

NET PROCEEDS

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

SETTLEMENT

**DWAYNE MAYS**
Owner/Manager
Res. 308-284-2069

**SCOTT VAN WINKLE**
Owner/Manager
Res. 308-874-2813

*Ogallala*

**LIVESTOCK AUCTION
MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

**HEATHER PETERSON**
Office Manager
308-284-2071

**DATE**   Sep 5, 2018                    SELL-NO: 20                010787

**SOLD FOR**   SUGAR LOAF HOLDINGS      1471 N 900 W        LEHI, UT 84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|------|-------------|-------|--------|--------|-------|--------|
|  | BALANCE FORWARD FROM PAGE 5 | | | | | $640,058.92 |
|  | Payable deductions....... | | | | | |
|  | CODY BROKERS LTD | | | | 3001.20 | |
|  | GURNEY TRUCKING INC | | | | 11857.20 | |
|  | JOSH KEARL | | | | 3001.20 | |
|  | MCKEE TRUCKING | | | | 3001.20 | |
|  | MURDOCK LIVESTOCK | | | | 3001.20 | |
|  | JR OKELBERRY TRANSPORT LL | | | | 3001.20 | |
|  | MATT & BRADY OLSEN LIVEST | | | | 3001.20 | |
|  | CLAY PALFREYMAN BROKERS | | | | 3001.20 | |
|  | 21 RANCH | | | | 3001.20 | |
|  | WALL LIVESTOCK & TRANSPOR | | | | 3001.20 | |
|  | MONT J WILLIAMS TRUCKING | | | | 3001.20 | |

| Averages: | Head | Avg-wt | Avg-$-cwt | Avg-$-hd |
|-----------|------|--------|-----------|----------|
| Bred Cow | 373 | 1367 | 93.52 | 1,278.82 |
| Cows | 35 | 1222 | 56.63 | 692.24 |

Continued***

**DEDUCTIONS**

**TOTAL DEDUCTIONS**

**NET PROCEEDS**

DWAYNE MAYS
Owner/Manager
Res. 308-284-2069

SCOTT VAN WINKLE
Owner/Manager
Res. 308-874-2813

**SETTLEMENT**

*Ogallala*

**LIVESTOCK AUCTION
MARKET, INC.**
P.O. Box 30
Ogallala, Nebraska 69153
308-284-2071

HEATHER PETERSON
Office Manager
308-284-2071

**DATE**   Sep 5, 2018                          SELL-NO:  20                    010788

**SOLD FOR**   SUGAR LOAF HOLDINGS        1471 N 900 W              LEHI, UT  84043

| Head | Description | Buyer | Avg-wt | Weight | Price | Amount |
|------|-------------|-------|--------|--------|-------|--------|
|      | BALANCE FORWARD FROM PAGE 6 | | | | | $640,058.92 |
|      | Averages:        Head   Avg-wt   Avg-$-cwt   Avg-$-hd | | | | | |
|      | Bulls            33     1318     74.20       978.19 | | | | | |
|      | Hfrettes         91     1265     91.86     1,162.09 | | | | | |
|      | Cow-cf pr.        1     1365     58.61       800.00 | | | | | |
| 534  |             |       |        | 712795 |       | $640,058.92 |

**DEDUCTIONS**

| | | | |
|---|---|---|---|
| COMMISSION | 12,828.26 | YARDAGE | 2,981.50 |
| BEEF COUNCIL | 534.00 | HEALTH | 213.60 |
| INSURANCE | 896.08 | BRAND INSP. | 534.00 |
| TRUCKING | 44,870.40 | PREG MO TATT | 3,234.00 |
| MO TATTOO | 10.00 | PREG TEST | 152.00 |
| REMOVE TAGS | 115.75 | HAY | 5,330.00 |

**TOTAL DEDUCTIONS**   $71,699.59

PLEASE KEEP THIS RECEIPT FOR YOUR RECORDS!!!!!!        **NET PROCEEDS**   $568,359.33

PLEASE DETACH THIS PORTION BEFORE DEPOSITING CHECK

---

*Ogallala*
**Livestock Auction Market, Inc.
Custodial Account For
Shippers' Proceeds**

**PAY** TO THE ORDER OF

76-1395
1041

**ADAMS BANK & TRUST CO.**
OGALLALA, NEBRASKA

| DATE | CHECK NO. | AMOUNT |
|------|-----------|--------|
| Sep 5, 2018 | 010788 | $***568,359.33 |

*************************Five Hundred Sixty Eight Thousand Three Hundred Fifty Nine and 33/100 Dollars

SUGAR LOAF HOLDINGS
& BANK OF THE WEST
1471 N 900 W
LEHI, UT  84043

OGALLALA LIVESTOCK AUCTION MARKET, INC.
CUSTODIAL ACCOUNT FOR SHIPPERS' PROCEEDS
VOID AFTER 180 DAYS

SIGNATURE   *Heather Peterson*

⑆010788⑆ ⑈104113958⑈ ⑆0000 066 8⑆

# **Exhibit M**

4836-7704-4088, v. 1

# APPRAISAL REPORT

## Sugarloaf Holdings LLC
### 7,164.35 +/- Acres
### Greenwood, Millard County, UT

Prepared For:
Clients
**Gerald H Suniville**
**Attorney for**
**Bank of the West**
**and its affiliates or subsidiaries**

Requested By:
**Gerald H Suniville**
**Attorney for**
**Bank of the West**
**215 South state Street, Suite 1200**
**Salt Lake City, UT 84111**
**(801) 531-8900**

Users:
**Bank of the West**
**and Its Legal Counsel**

| | |
|---|---|
| **Date of Opinion of Value:** | **September 6, 2018** |
| **Date of Inspection:** | **September 6, 2018** |
| **Date of Report:** | **September 10, 2018** |

Prepared By:
Victor L. 'Le' Jackson
Certified General Appraiser
Jackson Property Services
785 South 530 East
Spanish Fork, Utah 84660-2834

# Table of Contents

Title Page:                                                      1

Table of Contents:                                              2

Summary of Salient Facts and Conclusions:                      3

Special Assumptions and Limiting Conditions:                   4

Appraisal Process:                                             5-8

Scope of the Appraisal:                                        9

Market Value Defined:                                         10

Exposure and Marketing Time:                                 10

Summary of Appraisal Problems:                               10

Purpose of the Appraisal:                                     11

Legal Description:                                            11

Area and Neighborhood Data:                                  11-12

State Map:                                                   13

Area and Neighborhood Map:                                   14

Topo Map of Subject showing Well Locations:                  15

Topo Map of Subject showing Subject Blocks:                  16

Aerial Photos of Farmstead:                                  17

Aerial Photos of South Farmstead:                            18

Subject Photos:                                              19-20

Property Data:                                               21-23

Use/History/Ownership:                                       21

Highest and Best Use:                                        24

Appraisal Process:                                           25-34

Concluded Opinion of Value:                                  34

Comparable Sales Map:                                        35

Comparable Sales:                                            35-54

Reconciliation and Final Value Conclusions:                 55

General Assumptions and Limiting Conditions:                 56

Appraiser Certifications:                                    57

## Addenda:

Engagement Letter - Statement of Work:                      A1-25

Commitment For Title Insurance:                             A26-68

Taxes and Assessed Valuations:                             A69-70

Block Acreage:                                             A71-73

State of Utah – Division of Water Rights:                  A74-108

Law Suite – WRNUM 67-1752:                                A109-123

Pictures of Un-Insured Buildings:                          A124

Appraiser's Active License (Copy):                         A125

Appraiser's Qualifications:                                A126

# Summary of Salient Facts and Conclusions

PROJECT:                          Sugarloaf Holdings LLC – Loan Collateral

PROPERTY OWNERS:                  Sugarloaf Holdings LLC

LOCATION:                         2300 W 3300 N, Greenwood, Millard Cnty

LEGAL DESCRIPTION:                Portions of various Sections located in T19S,
                                  & T20S, R5W, SLM – Preliminary Report in
                                  the Addendum.

TAX PARCEL #:                     77 parcels – see attached Tax Valuation Sheet

SITE DESCRIPTION:                 7,164.35 acres of irrigated crop & desert
                                  pasture land

RIGHT OF WAY:                     3300 N, 3800 N, 4700 N, 8900 N and 1500
                                  W, 1800 W, 2200 W, Highway 50 and
                                  Highway100.  Dirt roads provide access to
                                  the interior of the property. see plat maps

ACCESS:                           Same

UTILITIES:                        Electricity, Phone, Culinary Water

WATER RIGHTS:                     28 WRNUMs – see attached Summary sheet
                                  266 shares of Chalk Creek Irrigation Shares

IMPROVEMENTS:                     see Summary on page 30

CHATTEL:                          Irrigation Pivots – Not included in this
                                  appraisal – See separate Chattel Appraisal

PROPERTY RIGHTS APPRAISED:        Available surface estate

HIGHEST & BEST USE:               VACANT:     Irrigated Crop and Desert
                                  Pasture Land
                                  IMPROVED:  Ranch with Irrigated Crop
                                  and Desert Pasture Land

ZONING:                           Agricultural-20 ac minimum and
                                  Agricultural Industrial (Millard County)

DATE OF INSPECTION:               September 6, 2018
DATE OF VALUATION:                September 6, 2018
DATE OF REPORT:                   September 10, 2018
FINAL OPINIONS OF VALUE:

## "As Is" Value     $5,170,000

## 180-Day Disposition Value     $4,135,000

## Extraordinary Value     $11,870,000

## Special Assumptions and Limiting Conditions

Utah is a non-disclosure State with no legal requirement for reporting of transactions or sale prices. A reasonable effort was made to research the market and locate the best available market comparables however no guarantee may be made as to the accuracy of the comparable data used. Information is true and correct to best of the knowledge of the appraiser.

Property size (acreage) was taken from the Millard County Assessor Plat Maps and Treasurer 2018 Tax Notices. (See addendum)

The appraiser has visited, inspected, and photographed the subject site and observed the general area. No investigation or inspection has been made as to soil conditions, engineering feasibility, or hidden or unapparent conditions that would limit the value or utility of the subject site.

No responsibility is assumed for any legal matters. The research done as to the title consisted solely of the Millard County Assessor Plat Maps, Millard County Treasurer 2018 Tax Notices and a Commitment for Title Insurance (#36133) issued by Juab Title & Abstract Company dated January 19, 2017. (See addendum) It is advised that an updated commitment for Title Insurance be obtained and reviewed prior to any lending decisions are made as to the collateral. It is assumed for purposes of this appraisal that clear surface interest is pledged subject to: taxes and road, utilities, canal/water pipeline, & petroleum easements and excluding mineral rights.

The property has water via wells located on the subject and from surface sources (Chalk Creek Irrigation Company [CCIC]). There are 28 Well Water Rights recognized by the State of Utah in the name of SugarLoaf Holdings, LLC. The water rights numbers (WRNUMs) are shown the summary in the Addenda as are the Data Printout Sheets. These rights can-not be transferred off of the property or their use be changed without the approval of the Utah State Division of Waters and the State Engineer. The summary sheet shows three (3) water rights used in conjunction with the active pivot located northeast the Ranch farmstead. One water right (WRNUM 67-525) located near the north end of the Ranch has irrigation rights but is presently just use for livestock water. There are twenty (20) additional water rights designated for livestock and/or domestic use. Water WRNUM 67-1752 is under litigation. The Plaintiffs charge that the replacement well can not be used to pump the flow requested. In addition, the Plaintiffs charge that the water right has been forfeited for lack of use. See a copy of the complaint in the addendum. Three (3) water rights are located off of the subject property.

I was not able to obtain any reliable information as to the amount of water delivered by CCIC to the subject. The Sugarloaf Holdings LLC has prepared a reservoir to receive any water delivered to the subject by CCIC. An extensive infrastructure has been installed for the handling and distribution of this and well water. The Greenwood area receives on an average 8.5" of precipitation spread fairly evenly throughout the year.

I inspected the subject and found fuel spills which I deemed typical of an agricultural operation. I am not qualified to verify or detect the presence of hazardous substances by visual inspection or otherwise, nor am I qualified to determine the effect, if any, of such substances present. The final value conclusion is based on the subject property being free of hazardous waste contaminations, and it is specifically assumed that present and subsequent ownerships will exercise due diligence to ensure that the property does not become otherwise contaminated.

Validity of this report is dependent upon its use in its entirety. No inference as to value conclusions, analysis or any other matter may be made without considering the entire report and analyses contained therein.

# Appraisal Process

The appraisal process is the orderly program in which the data used to estimate value is collected, classified, analyzed, and presented.  After defining the appraisal problem, the appraiser collects and analyzes factors that affect market value.  These include area and neighborhood data, site and improvement analysis, highest and best use analysis, and the application of the three approaches to value.  They are the Cost Approach, the Income Approach, and the Sales Comparison Approach to Value.  An explanation of the methodology of each approach is given below.  However, with some property it is not possible or economically feasible to obtain adequate information to apply all three approaches.  The appraiser then applies the approach or approaches for which he has adequate data to give a reliable value estimate.

All three approaches are basically predicated on the principle of substitution which implies that an investor or purchaser will pay no more for a given property than the amount for which he could purchase another property with equal utility and desirability.  On the other hand, a prudent seller will sell for no less than the price for which similar properties are selling.

# Cost Approach

The Cost Approach to value is one in which the appraiser identifies the different components which comprise a given property and estimates the value of each component separately by using sales within the market which are comparable to that component.  This approach is based on the assumption that the summation of the contributory value of the various components will approximate the value of the property as a whole.  Specifically, this approach calls for inventorying the various improvements, as well as the different types or classes of land which comprise the subject, and estimating the value of each.  In valuing the improvements, the current cost of replacing or reproducing the improvement is estimated and then accrued depreciation is deducted to arrive at an estimated contributory value.  Reproduction cost is the estimated cost to construct, at current prices, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all the deficiencies, super-adequacies, and obsolescence of the subject building.  Replacement cost is the estimated cost to construct, at current prices, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout.  Accrued depreciation is the total of physical, functional and external depreciation.

Valuation of the land component consists of identifying the different types or classes of land which make up the subject property.  Then, sales composed totally or predominantly of each type of land are used to determine the value of that type of land.  The values of leases or grazing privileges that may be included in a ranch property are valued in the same manner.  The value of each land type or class is then added to the estimated contributory value of the improvements to indicate the composite value of the whole property.

## Income Approach

The value of real estate represents the present worth of future benefits which an owner or buyer can reasonably anticipate (Principle of Anticipation). The Income Approach to value is a discounting process through which future income expectations are converted to present worth. This approach is predicated on the assumption that there is a relationship between the amount of net income a property can produce and its value. The application of the Income Approach calls for estimating the net income a property can produce. In order to do this, the gross income the property can generate must be estimated, then, expenses incurred in generating this income must be estimated and subtracted. The expense estimate must consider taxes, insurance and maintenance on improvement, any operating expenses and a management fee if it is typical for the area and type of property being appraised.

The net income thus derived is then capitalized into an indication of value using a capitalization rate, or rate of return, which is typical of the property being appraised. The capitalization rate is extracted from the market using current sales of property similar to the subject and net income on an owner-operator, crop share rent or cash rent basis. The capitalization rates based on the different types of operation will not be the same. The capitalization rate on a cash rent basis should be the lowest because it involves the least risk to the property owner and the rate determined on an owner-operator basis should be the highest because it involves the most risk. The method used to determine net income and the capitalization rate should be the same on all of the sales and the subject or it will not result in an accurate indication of value. Capitalization rates on agricultural properties tend to be lower than the returns that can be earned on other types of investments. This would indicate that the investor in farmland would expect to get most of the return on his investment when the property is sold rather than during the time the property is held. This also infers that the buyer expects the value of the land to increase, rather than decrease.

## Sales Comparison Approach

The Sales Comparison Approach to value is a process of comparing sales data; that is, the prices paid for similar properties, prices asked by owners and offers made by prospective purchasers willing to buy. The Sales Comparison Approach is based on the principle of substitution, which holds that a prudent man will pay no more for a property than it would cost him to buy an equally desirable substitute property. This approach requires the appraiser to search the market area for recent sales of properties similar to the subject and to verify the sale information with parties involved in the transaction (buyer, seller, broker, banker, etc.). The application of this approach consists of the comparing and rating of properties for which sales data is known against the property being appraised. By making adjustments to the sales information for differences between properties, indications are developed of what these properties would have sold for had they possessed the same characteristics as the subject property. Because like units must be compared, the appropriate unit of comparison should be selected. Farm properties are usually valued on a per acre basis and ranches and dairies are usually valued on an Animal Unit or Per Head basis. Other types of properties may be valued based on capacity, throughput, or area basis.

There are ten basic elements of comparison that should be considered in the Sales Comparison Analysis.

They are:

1 - real property rights conveyed;
2 - financing terms;
3 - conditions of sale;
4 - expenditures made immediately after purchase;
5 - market conditions;
6 – location;
7 - physical characteristics (size, construction quality, condition);
8 - economic characteristics (operating expenses, lease provisions, management, tenant mix);
9 - use (zoning);
10-non-realty components of value.
(Appraisal of Real Estate, 11th Edition, A.I., Chicago, Ill.)

Adjustments are made to sale prices in order to make the sale the similar to the subject. Adjustments should be derived from the market, if possible, through a process called paired sales analysis. The adjustments are determined by comparing sales that are similar in all but one respect to determine the adjustment for that factor; sometimes a series of adjustments must be made in order to isolate the effect of one factor. This method may not always be practical, because there is not enough data available to determine the adjustments. In these cases, the appraiser must use his or her best judgment to determine adjustments from the data available and from past experience in similar situations. Adjustments may be made on a percentage or dollar basis. Many times, the client will specify how the adjustments are to be made.

Each final adjusted sale price is a possible value indicator for the subject property. The set of final sale prices indicates the range of value in which the values of the subject will likely fall. The sale with the least adjustment to sale price is the sale most similar to the subject and generally should be given more weight when reconciling the value indications from the sales Comparison Approach.

Income multipliers, capitalization rates, and yield rates used in the Income Approach are extracted from comparable properties in the Sales Comparison Approach. Information developed in the analysis of sales information is also used in the Cost Approach.

# Reconciliation

After the appraiser has completed the three approaches to value and arrived at an indicated value from each approach, he must reconcile the values to arrive at a final value conclusion. The appraiser should identify the strengths and weaknesses in each approach and how each approach relates to the others. If one or more approaches to value is not used the appraiser should explain why it is not used, or why it does not relate to the appraisal problem. After going through this process, the appraiser arrives at a value, or range of value, as defined later in this report.

All three accepted and recognized approaches to value were considered in this appraisal assignment. Because of the type of property being appraised (combined irrigated crop and desert pasture land) and the availability (or lack thereof) of market data, only the modified cost approach / market or direct sales comparison approach was considered useful and applicable for this assignment.

The cost approach to value is being used. It takes land values using the sales comparison approach to value and adds depreciated improvement values. Depreciation indicators were taken from the local market and from state wide information. A replace cost new was done for each structure on the subject "regardless of physical condition" as directed by the engagement letter.

A direct sales comparison approach to value was not done as ranch / farm properties of this size with improvements could not be found in the market area. The subject is a compilation of many smaller parcels acquired over a three-year period.

The income approach was not deemed applicable for this appraisal because agricultural properties don't generate income indicative of their market value. This is not uncommon for agricultural properties. Many people desire the stability that real estate holdings provide over and above the return on their investment. The economic return does not consider the pride in ownership that many people get from owning real estate. Accordingly, the Income Approach to Value is not used in this appraisal.

# Scope of the Appraisal

This report is presented in a Self-Contained format.  It is intended to comply with "The Uniform Standards of Professional Appraisal Practice (USPAP), to the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) and your requirements as the client.

On August 7, 2018 I visited the subject site and photographed and inspected the subject property.  David Gray, owner of the ranch rode around with me and showed me various parcels and sites on the property.  I again visited the subject on September 4th and September 6th to measure the buildings and take additional pictures.

The subject consists of seventy-seven (77) non-contiguous tax parcels.  It has frontage on 3300 N, 3800 N, 4700 N, 8900 N and 1500 W, 1800 W, 2200 W, Highway 50 and Highway100.  Dirt roads provide access to the interior of the property.

Surrounding properties and land uses were observed with regard to conformity and arriving at the highest and best use of the subject.  It was noted by observation that the area is rural.  The surrounding parcels are irrigated crop land (with pivots) and desert dry pasture land.  The area's economy is agriculturally based.  There are few sales of irrigated crop land so the search was expanded to include the Delta area and the Kanosh area south of Delta.

As mentioned previously, all three accepted and recognized approaches to value were considered in this appraisal assignment, but only the cost approach was considered useful and applicable for this assignment.

The Cost Approach provides a reliable approach to valuing the subject.  This approach reflects the reaction of typical buyers and sellers in the market place. It compares transactions of similar properties capable of assemblage.  Similar sales with structural improvements allow for determining depreciation.

The Sales Comparison Approach to Value was not applicable as no ranch sales the size of the subject were found in the market area.

The Income Approach to Value is deemed to be unreliable because of the significant variation in CAP rates that can occur between agricultural property.  For this reason, the Income Approach to Value is not used in this appraisal.

## Market Value Definition
### (As per FIRREA effective August 24, 1990)

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specific date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their best interest;
3. a reasonable time is allowed for exposure on the open market;
4. payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

## Exposure and Marketing Time Estimates

Market value (see above definition) as estimated and the costs and other estimates used in arriving at the opinion of value are as of the date of the appraisal. Because markets upon which these estimates and conclusions are based upon are dynamic in nature, they are subject to change over time. Further, the report and value opinions are subject to change if future physical, financial, or other conditions differ from conditions as of the date of appraisal.

In applying the market value definition to this appraisal, a reasonable exposure time of <u>6-12</u> months has been estimated. Exposure time is the estimated length of time the property interest being appraised would have been offered in the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; exposure time is always presumed to precede the effective date of the appraisal.

## Summary of Appraisal Problem

As previously stated this appraisal involves arriving at an opinion of the market value of the available surface estate of the described property. The opinion of value of this type of property is best arrived at through the cost approach to value. In the cost approach recent sales of similar vacant land are analyzed and adjusted either upward or downward as an indication of what the subject would most probably sell for. Then the contributory value of the structural improvements is added to that of the vacant land.

The credibility of this approach and the accuracy of the opinion of value are limited by the availability of similar indicative market data. It is also dependent upon proper analysis and adjustment of this data.

# Purpose of the Appraisal

The purpose of the appraisal is to provide the clients with an opinion of market value of the subject, as of the date of the last inspection (September 6[th,] 2018), and to be used in possible liquidation of the subject. The property rights appraised were the available surface **estate** rights of the property. See Assumptions and Limiting Conditions.

# Legal Description:

The subject is seventy-seven (77) parcels totaling 7,164.35 +/- acres. They are identified on the Millard County records as the parcel numbers shown in the Commitment for Title Insurance in the Addenda. The property consists properties located in Sections in T 19 & 20 S, R 5 W, SLB&M.

# Area and Neighborhood Data

A neighborhood is "A group of complementary land uses; a congruous grouping of inhabitants, buildings or business enterprises."
*The Dictionary of Real Estate Appraisal* (Appraisal Institute, Chicago, IL., Third Edition, 1993) p242.

The subject is located northwest of Fillmore in Millard County, Utah. For the purpose of this appraisal, the subject's general neighborhood Millard County. The subject's immediate neighborhood is that area around Greenwood in Millard County. The properties immediately adjacent to the subject are vacant agricultural acreages

Millard County is located in west central Utah. Millard County was first settled in 1851. It was named to recognize then President Millard Fillmore. Fillmore the county seat is near the geographic center of the Territory of Utah and served as the State Capital for a few years until the legislature voted to move the Capital to the more populous Salt Lake City. Fillmore is located on the north/south corridor (Interstate 15) connecting Salt Lake City on the North with Los Angeles, CA on the south. Millard County is the third largest county by land area in the State of Utah. There is a total of 4,375,614 acres in the county. Of the total acreage, 74.4% is federally owned, 12.1% is State owned and 13.5% is privately or local government owned. Delta is the largest city in the county. It is located 36 miles to the west of Fillmore and the I-15 corridor.

The Sevier River ends in a dry lake southwest of Delta. The Delta area is the last consumer of the river water for irrigation. When Intermountain Power moved into the county and built their coal fired power plant, they bought up much of the water rights for cooling purposes. They bought more than they presently use, for possible expansion. They rent back to the farmers the water they are not possibly using. Thus, you will find farm ground designated as crop land without water rights. Alfalfa is the top agricultural commodity of the area. The Delta area receives about 8.5 inches of precipitation per year. Temperatures are moderate and rarely dip below 0* in the winter or exceed 100* in the summer. This makes for an ideal climate to raise cattle.

Fillmore is located on I-15. Freeway I-15 connects Salt Lake City to the northeast and Los Angeles, CA, to the southwest. Greenwood, which is northwest of Fillmore lies between Fillmore and Delta connected by Highway 50 and 100. A small regional airport provides for private air traffic in and out of Delta.

A hospital is located in Fillmore with a medical clinic in Delta.  Delta and Fillmore each have elementary schools and high schools.  Post-secondary schools are located along the Wasatch Front (Provo-Salt Lake-Ogden area).  There are congregations of most religious groups located in the county, but The Church of Jesus Christ of Latter-day Saints is the dominant religion, as it is in most of Utah.

## SOCIAL CONSIDERATIONS

The Millard county area is well known for its hunting opportunities.  The area provides excellent hunting for mule deer and elk.  There are leagues for bowling, softball, baseball, basketball, and volleyball.  There are also other community, church, and school sponsored cultural activities.

### POPULATION

|  | 1970 | 1980 | 1990 | 2000 | 2010 | Annual % Change 0-10 |
|---|---|---|---|---|---|---|
| Delta | 1,610 | 1,930 | 2,998 | 3,209 | 3,436 | 7.1% |
| Holden | 351 | 364 | 402 | 400 | 378 | -5.5% |
| Fillmore | 1,411 | 2,083 | 1,956 | 2,253 | 2,435 | 8.1% |
| Leamington | 112 | 113 | 253 | 217 | 226 | 4.1% |
| Oak City | 278 | 389 | 587 | 650 | 578 | -11.1% |
| Balance of Co | 3,226 | 4,091 | 5,137 | 5,676 | 5,450 | -4.0% |
| Millard Cnty | 6,988 | 8,970 | 11,333 | 12,405 | 12,503 | 0.8% |
| State of UT | 1,059,537 | 1,461,037 | 1,722,850 | 2,233,169 | 2,763,855 | 4.75% |

The population of Millard County was 12,405 in 2000.  By 2010 it was 12,503.  This represents a .8% annual increase as compared to 4.75% for the State as a whole.

## ECONOMIC CONSIDERATIONS

Agricultural employment uses 20% of the labor force in the county.  Major non-agricultural employers in Millard County include Intermountain Power Services (electric/gas/sanitary services), the Millard County School District, Millard County, Delta Community Medical Center, Brush Wellman Inc., State of Utah, Federal Government, Sunrise Engineering, Fillmore Hospital, Continental Lime, Quality Market and Duanes's Market.

### Employment

|  |  | Labor Force | Employment | % Unemployment |
|---|---|---|---|---|
| Millard Cnty | 2000 | 4,318 | 4,146 | 3.98% |
|  | 2010 | 6,431 | 6,012 | 6.52% |
| State of UT | 2000 | 1,104,208 | 1,068,371 | 3.25% |
|  | 2010 | 1,371,883 | 1,262,083 | 8.00% |

Top agricultural employers include Pictseet Mushroom Farms and Garden of Eat'n.  Millard County was ranked sixth in the number of farms among Utah counties with 457,823 acres on 650 farms (350 considered full time farms).  Millard County is a leading county in grain and hay production.  Other crops grown in the area include corn for silage and grain.  The corn silage and some of the small grains are fed to livestock locally, with the rest being shipped out of the area.  Average yields for corn silage are 19 ton/acre.  Corn for grain averaged 144 Bu/acre.  The average yield for barley is 87 Bu/acre (Utah Agricultural Statistics, 2006).

Millard County is zoned and there are Land Use Planners on the county staffs to regulate land use and development in the County.  Real estate tax rates in the area appear to be typical for the State of Utah.

## SUMMARY

The general economy of the immediate neighborhood is expected to remain stable.  There are efforts to encourage tourism in the area but this is not expected to produce a major impact in the near future.  Real estate values are expected to continue to be stable, depending on the type of property.  The population is expected to remain stable.  Vacant land values have remained stable with limited activity.



**STATE MAP**



**AREA / NEIGHBOR MAP SHOWING SUBJECT**



**Topographical Map of the Subject Showing Well Locations**



**Map of the Subject Showing the "Blocks"**



**Aerial Photo of the Farmstead**



**Aerial Photo of the Sheds and Feedlots south of the Farmstead**



**Picture 1** is looking north at the house on farmstead on Block "B" of the subject. Picture was taken from the road - 3300 North.



**Picture 2** is looking north/northeast at the main shop on the farmstead. A partially completed office is just inside the walk-in door.



**Picture 3** is looking southwest at the garage on the farmstead of the subject.



**Picture 4** is looking north/northwest from the south of 3300 N at the 100 Ton scales (left) & scale house (center).



**Picture 5** is looking northeast at bottom of the subject reservoir.



**Picture 6** is looking at the overflow (center – crest) of the subject reservoir.



**Picture 7** is looking south/southwest at equipment shed & granaries & pump house located south of 3300 North, Block "B".



**Picture 8** is looking southeast at the two granaries with coned concrete floors.



**Picture 9** is looking west/northwest at a 2nd equipment shed west of Highway 100.



**Picture 10** is looking south/southwest a near the 2nd equipment shed (Block "C").



**Picture 11** shows one of the stock tanks
on Block "C" of the subject.



**Picture 12** is looking west at solar panel,
well (lower center) and
water tough (tire – center of picture).



**Picture 13** is looking south at another well
house next to holding corral (left of shed).



**Picture 14** is looking at dry pasture on the
subject. Common to Blocks "C", "E" & "F".



**Picture 15** is looking at dry pasture on the
subject. Notice sand dune left of center on the
horizon.  Common to Blocks "E" & "G".



**Picture 16** is looking west along 8900 North.
Block "G" of the Subject is on the right in the
picture.



**Picture 17** is looking at another array of solar-
panels.  Well is visible on the right and is just
north of 8900 North.



**Picture 18** is looking north/northwest at the
equipment shed on Block "G" of the subject.

## Photos of Sites on the Subject

# Property Data

**Site:**

The subject consists of seventy-seven (77) individual tax parcels, totaling 7,164.35 +/- acres. Not all of the parcels are contiguous. For purposes of this appraisal the tax parcels are being grouped into blocks to simplify this appraisal and reflect possible marketing of the subject. See page 16 of this report. The subject was not acquired as a single parcel or Block and would reasonably be disposed of in the same manner. The Blocks are not matched up with the respective purchases. Block "A" is irrigated with a pivot with low head sprinklers. Block "B" has the majority of the buildings and is where the main house in located as well as shops and feed lots. Block "B" is where the Chalk Creek Irrigation water has been used with flood irrigation. The majority of the property consists of dry pasture ground with the irrigated crop land mentioned. The subject is located northwest of Fillmore and west of Holden. The structural improvements are those normally associated with a cattle operation. The residence on the subject is an older dwelling in fair/poor condition. For purposes of this appraisal the subject is broken into seven (7) Blocks with the following acreages. See addendum for chart showing the breakdown by tax parcels.

| | | |
|---|---|---|
| Bock "A" | - | 160 acres |
| Bock "B" | - | 1,188.72 acres |
| Bock "C" | - | 830.01 acres |
| Bock "D" | - | 40 acres |
| Bock "E" | - | 2,696.65 acres |
| Bock "F" | - | 40 acres |
| Bock "G" | - | 2,208.97 acres |

**Use History:**

The ranch has been used for raising beef cattle. A quarter section is irrigated crop ground with a seven (7) tower pivot. Water comes from a well located in the northwest corner of the quarter section. The remainder of the property is dry pasture ground and desert pasture ground.

**Sales History/Ownership:**

The property was purchased as separate parcels as mentioned previously beginning in 2013. Seven purchases were made in 2013 and three purchases were made in 2014. Another purchase was made in June of 2017. The majority of the subject parcels were originally purchased in the name of Gray Ranch LLC. The title to the property was subsequently changed to Sugarloaf Holdings LLC. Principals of the two LLCs are the same.

I am not aware of any current efforts by the owner to market the property to any outside interests. I am aware that Bank of the West may be beginning foreclosure proceedings.

**Legal:**

The subject is seventy-seven (77) parcels totaling 7,164.35 +/- acres. They are identified on the Millard County records as per the chart in the addenda. The parcel numbers and legal descriptions are shown in the Commitment for Title Insurance in the Addenda. The property is located in 26 Sections within Townships 19S & 20 S, Range 5 W, SLB&M.

**Right-of-Way / Access:**
It subject has frontage on 3300 N, 3800 N, 4700 N, 8900 N and 1500 W, 1800 W, 2200 W, Highway 50 and Highway100. Dirt roads provide access in the interior of the property.

**Easements:**
Utility lines were observed leading to and on the property. County roads and power lines were observed crossing the property and are mentioned in the Commitment for Title Insurance. The Commitment for Title Insurance reveals other easements. It is advised that a current Commitment for Title Insurance be obtained and reviewed prior to any lending decisions are made as collateral.

**Water Rights:**
The property has water from 28 different WRNUMs. See the addenda for a list of those water right.
There are also 266 shares of the Chalk Creek Irrigation Company water which goes with the subject. These shares are identified to be highwater shares. These shares are designated for 1,122.9 acres. Copies of the shares were not been provided to this appraiser nor the amount of water historically delivered to the subject.

**Vegetation:**
The vegetation on the non-farmstead portion of subject includes various grasses, rabbit brush, sage brush and grease wood. The quarter section which is presently irrigated with a pivot has an older stand of alfalfa interplanted with sorghum.

**Mineral Rights:**
No mention of mineral rights being excluded. There was found mention of the exception of some gravel and gravel pits.

**Utilities:**
There is electricity, phone and culinary water on the subject.

**Improvements/Fixtures:**

See the List of Buildings in the addendum.

The corrals in Block "B" are divided into multiple pens with headlock and non-headlock stanchions. There are 139 full size headlocks and 186 smaller headlocks.

A 100' (100 ton) digital scale compliments the farmstead.

**Topography:**
The property is generally level with a slight slop to the west. Block "A" has an elevation of approximately 4770'. The elevation ranges on Blocks "B" & "C" from approximately 4800' on the east to 4600' in the west or a 200' drop in four miles. The northern Blocks ("E", "F" & "G") range from 4700' to 4600'. Several of these northern parcels have sand dunes of 5' to 15' in height.

**Soils:**

The soils that are on the subject are identified by the United State Department of Agriculture / Natural Resources Conservation Service as: Bandag loam; Heist fine sandy loam; Hiko Peak fine sandy loam; Jigsaw-Oakcity comlex; Kanosh very fine sandy loam, Kessler loam, Musinia silt loam; Saltair silt loam, Taylorsflat loam and Yenrab fine sand.

**Flood Zone:**

The unincorporated areas of Millard County have not incorporated the FEMA flood guidelines. The subject is in the area that would be Map 490233 if it were mapped. By observation one would conclude that the subject is not in a flood zone. There is no physical evidence that it is in a flood area.

**Hazardous Waste:**

In my inspection of the property, I did not notice any signs of hazardous waste. I did observe minor oil spills around the fuel tanks, typical of those found around other farmsteads.

**Special Environmental Considerations:**

I observed major portions of the property. I did not notice any special environmental considerations that would impact the subject. However, my opinion of value could change pending new information provided by any governmental agency.

**Tax Assessment:**

The property is currently being assessed by Millard County. See Tax Summary statement in the addendum. The County Market Value for the 7,164.34 +/- acres is $2,735,221. Tax liability for the 2017 year was $5,251.85 and for 2018 will be $5,364.56. The subject is in the green belt program which would require payment of roll back taxes of 5 years if taken out of the program.

**Zoning and Land use Regulations:**

The site is zoned Agricultural (A-20) and Agricultural Industrial by Millard County. It is the intent of the Agricultural (A-20) zone to allow limited residential use while maintaining agricultural uses. Residential home sites in this zone require at least twenty acres. The Agricultural Industrial zoning is intended to allow concentrated agricultural operations. The chances for the county to change the zoning are slight.

# Highest and Best Use:

Highest and best use is defined as follows:

"The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."  *The Dictionary of Real Estate Appraisal. (Appraisal Institute- Third Edition)*

In performing the Highest and Best Use analysis, four steps or questions are followed. The first step in determining Highest and Best Use of any property is the legal limitations set on it, e.g. zoning. Second step is to determine if the contemplated uses are physically possible. The third question asked is the financial feasibility. The fourth and final step is whether or not the use results in the maximum profitability for the property. Because the use of land can be limited by any improvements that are present, highest and best use needs to be determined on the basis of the land being vacant and available for any use, in the first analysis. A second analysis is performed for the property as improved.

The subject is zoned Agricultural (A-20) and Agricultural Industrial. With this zoning commercial or non-agricultural industrial uses are prohibited. Agricultural, mining, and rural residential uses are permissible on the property. The A-20 zoning requires a 20-acre minimum lot size for the building of a dwelling. Agricultural Industrial requires a 1 acre minimum.

The second step is the physical limitation or possibilities to the property. There are utilities to the subject at different locations. The subject is 7,164 acres and has about 60,720' of road frontage. Rural residential lots require 20 acres and 200' of frontage. The property's size would allow the subject division into 300 lots. The availability of other properties within the area makes the subdivision of the subject unlikely. Demand for rural home sites in the area is very low

The third step in determining highest and best use of the property is whether the use has financial feasibility of the potential uses. The subject with vacant irrigated land provides limited income. The vacant desert land on the property can be rented for winter pasture but provides little income. This is not uncommon for agricultural properties. Many people desire the stability that real estate holdings provide over and above the return on their investment. The economic return does not take into account the pride in ownership that many people get from owning real estate.

The forth step is whether the use is maximally productive. The more densely developed, generally the higher the value of the property. The properties around the subject are irrigated crop land and vacant desert land. Demand is slim to none for rural residence home sites. Likely the property as vacant would continue to be held as irrigated crop and desert pasture land.

Accordingly, the highest & best use of the subject as vacant is irrigated crop and desert pasture land.

The first step in determining the Highest and Best Use as Improved is the same as when vacant. The subject is improved with corrals, sheds and buildings for a cattle operation. These improvements meet the zoning requirement for the property.

The ranch improvements meet the second requirement of being physically possible.

The third step (being financially feasible) is being met by the ranch operation. The ranch has the ability to pay for the property taxes, property maintenance. It is my understanding that it has not met it current debt servicing needs.

The forth step in the Highest and Best use analysis as improved is whether the present use is maximally productive. The ranch operation produces more revenue than other uses can for the property. To make the subject more productive all possible irrigation needs to be due to raise feed for the cattle during winter months.

Accordingly, the Highest and Best Use for the subject as improved is recognized as the existing ranch operation.

# APPRAISAL PROCESS

The subject as a ranch operation is best valued using the combined cost approach and sales comparison approach. The analysis for the sales comparison approach will be done first to arrive at land values. The cost approach will then be done to arrive at replacement cost new of the physical structures. Depreciation will then be derived from the sales comparison approach and subtracted from the replacement cost new of the buildings. The depreciated building values will then be added to the land values arrived at through the sales comparison approach.

In using the Sale Comparison Approach an effort was made to identify and locate any recent sales of irrigated crop land and dry and desert pasture land with or without buildings. The market data used has been verified with real estate brokers, agents, parties to transactions, other appraisers, multiple listing service, and / or Millard County records. The State of Utah is however a non-disclosure state and the accuracy of any data used cannot be guaranteed.

The demand for land in the Fillmore area appears to be stable. The availability of properties has been limited during the last several years. Twelve sales were found for the years 2015 to 2018. They were all dry pasture land sales. To find irrigated land sales the search area was expanded to the Delta area. Four sales which occurred in the last year and half were found and are being used in comparison to the 160 acres of Block "A" – the pivot irrigated ground. The four sales chosen for this analysis are shown in the grid that follows.

| Sales Comparison Grid | | | | | |
|---|---|---|---|---|---|
| | Subject | 1 | 2 | 3 | 4 |
| Sales Date | Aug-18 | Jun-18 | Jun-17 | Feb-17 | Jan-17 |
| Seller | | TLJ Farms | Bishops | Flagg | George |
| Buyer | | Withers | Dantes | Bulldog | Johnson |
| Location | Greenwood | Sutherland | Delta | Deseret | Delta |
| Total Sale Price | | $740,000 | $292,559 | $1,132,000 | $414,000 |
| Acres | 160 | 148 | 119 | 160 | 59 |
| Price / Acre | | $4,996 | $2,465 | $7,075 | $6,976 |
| Irrig Acre Price | | $6,700 | $6,700 | $6,700 | $6,975 |
| W/o Water / Ac $ | | $894 | $1,091 | $1,000 | - |

Of the twelve dry pasture sales found in the subject's immediate area, the largest and the five which occurred in the last three years have been chosen for comparison.

| Dry Sales Comparison Grid | | | | | |
|---|---|---|---|---|---|
| | Subject | 5 | 6 | 7 | 8 | 9 |
| Sales Date | Aug-18 | Feb-18 | Dec-17 | Dec-17 | Mar-17 | Sep-16 |
| Seller | | Neilson | Trail Break | Pahvant | Mascaro | Pahvant |
| Buyer | | Lewis | Cox | Murdocks | Mascaro | Hawbush |
| Location | Greenwood | Holden | McCormack | McCormack | Fillmore | Holden |
| Total Sale Price | | $399,312 | $380,000 | $1,054,000 | $355,000 | $470,000 |
| Acres | 7004 | 499 | 440 | 2,480 | 640 | 720 |
| Price / Acre | | $800 | $864 | $425 | $555 | $653 |

Sale #1 is located 7 miles north/northwest of Delta and 40 miles northwest of the subject. It consists of 104.65 acres with a full water supply (Delta Irrigation Company and Abraham Irrigation shares) and 43.47 acres of crop land without water. Water is rented for the 43.47 acres or the water it has is rotated around. $6,700/acres was assigned to the ground with the full water supply and $893.60/acre for the ground without a water supply. The property only had frontage on its north end. The figure of $6,700/acre for the irrigated ground in this sale was arrived at by pairing the sale with other sales that only had fully irrigated ground. Sale #4 is an example of one of these sales.

Sale #2 is located 3.5 miles west of Delta 46.5 miles northwest of the subject. It consists of 29.06 acres with a full water supply (also Delta Irrigation Company and Abraham Irrigation shares) ($6,700/acre) and 89.63 acres of crop land without water ($1,091.78/acer). Water is also rented for the acres without water. The property only has frontage (1,320') on its west end. Buyer had been leasing the property for years. Sale price appears to be at market value.

Sale #3 is 2 miles south of Delta. It is 31 miles northwest of the subject. It had frontage on three sides. There was 154.52 acres with a full water supply (Melville Irrigation Company) ($6,700/acre) and 5.48 acres without water ($1,000/acres). There was also $91,242 of buildings on the property (House, Large Shop and Equipment Shed). For purposes of this analysis the building values are excluded.

Sale #4 is 2.5 miles northwest of Delta and 35 miles northwest of the subject. The property is 59.35 acres with a full water supply (Delta Irrigation water and Abraham water). The price per acre is believed to be higher because the buyer had outside money available. The property is significant smaller than the other three sales.

The four sales now need to be compared to Block "A" of the subject land. Where market data is available quantitative adjustments are made based on puritan sales. When there is not enough market data to provide for quantitative adjustments, qualitative adjustments can and are made. These adjustments are shown on the following grid as: 1) the sale being equal (=) to the subject; 2) the sale being better (- needing to be adjusted down to the subject); or 3) the sale being less (+ the sale needing to be adjusted up to the subject).

## Sales Comparison Adjustment Grid

|  | Subject | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|
| Sales Date | Aug-18 | Jun-18 | Jun-17 | Feb-17 | Jan-17 |
| Seller |  | TLJ Farms | Bishops | Flagg | George |
| Buyer |  | Withers | Dantes | Bulldog | Johnson |
| Location | Greenwood | Sutherland | Delta | Deseret | Delta |
| Total Sale Price |  | $740,000 | $292,559 | $1,132,000 | $414,000 |
| Acres | 160 | 148 | 119 | 160 | 59 |
| Price / Acre |  | $4,996 | $2,465 | $7,075 | $6,976 |
| Irrig Acre Price |  | $6,700 | $6,700 | $6,700 | $6,975 |
| W/o Water / Ac $ |  | $894 | $1,091 | $1,000 | - |
| Property Rights |  | = | = | = | = |
| Financing Terms |  | = | = | = | = |
| Sales Conditions |  | = | = | = | = |
| Post Expenditures |  | = | = | = | = |
| Time, Marketing Cond |  | = | = | = | = |
| Access/Location |  | + | + | - | = |
| Size |  | = | = | = | - |
| Econom Charact |  | = | = | = | = |
| Use/Zoning |  | = | = | = | = |
| Non-Realty Comp |  | = | = | = | = |
| Total Subj Adj |  | + | + | - | - |
| Irrig Acre Price |  | $6,700 | $6,700 | $6,700 | $6,750 |
| Total Subj Adj |  | + | + | - | - |
| W/o Water / Ac $ |  | $950 | $1,100 | $1,000 | - |

The ten basic elements of comparison that should be considered in Comparing sales are:
1 - real property rights conveyed;
2 - financing terms;
3 - conditions of sale;
4 - expenditures made immediately after purchase;
5 - market conditions;
6 – location;
7 - physical characteristics (size, construction quality, condition);
8 - economic characteristics (operating expenses, lease provisions, management, tenant mix);
9 - use (zoning);
10-non-realty components of value.

All four sales were equal to the subject except in Access & Size.  Accordingly, no (=) adjustments were made for these other factors.

All of the sales occurred within the last eighteen months so no (=) time adjustments are suggested for these sales.

Sales 1 & 2 have limited access (frontage on only one side) so an (+) upward adjustment was made to bring them in line with the subject.

Sale 4 is about ½ the size of the other three sales as well as the subject.  A (-) downward adjustment is made to bring Sale 4 in line with the subject.

From the previous Sales Comparison Chart, $6,700/acre is chosen as the appropriate value for irrigated crop ground.  A value of $1,000/acre is chosen for land using rented water because it does not have water rights of its own.

Block "A" with it seven tower pivot has 125.5 acres of irrigated ground and 34.5 of dry pasture ground in the four corners. Choosing $6,700/acre for the irrigated ground from our previous Sales Comparison results in 125.5 acres X $6,700/ac = $840,850. A value for the dry pasture corners is taken from the comparison of dry sales found on the next two pages. This seems more appropriate than using the cropland without water from the Delta area. The adjusted value of Sale #8 ($500) is considered the most appropriate for the corners. Calculated as 34.5 acres X $500/ac = $17,250. Total value for Block "A" is $840,850 + $17,250 = $858,100.

Next a sales Comparison for dry pasture land needs to be made using sales 5 through 9. The Comparison and adjustments are being shown in the following grid.

| Sales Comparison Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 5 | 6 | 7 | 8 | 9 |
| Sales Date | Aug-18 | Feb-18 | Jan-18 | Dec-17 | Mar-17 | Sep-16 |
| Seller | | Neilson | Trail Break | Pahvant | Mascaro | Pahvant |
| Buyer | | Lewis | Cox | Murdocks | Mascaro | Hawbush |
| Location | Greenwood | Holden | McCormack | McCormack | Fillmore | Holden |
| Total Sale Price | | $399,312 | $380,000 | $1,054,000 | $355,000 | $470,000 |
| Acres | See Below* | 499 | 440 | 2,480 | 640 | 720 |
| Price / Acre | | $800 | $864 | $425 | $555 | $653 |
| Property Rights | | = | = | = | = | = |
| Financing Terms | | = | = | = | = | = |
| Sales Conditions | | = | = | = | = | = |
| Post Expenditures | | = | = | = | = | = |
| Time, Marketing Cond | | = | = | = | = | = |
| Access/Location | | = | = | = | = | + |
| Size | | * | * | * | * | * |
| Econom Charact | | = | = | = | = | = |
| Use/Zoning | | = | = | = | = | = |
| Non-Realty Comp | | = | = | = | = | = |
| Total Subj Adj | | * | * | * | * | * |
| Total Subj Adj $ | | $600 | $625 | $525 | $500 | $550 |

All five sales (5-9) were equal to the subject Blocks "B", "C", "D", "E", "F" and "G" except in Access & Size. Accordingly, no (=) adjustments were made for these other factors.

Sales #9 has limited access (frontage of only 2,640'). This would make it less desirable than all of the Blocks except Block "C". This would require an (-) downward adjustment to bring them in line with the subject. Sale #9 requires no (=) adjustment to bring it in line with Block "C" of the subject.

|  |  |  | Access | Size |
|---|---|---|---|---|
| Bock "B" | - | 1,188.72 acres | (-) | (-) |
| Bock "C" | - | 830.01 acres | (=) | (-) |
| Bock "D" | - | 40 acres | (-) | (- -) |
| Bock "E" | - | 2,696.65 acres | (-) | (=) |
| Bock "F" | - | 40 acres | (-) | (-) |
| Bock "G" | - | 2,208.97 acres | (-) | (=) |

Sale 7 is about the same size as Blocks "E" & (G), thus no (=) adjustments are being made for size. All of the other sales are much smaller than the Blocks of the subject. A (-) downward adjustment is being made to them to bring them in line with the subject.

The next step in the valuation process is to take the comparable sales with their quantitative and qualitative adjustments and relate them to the subject property recognizing which are most comparable and which are least comparable. This is illustrated in the following table.

| Sales Comparison Adjustment Grid | | | | | | |
|---|---|---|---|---|---|---|
| | Subject | 5 | 6 | 7 | 8 | 9 |
| Sales Date | Aug-18 | Feb-18 | Jan-18 | Dec-17 | Mar-17 | Sep-16 |
| Seller | | Neilson | Trail Break | Pahvant | Mascaro | Pahvant |
| Buyer | | Lewis | Cox | Murdocks | Mascaro | Hawbush |
| Location | Greenwood | Holden | McCormack | McCormack | Fillmore | Holden |
| Total Sale Price | | $399,312 | $380,000 | $1,054,000 | $355,000 | $470,000 |
| Acres | 7,004 | 499 | 440 | 2,480 | 640 | 720 |
| Price / Acre | | $800 | $864 | $425 | $555 | $653 |
| Total Subj Adj $ | | $600 | $625 | $525 | $500 | $550 |

| Bock "B" | - | 1,188.72 acres | $775 |
|---|---|---|---|
| Bock "C" | - | 830.01 acres | $550 |
| Bock "D" | - | 40 acres | $850 |
| Bock "E" | - | 2,696.65 acres | $525 |
| Bock "F" | - | 40 acres | $700 |
| Bock "G" | - | 2,208.97 acres | $525 |

Block "B" with 1,188.72 acres is felt to be superior to Sales 6 & 7 because of its frontage.

Block "C" is being compared to Sale #3 which is similar in size and access.

Block "D", because of it smaller size is felt to be superior of all the sales. A value equal to or slightly in excess of the unadjusted prices of Sale #5 & #6 are felt to be appropriate for Block "D".

Block "E" is the largest of the subject blocks. A value per acre similar to that of Sale #7 is felt to be appropriate.

Block "F" is similar to Block "D". It is more remote so the value shown is deemed appropriate.

Block "G" is the second largest of the subject blocks. A value per acre similar to that of Sale #7 is also appropriate for this block.

| Bock "B" | - | 1,188.72 ac X $775/ac = | $921,258.00 |
|---|---|---|---|
| Bock "C" | - | 830.01 ac X $550/ac = | $456,505.50 |
| Bock "D" | - | 40 ac X $850 = | $34,000.00 |
| Bock "E" | - | 2,696.65 ac X $525 = | $1,415,741.25 |
| Bock "F" | - | 40 ac X $700 = | $28,000.00 |
| Bock "G" | - | 2,208.97 ac X $525 = | $1,159,709.25 |
| | | | |
| Bock "A" | - | | $858,100.00 |
| | | | |
| Total Land Value | | | $4,873,314.00 |

The next step in the Cost Approach is to arrive at the contributory values of the structural improvements.

As mentioned previously, in the Cost Approach, land and structural improvements are valued separately. The buildings are valued at cost new, less depreciation. This building value is then added to the value of the land. The following definitions are important to keep in mind when the Cost Approach is used. They come from the "The Appraisal of Real Estate", by the Appraisal Institute.

"Reproduction cost is the estimated cost to construct, at current prices as of the effective date, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout and quality of workmanship, and embodying all the deficiencies, super adequacies, and obsolescence of the subject building." (page 318)

"Replacement cost is the estimated cost to construct, at current prices as of the effective appraisal date, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout." (page 319)

The use of replacement cost eliminates the need to estimate some forms of functional obsolescence, but other forms of functional obsolescence, physical deterioration and external obsolescence must still be measured."

Some of the improvements will be value on a square foot basis while others will be on a bushel basis. The sizes were arrived at when I as the appraiser measured the buildings by stepping off the respective sides. The source of the cost information is the Marshall and Swift Cost Handbook (Sec 12, 17 and 97, pages 12, 20, 28, 29, 30, 33 & 54 and 6, 7 & 9).

The following is a breakdown of the subject improvement costs on a per unit basis.

| | Units | Width | | Length | Sq. Ft. | RCN/ Unit | Total RCN | |
|---|---|---|---|---|---|---|---|---|
| House | | Irregular | | | 2160 | $67.69 | $146,210 | |
| Garage | | 24 | X | 27 | 648 | $23.20 | $15,034 | |
| Well House | | 10 | X | 10 | 100 | $11.05 | $1,105 | |
| Shop / Equip Shed | | 54 | X | 84 | 4536 | $23.71 | $107,549 | |
| Scale House | | 10 | X | 10 | 100 | $14.53 | $1,453 | |
| Scale | | | | | 100 T | | $12,560 | |
| Well House | | 10 | X | 10 | 100 | 11.05 | $1,105 | |
| Tack Shed | | 12 | x | 12 | 144 | $11.25 | $1,620 | |
| Well House | | 10 | X | 12 | 120 | 11.05 | $1,326 | |
| Quonset Shed | | 60 | X | 115 | 6900 | $10.39 | $71,691 | |
| Granary | 2 | 10' H | X | 24' D | 5000B | | $2,490 | |
| Cow Shed | | 20 | X | 60 | 1200 | $4.72 | $5,664 | |
| Cow Shed | | 20 | X | 40 | 800 | $4.72 | $3,776 | |
| | | | | | | | Block "B" Subtotal | $371,583 |
| Quonset Shed | | 60 | X | 115 | 6900 | $10.39 | $71,691 | |
| Tack Shed | | 12 | x | 12 | 144 | $11.25 | $1,620 | |
| | | | | | | | Block "C" Subtotal | $73,311 |
| Cow Shed | | 30 | X | 12 | 360 | $4.72 | $1,699 | |
| | | | | | | | Block "E" Subtotal | $1,699 |
| Cleary Shed | | 50 | X | 84 | 4200 | $18.00 | $75,600 | |
| | | | | | | | Block "G" Subtotal | $75,600 |
| | | | | | | | | $522,193 |

Depreciation is caused by deterioration or obsolescence in the property. Deterioration is evidenced by wear and tear on the structure. Functional obsolescence is caused by internal property characteristics, such as a poor floor plan, inadequate mechanical equipment, or functional inadequacy or super adequacy due to size or other characteristics. External obsolescence is caused by conditions outside the property, such as a lack of demand, changing property uses in the area, or national economic conditions. Some types of depreciation interact with one another, and the analysis of depreciation from all causes is cumulative. Several methods may be used to estimate accrued depreciation: the economic age-life method, the modified economic age-life method, the breakdown method, cost-to-cure estimates, sales comparison techniques, and income capitalization techniques."

Depreciation rates are extracted from the market with sales that have structural improvements similar to those on the subject. The value of the land in the sales is established by comparison to puritan land sales in the area. Once the land value has been established it is subtracted from the total sale price to arrive at the contributory value of the structural improvements. The replacement cost new (RCN) of the structural improvements is then calculated. The difference between the replacement cost new and the contributory value of the improvements is then the depreciation.

Example

Sale E – Sale Price $170,000

40 acres X $2,500 = $100,000

Building Value = $70,000

RCN

1,848 sq ft X $61.69 = $114,006

RCN minus Building Value equals Depreciation Amount

$114,006 - $70,000 = $44,006

Depreciation Amount divided by RCN equal Percent Depreciated

$44,006 / $114,006 = 38.6%

This can be converted to annual depreciation by dividing

the Percent Depreciated by the age of the building.

38.6% / 35 years = 1.1% per year

This depreciation is a combination of physical, functional and external obsolescence. To isolate the amounts of the three types of depreciation requires sufficient sales, some having only physical depreciation, some having both physical and functional depreciation, and some having all three types of depreciation. A sale with only physical depreciation is paired with a sale which has both physical and functional depreciation to isolate the functional depreciation in the latter. Then that sale is paired with a comparable sale that has physical and functional depreciation along with external obsolescence. The difference between those two sales is attributed to the external obsolescence. Physical depreciation is figured on an annual basis while functional depreciation is a percentage of the physically depreciation value. External obsolescence is a percentage of the physically and functionally depreciated value.

The amount of ranch sales and farm sales with improvements in the neighborhood and region of the subject were very limited. Consequently, depreciation rates could not be extracted from local sales but had to be taken from a compilation of improved sale throughout the State of Utah over a number of years. These market area surveys of which I have participated, suggest depreciation rates for agricultural buildings at rates of 2% to 5%. These rates are supported by studies published by Marshall and Swift. I have not found sales which would quantify either functional depreciation or external obsolescence even though at times it was obvious that one or both existed.

In the case of the subject, I do not believe there is any external obsolescence. The area is agriculturally based. The following grid shows the depreciation for the subject improvements and how they were figured.

| | Eff | Age/Life Remang | Total | Deprc | Remang | RCN | Contrib Value | |
|---|---|---|---|---|---|---|---|---|
| House | 55 | 5 | 60 | 92% | 8% | $146,210 | $12,184 | |
| Garage | 39 | 1 | 40 | 98% | 3% | $15,034 | $376 | |
| Well House | 10 | 10 | 20 | 50% | 50% | $1,105 | $553 | |
| Shop / Equip Shed | 5 | 25 | 30 | 17% | 83% | $107,549 | $89,624 | |
| Scale House | 4 | 16 | 20 | 20% | 80% | $1,453 | $1,162 | |
| Scale | 19 | 6 | 25 | 76% | 24% | $12,560 | $3,014 | |
| Well House | 8 | 12 | 20 | 40% | 60% | $1,105 | $663 | |
| Tack Shed | 10 | 10 | 20 | 50% | 50% | $1,620 | $810 | |
| Well House | 8 | 12 | 20 | 40% | 60% | $1,326 | $796 | |
| Quonset Shed | 5 | 25 | 30 | 17% | 83% | $71,691 | $59,743 | |
| Granary | 15 | 10 | 25 | 60% | 40% | $2,490 | $996 | |
| Cow Shed | 15 | 0 | 15 | 100% | 0% | $5,664 | $0 | |
| Cow Shed | 15 | 0 | 15 | 100% | 0% | $3,776 | $0 | |
| | | | | | | Block "B" Subtotal | | $169,920 |
| Quonset Shed | 5 | 25 | 30 | 17% | 83% | $71,691 | $59,743 | |
| Tack Shed | 10 | 20 | 30 | 33% | 67% | $1,620 | $1,080 | |
| | | | | | | Block "C" Subtotal | | $60,823 |
| Cow Shed | 15 | 0 | 15 | 100% | 0% | $1,699 | $0 | |
| | | | | | | Block "E" Subtotal | | $0 |
| Cleary Shed | 4 | 26 | 30 | 13% | 87% | $75,600 | $65,520 | |
| | | | | | | Block "G" Subtotal | | $65,520 |
| | | | | | | | | $296,263 |

The land value of $4,873,314 plus the building contributory value of $296,263 from the subject results in an estimate of value for the subject of $5,169,577 rounded off to:

# $5,170,000

## Five Million, One Hundred & Seventy Thousand Dollars

By definition the above is considered the "**As Is" market value** of the subject. The appraisal assignment also requests a 180-day disposition value. The real estate market has been positive in resent years. I am not aware of any financial disposition of agricultural land in the last several of decades. However, when the last such sales occurred, they reflected values 10% to 30% below similar property sales. Using this market generated information, I am applying a 20% discount to the "As Is" value arrived at above.

$5,170,000 X 80% = $4,136,000

rounded off to:

# 180-DAY DISPOSITION VALUE

# $4,135,000

## Four Million, One Hundred & Thirty-Five Thousand Dollars

The engagement letter also requests an appraisal using "an extraordinary assumption that indicates the CCIC (Chalk Creek Irrigation Company) water will be approved for use in the pivots to the extent of the available CCIC water".

Use of this water would be on Block "B", "C" & "D" of the subject. Chalk Creek water right covers 1,122.9 acres of the subject. The CCIC water would be accumulated in a reservoir on Block "B" of the subject and in the local aquifer. The owner's design would pump this water into a pipeline infrastructure connecting nine (9) pivots on Block "B", one (1) pivot on Block "D" and three (3) pivots on Block "C". The pivot irrigation acreage is figured as follows:

| Pivots | Towers | Acreage | | |
|--------|--------|---------|---|---|
| Full | 7 | 125.5 | | |
| Full | 7 | 125.5 | | |
| Full | 7 | 125.5 | | |
| 3/4 | 7 | 94.1 | | |
| 3/4 | 7 | 94.1 | | |
| 1/2 | 7 | 62.8 | | |
| 1/2 | 7 | 62.8 | | |
| Full | 4 | 71.7 | | |
| Full | 3 | 53.8 | | |
| | | Block 'B' Acreage | 815.8 | |
| Full | 4 | 71.7 | | |
| | | Block 'D' Acreage | 71.7 | |
| Full | 4 | 71.7 | | |
| Full | 7 | 125.5 | | |
| Partial | 7 | 38.2 | | |
| | | Block 'C' Acreage | 235.4 | |
| | | Total CCIC Pivot Irrigation | 1,122.9 | |

The requested extraordinary assumption is that the CCIC high water right will provide a full water supply on 1,122.9 acres. The value of the subject can be increased by the difference between Dry Pasture Per Acre Value and the Irrigated Crop Land Per Acre Value. The irrigated per acre value recognized on Block "A" is $6,700/ac. The dry pasture per acre value recognized on Block "B" is $775. See the grid below showing the value difference.

| | Pivot Acres | | Dry Pasture Values | | | | Irrigated Crop | | Land Values |
|---|---|---|---|---|---|---|---|---|---|
| Block 'B" Acreage | 815.8 | X | $775 | = | $632,206 | X | $6,700 | = | $5,465,525 |
| Block 'D" Acreage | 71.7 | X | $850 | = | $60,945 | X | $6,700 | = | $480,390 |
| Block 'C" Acreage | 235.4 | X | $550 | = | $129,478 | X | $6,700 | = | $1,577,276 |
| Total CCIC Pivot Irrigation Ac | 1,122.9 | | | | $822,629 | | $6,700 | = | $7,523,191 |
| | | | | | | Difference because of irrigation | | | $6,700,562 |

The extraordinary assumption market value is thus the "As Is" value plus the increase due to additional irrigation.

"As Is" value for the subject of $5,169,577 plus the increase due to additional irrigation of $6,700,562 equals $11,870,139, rounded off to:

# Extraordinary Value

# $11,870,000

## Eleven Million, Eight Hundred & Seventy Thousand Dollars

# "As Is" Value

# $5,170,000

## Five Million, One Hundred & Seventy Thousand Dollars

# 180-DAY DISPOSITION VALUE

# $4,135,000

## Four Million, One Hundred & Thirty-Five Thousand Dollars



**IRRIGATED CROP LAND SALES  MAP**



**DRY LAND SALES MAP**

# LAND DATA SHEET – SALE 1

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Irrigated Crop Land / With & Without Water |
| Location: | 2.15 miles NW of Sutherland with frontage on 4500 North |
| County: | Millard |
| Tax Parcel No: | DO-3294 |
| Legal Description: | Portion of W/2 of Section 20, T 16 S, R 7 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | JLJ Farms, LP |
| Grantee: | Withers, Aliese |
| Sale Date: | June 28, 2018 |
| Sale Price: | $740,000 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $6,700/ac – 104.65 acres of IFC<br>$893.60/ac – 43.47 acres of crop land without water |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 6/28/2018, #00203506, Bk 645, p 99 |
| Confirmation: | Sales Contract and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 148.12 acres |
| Zoning: | A-1 – Millard County |
| Elevation: | Approximately 4560' |
| Frontage/Visibility: | 4500 N, paved county road on the north side, 3500 N (gravel rd on the south) |
| Access: | Same |
| Topography: | laser level – flood irrigated |
| Utilities: | Along 4500 N |
| Water Rights: | 100 shares of Delta Irrigation Company water<br>100 shares of Abraham Irrigation water and<br>rented water for the 43.47 acres |
| Property Rights: | Available Fee Rights |
| Vegetation: | Alfalfa |
| Improvements: | None |

**COMMENTS:**   Both Seller and Buyer are local – from Delta.  Property is irregularly shaped parcel.  Wilson canal bound the property on the east side.



**Plat Map**



Picture of Sale 1 looking west/southwest from 4500 N.

# LAND DATA SHEET – SALE 2

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Irrigated Crop Land / With & Without Water |
| Location: | 1280 N 5000 W, Delta |
| County: | Millard |
| Tax Parcel No: | HD-4113 & HD-4117 |
| Legal Description: | Portion of Section 5, T 17 S, R 7 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | Bishops Farm |
| Grantee: | Dantes Holdings, LLC |
| Sale Date: | June 7, 2017 |
| Sale Price: | $292,559 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $6,700/ac – 29.06 acres of IFC
$1,091.78/ac – 89.63 acres of crop land without water |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 6/7/2017, #00199753, Bk 627, p 827 |
| Confirmation: | With Buyer by Craig Turner and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 118.69 acres |
| Zoning: | Agriculture – Millard County |
| Elevation: | Approximately 4600' |
| Frontage/Visibility: | 5000 W, paved county road on the west side |
| Access: | Same |
| Topography: | laser level |
| Utilities: | Along 5000 West |
| Water Rights: | 36 shares of Delta Canal Company water
18 shares of Abraham Irrigation water and
rented water for the 89.63 acres |
| Property Rights: | Available Fee Rights |
| Vegetation: | Alfalfa |
| Improvements: | None |
| **COMMENTS:** | Seller was up in years. He has been leasing this property to the buyer for some years. He decided he wanted to convert this asset into cash. The Buyer has been buying up property in the area to expand his operation. When the sale was offered for sale he said yes. Sale price appears to be at arm's length and at market value. |



**Plat Map**



Picture of Sale 2 looking south.  5000 W is on the right.

# LAND DATA SHEET – SALE 3

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Irrigated Crop Land / With & Without Water |
| Location: | 8.5 miles SW of Delta with frontage on 2500 South, 1000 West & 500 West |
| County: | Millard |
| Tax Parcel No: | DO-4349, DO-4349-2, DO-4350, DO-4350-1 and DO-4351 |
| Legal Description: | NW/4 of Section 25, T 17 S, R 7 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | Flagg, Doug |
| Grantee: | Bulldog Construction |
| Sale Date: | Feb 8, 2017 |
| Sale Price: | $1,132,000 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $6,700/ac – 154.52 acres of IFC & Farmstead<br>$1,000/ac – 5.48 acres of crop land without water<br>$91,242 – House, 2440 sqft, Average Condition, Large Shop (55' X 90') and Equipment Shed (40' X 75') |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 2/8/2017, #00198237, Bk 622, p 264 |
| Confirmation: | With Buyer by Craig Turner and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 160 acres |
| Zoning: | A-1 – Millard County |
| Elevation: | Approximately 4600' |
| Frontage/Visibility: | 2500 South, 1000 West & 500 West, paved county road on the north side |
| Access: | Same |
| Topography: | laser level |
| Utilities: | Along 2500 South on the north side of property |
| Water Rights: | 160 shares of Melville Irrigation water<br>WRNUM #68-235 good for two (2) domestic units. |
| Property Rights: | Available Fee Rights |
| Vegetation: | Alfalfa |
| Improvements: | A 26-year old house (2440 sqft) on the northeast corner of the property |
| **COMMENTS:** | Buyer plans to sell the house in about a year. He told the seller he could stay in the home for the year. Irrigation is from dirt and concrete ditches. |



**Sale 3 Plat Map**



Picture of Sale 3 looking east along 2500 S.

# LAND DATA SHEET – SALE 4

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Irrigated Crop Land |
| Location: | 3.5 miles NW of Delta |
| County: | Millard |
| Tax Parcel No: | DO-3333-A and DO-3333-A-4 |
| Legal Description: | Portion of Section 27, T 16 S, R 7 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | George, Jeff & Diane |
| Grantee: | Johnson, Elwin |
| Sale Date: | Jan 4, 2017 |
| Sale Price: | $414,000 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $6,975.57/ac – 59.35 acres of IFC |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 1/4/2017, #00197922, Bk 620, p 854 |
| Confirmation: | With Buyer by Craig Turner and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 59.35 acres |
| Zoning: | A-1 – Millard County |
| Elevation: | Approximately 4640' |
| Frontage/Visibility: | 2500 North & 3000 North, paved county road on the north side |
| Access: | Same |
| Topography: | laser level |
| Utilities: | None – some distance to utilities |
| Water Rights: | 71 shares of Delta Irrigation water<br>22 shares of Abraham Water |
| Property Rights: | Available Fee Rights |
| Vegetation: | Alfalfa |
| Improvements: | None |

**COMMENTS:**   Seller inherited the ground and tried farming it for several years. He then decided to sell. The Buyer is an older gentleman who loves to farm. He has outside money coming from his fertilizer business. Buyer lives a mile north of the sale property but has no other properties in the area of the sale property. He is always looking to grow his operation.



**Sale 4 Plat Map**



Picture of **Sale 4** looking south along the east ditch.

# LAND DATA SHEET – SALE 5

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Dry Pasture Land |
| Location: | Holden / Greenwood |
| County: | Millard |
| Tax Parcel No: | 6505 and 6490 |
| Legal Description: | Portion of S/2 of Sec 7 and W/2 of Sec 8, T 20 S, R 4 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | Neilson Trust |
| Grantee: | Lewis Trust |
| Sale Date: | Feb 8, 2018 |
| Sale Price: | $399,312 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $800/ac – Dry Pasture |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 2/8/2018, #00202268, Bk 639, p 221 |
| Confirmation: | With Scott Pace, Agent, and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 499.14 acres |
| Zoning: | Agriculture – Millard County |
| Elevation: | 4790' to 4880' |
| Frontage/Visibility: | 6100 North (paved) and 100 W (gravel/dirt road) |
| Access: | Same |
| Topography: | Undulating |
| Utilities: | Electricity along 6100 N |
| Water Rights: | WRNUM 67-821, 015 cfs for 150 ELUs and .25 acres - Certificated |
| Property Rights: | Available Fee Rights |
| Vegetation: | Native Grasses |
| Improvements: | Well House & Corrals |

**COMMENTS:**    Seller was from Draper Utah.  Buyer was from Lehi Utah.  Sale was negotiated in December 2017 but did not close until January 2018.



**Sale 5 Plat Map**



Picture of **Sale 5** looking south along the east fence line.

# LAND DATA SHEET – SALE 6

**PROPERTY IDENTIFICATION:**

| | |
|---|---|
| Type / H&BU: | Dry Pasture Land |
| Location: | McCormack / Greenwood |
| County: | Millard |
| Tax Parcel No: | 5751 and 5752-1 |
| Legal Description: | The north 440 Acres of Sec 20, T 19 S, R 4 W, SLB&M |

**SALE DATA:**

| | |
|---|---|
| Grantor: | Trail Break Ranches, LLC |
| Grantee: | Cox, Aubrilyn |
| Sale Date: | Jan 11, 2018 |
| Sale Price: | $380,000 |
| Terms: | $338,250 Cash Down, Seller took back a note and D/T for $41,750 |
| Conditions of Sale: | N/A |
| Unit Price: | $863/ac – Dry Pasture |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 1/11/2018, #00202015, Bk 638, p 14 |
| Confirmation: | With Scott Pace, Agent, and with the county by VLJ |

**SITE DATA:**

| | |
|---|---|
| Size: | 440 acres |
| Zoning: | Agriculture – Millard County |
| Elevation: | 4830' to 4977' |
| Frontage/Visibility: | 8900 North (gravel) and 400 W (paved road) |
| Access: | Same |
| Topography: | slightly undulating |
| Utilities: | Electricity along 400 W |
| Water Rights: | WRUMs: 67-138, 0.015 cfs Well (9/2013) with 200 stock units |
| Property Rights: | Available Fee Rights |
| Vegetation: | Native Grasses |
| Improvements: | Cow Shed |

**COMMENTS:** Seller was from Highland Utah. Buyer was from out of the area, CA. Sale was negotiated in December 2017 but did not close until January 2018.



**Sale 6 Plat Map**



Picture of **Sale 6** looking south along 8900 North.

# LAND DATA SHEET – SALE 7

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Dry Pasture Land |
| Location: | McCormack with frontage on Highway 50 and State Road 100 |
| County: | Millard |
| Tax Parcel No: | 5260-A, 5263-1, 5263-A, 5265, 5265-1, 5265-A, 5266-1, 5271-1, 5272-1, 5273-1, 5273-A5275, 5260 and 5300 |
| Legal Description: | Portions of Sec 13, 14, 15, 16, 17, 22, 23, 24 and 28, T 18 S, R 5 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | Pahvant Ensign Ranches, L.C. |
| Grantee: | Murdocks & Hutchings, etal |
| Sale Date: | Dec 12, 2017 |
| Sale Price: | $1,054,000 |
| Terms: | 68% Cash down with a WAC loan for $340,000 at 5% interest. |
| Conditions of Sale: | N/A |
| Unit Price: | $425/ac – Dry Pasture |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 3/1/2018, #00202431, Bk 640, p 01 |
| Confirmation: | With George Hutchings and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 2480 acres |
| Zoning: | Agriculture – Millard County |
| Elevation: | 4700' to 5200' |
| Frontage/Visibility: | Highway 50, paved road and State Highway 100, paved road |
| Access: | Same |
| Topography: | undulating |
| Utilities: | None |
| Water Rights: | WRUMs: 67-625, Well with 3 edu & 60 stock units; 67-627, Well with 3 edus & 360 stock units and 67-1577, Well with 48.84 stock units |
| Property Rights: | Available Fee Rights, Mineral Rights Excepted |
| Vegetation: | Native Grasses |
| Improvements: | None |

| | |
|---|---|
| **COMMENTS:** | Both Seller and Buyers are from out of the area.  Sale was negotiated in December 2017 but did not close until March 2018. |



**Sale 7 Plat Map**



Picture of **Sale 7** looking east/northeast along Highway 100.

# LAND DATA SHEET – SALE 8

**PROPERTY IDENTIFICATION:**

| | |
|---|---|
| Type / H&BU: | Irrigated Crop Land |
| Location: | 3.5 miles NW of Delta |
| County: | Millard |
| Tax Parcel No: | DO-3333-A and DO-3333-A-4 |
| Legal Description: | Portion of Section 27, T 16 S, R 7 W, SLB&M |

**SALE DATA:**

| | |
|---|---|
| Grantor: | George, Jeff & Diane |
| Grantee: | Johnson, Elwin |
| Sale Date: | Jan 4, 2017 |
| Sale Price: | $414,000 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $6,975.57/ac – 59.35 acres of IFC |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 1/4/2017, #00197922, Bk 620, p 854 |
| Confirmation: | With Buyer by Craig Turner and with the county by VLJ |

**SITE DATA:**

| | |
|---|---|
| Size: | 59.35 acres |
| Zoning: | A-1 – Millard County |
| Elevation: | Approximately 4640' |
| Frontage/Visibility: | 2500 North & 3000 North, paved county road on the north side |
| Access: | Same |
| Topography: | laser level |
| Utilities: | None – some distance to utilities |
| Water Rights: | 71 shares of Delta Irrigation water<br>22 shares of Abraham Water |
| Property Rights: | Available Fee Rights |
| Vegetation: | Alfalfa |
| Improvements: | None |

**COMMENTS:** Seller inherited the ground and tried farming it for several years. He then decided to sell. The Buyer is an older gentleman who loves to farm. He has outside money coming from his fertilizer business. Buyer lives a mile north of the sale property but has no other properties in the area of the sale property. He is always looking to grow his operation.



**Sale 8 Plat Map**



Picture of **Sale 8** looking south along the east ditch.

# LAND DATA SHEET – SALE 9

## PROPERTY IDENTIFICATION:

| | |
|---|---|
| Type / H&BU: | Dry Pasture Land |
| Location: | 5400 N 6100 North, W of Holden |
| County: | Millard |
| Tax Parcel No: | 6666, 6667, 6668, 6675, 6675-2, 6699, 6700, 6702 and 6706 |
| Legal Description: | Potions of Sec. 1, 2 and 11, T 20 S, R 4 W, SLB&M |

## SALE DATA:

| | |
|---|---|
| Grantor: | Pahvant Ensign Ranches, L.C. |
| Grantee: | Hawbush Ranches, L.C. |
| Sale Date: | Sep 8, 2016 |
| Sale Price: | $470,000 |
| Terms: | Cash |
| Conditions of Sale: | N/A |
| Unit Price: | $653/ac – 720 acres of dry pasture land |
| Exposure Period: | N/A |
| Instrument: (BkPg) | Recorded 9/8/2016, #00196519, Bk 616, p 124 |
| Confirmation: | With Seller by Craig Turner and with the county by VLJ |

## SITE DATA:

| | |
|---|---|
| Size: | 720 acres irregularly shaped |
| Zoning: | A-20 – Millard County |
| Elevation: | 4700' to 4740' |
| Frontage/Visibility: | 6100 N, gravel county road which at the subject |
| Access: | Same |
| Topography: | undulating |
| Utilities: | Electricity |
| Water Rights: | WRNUMs: 67-388,473, 474, 486, 593, 619, 620, 766, 1195 and 1655. According to WRNUMs the property has the right to irrigate 166 acres. There are no developed irrigated acres of the sale property but the operator runs some hand lines on the pasture periodically in order to keep the water right proved up. |
| Property Rights: | Available Surface Fee Rights – Seller retained all mineral rights |
| Vegetation: | native grasses |
| Improvements: | Property is fenced around the exterior. |

## COMMENTS:

Seller is an investor/rancher who purchased the property in 2015 as part of a very large ranch property. He has bought and sold other properties since that time in an effort to block up his land holdings. Buyer is a local rancher who wanted to expand and this tract will work well in the operation.



**Sale 9 Plat Map**



**Picture of Sale 9** looking southwest where 6100 N ends at the property.

## RECONCILIATION AND FINAL VALUE CONCLUSION

Cost Approach ---------------------------------------------------------------------- $ **5,170,000**

Income Approach ------------------------------------------------------------------ $ N/A

Sales Comparison Approach ----------------------------------------------- $ N/A

One approach to value has provided the final Estimates of Value for the Subject. The Cost Approach to value is used, as the land and structural improvements can be valued separately. This approach is based on the assumption that the summation of the contributory value of the various components will approximate the value of the property as a whole. The Cost Approach is based on the premise that an informed buyer would pay no more for a property than the cost of producing a desirable substitute property with the same utility as that of the subject.

The Income Approach to Value was not done as too many management factors can result in great variance in the CAP rates of the comparables. The income is based on projections. Difference in CAP rates result in large swings in value. These variances put the reliable of Income Approach to Value in question.

The Sale Comparison Approach to value was used to arrive at land values used in the cost approach. The market did not provide sufficient quantities of reliable data on ranch properties to use the full sales comparison approach.

Therefore, the value estimate arrived at for the subject in this appraisal comes from the Cost Approach. The final conclusion (rounded off to the nearest ten thousand dollars) is:

# "As Is" Value

# $5,170,000

## Five Million, One Hundred & Seventy Thousand Dollars

The client asked for the following two values which also come from the Cost Approach.

# 180-DAY DISPOSITION VALUE

# $4,135,000

## Four Million, One Hundred & Thirty-Five Thousand Dollars

# Extraordinary Value

# $11,870,000

## Eleven Million, Eight Hundred & Seventy Thousand Dollars

# General Assumptions and Limiting Conditions

The certification of the Appraiser(s) appearing in the appraisal report is subject to the following conditions and to such other specific and limiting conditions as are set forth in the report.

1.  The Appraiser(s) assume no responsibility for matters of a legal nature affecting the property appraised or the title thereof, nor does the Appraiser(s) render any opinion as to title, which is assumed to be good and marketable.  The property is appraised as though under responsible ownership.

2.  Sketches in the report may show approximate dimensions and are included only to assist the reader in visualizing the property.  The Appraiser(s) have made no survey of the property.  Drawings and/or plats are not represented as an engineer's work product, nor are they provided for legal reference.

3.  The Appraiser(s) are not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made.

4.  Any distribution of the valuation in the report applies only under the existing program of utilization.  The separate valuations of components must not be used outside of this appraisal and are invalid if so used.

5.  The Appraiser(s) have, in the process of exercising due diligence, requested, reviewed, and considered information provided by the ownership of the property and client, and the Appraiser(s) have relied on such information and assumes there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.  The Appraiser(s) assume no responsibility for such conditions, for engineering which might be required to discover such factors, or the cost of discovery or correction.

6.  While the Appraiser(s) have (X) have not (   ) inspected the subject property and have (X) have not (   ) considered the information presented in the course of such inspection, together with the information provided by the ownership and client, the Appraiser(s) are not qualified to verify or detect the presence of hazardous substances by visual inspection or otherwise, nor qualified to determine the effect, if any, of known or unknown substances present.  Unless otherwise stated, the final value conclusion is based on the subject property being free of hazardous waste contaminations, and it is specifically assumed that present and subsequent ownerships will exercise due diligence to ensure that the property does not become otherwise contaminated.

7.  Information, estimates, and opinions furnished to the Appraiser(s), and contained in the report, were obtained from sources considered reliable and believed to be true and correct.  However, no responsibility for accuracy of such items furnished the Appraiser(s) can be assumed by the Appraiser(s).

8.  Unless specifically cited, no value has been allocated to mineral rights or deposits.

9.  Water requirements and information provided have been relied on and, unless otherwise stated, it is assumed that:

    a.  All water rights to the property have been secured or perfected, that there are no adverse easements or encumbrances, and the property complies with Bureau of Reclamation or other state and federal agencies;

    b.  Irrigation and domestic water and drainage system components, including distribution equipment and piping, are real estate fixtures;

    c.  Any mobile surface piping or equipment essential for water distribution, recovery, or drainage is secured with the title to real estate; and

    d.  Title to all such property conveys with the land.

10. Disclosure of the contents of this report is governed by applicable law and/or by the Bylaws and Regulations of the professional appraisal organization(s) with which the Appraiser(s) are affiliated.

11. Neither all nor any part of the report, or copy thereof, shall be used for any purposes by anyone but the client specified in the report without the written consent of the Appraiser.  This report was prepared for the client's use at the client's sole discretion within the framework of the function stated in the report, and its use for any other purpose is beyond the scope contemplated in the appraisal.

12. Where the appraisal conclusions are subject to satisfactory completion, repairs, or alterations, the appraisal report and value conclusion are contingent upon completion of the improvements in a workmanlike manner consistent with the plans, specifications and/or scope of work relied upon in the appraisal.

13. Acreage of land types and measurements of improvements are based on physical inspection of the subject property unless otherwise noted in this appraisal report.

14. EXCLUSIONS.  The Appraiser(s) considered and used the three independent approaches to value (cost, income, and sales comparison) where applicable in valuing the resources of the subject property for determining a final value conclusion.  Explanation for the exclusion of any of the three independent approaches to value in determining a final value conclusion has been disclosed in this report.

15. The Appraiser(s) liability is limited to the fee charged for the report and professional services.

16. Acceptance of the report by the client constitutes acceptance of all assumptions and limiting conditions contained in the report.

17. Other Contingent and Limiting Conditions:  See Page 4

# Appraiser's Certification

**I certify that, to the best of my knowledge and belief:**

The statements of fact contained in the report are true and correct;

The reported analyses, opinions, and conclusions are limited only by the reported assumptions, limiting conditions, and legal instructions, and are the personal, unbiased professional analyses, opinions, and conclusions of the appraiser;

The appraiser has no present or prospective interest in the property appraised nor any personal interest or bias with respect to the parties involved;

The appraiser has ( ) / has not (X) appraised the subject previously;

The compensation received by the appraiser for the appraisal is not contingent on the analyses, opinions, or conclusions reached or reported:

The appraisal was made and the appraisal report prepared in conformity with the Appraisal Foundation's "Uniform Standards for Professional Appraisal Practice"**;**

The appraiser has made a personal inspection of the property appraised and that the property owner, or his/her designated representative, was given the opportunity to accompany the appraiser on the property inspection;

No one provided significant professional assistance to the appraiser;

My opinion of the market value of the subject property as of **September 6, 2018** is:

## "As Is" Value      $5,170,000

## 180-Day Disposition Value      $4,135,000

## Extraordinary Value      $11,870,000

*V. L. Jackson*

_____          September 10, 2018
Victor L. Jackson
Jackson Property Services, P.C.
785 South 530 East
Spanish Fork, UT 84660

Utah State Certified General Appraiser
License #5453711-CG00, Expires 12/31/2019