**This order is SIGNED.**

**Dated: August 5, 2020**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*ar*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| In re: SUGARLOAF HOLDINGS, LLC, Debtor | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER AS TO BANK OF THE WEST'S AND URSUS REAL ESTATE'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE<br><br>Case No. 18-27705<br><br>Chapter 11<br><br>Hon. Kevin R. Anderson |
|---|---|

This matter came before the Court on July 31, 2020 at an evidentiary hearing on the Motion for entry of an order to appoint a Chapter 11 Trustee (the "Motion to Appoint") filed by Bank of the West ("BOTW") and Ursus Real Estate, Inc., a California corporation ("Ursus" and together with BOTW, "Movants"). The Court, having considered the Motion, the Supplemental Brief in Support of the Motion to Appoint, the Movants' statement of contested and uncontested facts,[1] the argument of counsel, Exhibits A-V, X-BB, DD-II, Docket Nos. 202 and 203, the fact testimony of David J. Gray, James Salisbury, and L. Judd Harward, the expert testimony of

---

[1] No parties in interest besides Ursus and BOTW filed papers regarding the Motion to Appoint.

1

James Riley, together with all other matters the Court deemed appropriate, makes the following Findings of Facts and Conclusions of Law.

## FINDINGS OF FACTS

1. BOTW originally moved for the conversion of this case to one under Chapter 7 under 11 U.S.C. § 1112(b) on April 27, 2020. Having reviewed the 2017 Federal Tax Returns for Sugarloaf Holdings, LLC (the "Debtor" or "Sugarloaf"), Movants' counsel conceded that the Debtor met the definition of "farmer" under 11 U.S.C. § 101(20) and since the Debtor objected to the motion to convert, 11 U.S.C. § 1112(c) bars conversion.

2. At the hearing on the Motion to Appoint, Debtor's Counsel likewise conceded that cause exists under 11 U.S.C. §§ 1104(a) and as defined by 1112(b)(4), arguing instead that it was in the best interest of the creditors to dismiss the case rather than appoint a Chapter 11 trustee. Therefore, the Court need not list those facts that establish cause. However, to the extent that facts relating to cause relate to factors the Court weighs to determine the best interest of creditors, the Court explicitly makes those findings here.

3. The Debtor did not comply with the Court's scheduling order for this motion (ECF No. 263) by failing to timely submit a witness and exhibit list and by failing to work with BOTW to prepare a list of stipulated and contested facts. The Debtor's failure to participate in discovery substantially increased the amount of time required for the evidentiary hearing.

4. Mr. Gray claimed that he could not respond because he had been in and out of the hospital with heart disease, but when pressed, he failed to adequately explain how his medical issues prevented his ability to comply with the Court's scheduling order. In counterpoint, the Court notes that Mr. Gray was capable of directing his attorney, Mr. Sumsion, to raise and prosecute issues in opposition BOTW's trust deed sale and that Mr. Gray attended the proposed Trustee's Sales of April 21, May 21, and July 13, and state court hearings on June 3 and July 8, 2020.

5. Debtor's counsel, Parsons Behle and Latimer has filed a motion to withdraw as counsel (ECF No. 267). The motion to withdraw represents that Mr. Gray has of late been generally unresponsive to counsel's requests for information or direction regarding the prosecution of this case, and that Mr. Gray has been specifically unresponsive to BOTW's discovery requests. The hearing on the motion to withdraw is set for August 18, 2020, at 2:00 pm. In spite of these challenges, Debtor's counsel has continued to appropriately, ethically, and zealously represent and defend the Debtor in this motion.

6. No parties filed written objections to the Motion to Appoint and other than the Debtor, no parties opposed the Motion to Appoint at the evidentiary hearing.[2] Counsel for the U.S. Trustee stated that given the evidence adduced at the hearing, the US Trustee supported the appointment of a trustee. The other parties-in-interest that appeared at the hearing either did not oppose or were expressly in favor of the appointment of a chapter 11 trustee.

7. Pursuant to stipulations with the Double O Pahvant plaintiffs, at least some of whom own land and water rights in the vicinity of the Replacement Well,[3] Sugarloaf did not use the Replacement Well during the 2018 and 2019 irrigation seasons. However, Sugarloaf resumed pumping water from the Replacement Well in May 2020 with Triple C's assistance (Ex. BB at 77:9-17; 107:3-108:11)

8. On September 12, 2019, BOTW filed a motion for relief from automatic stay, arguing that Sugarloaf had not met any of the requirements in the Cash Collateral Order.

---

[2] When asked, counsel for creditor Kirton & McConkie stated that it did not oppose the Motion to Appoint although it had previously filed a joinder to the Debtor's objection to the motion to convert.

[3] In March 2017, Sugarloaf obtained approval from the State Engineer to drill a replacement well for Water Right No. 67-1752. It drilled that well (hereinafter the "Replacement Well") during the spring and summer of 2017 (Ex. E)

3

9. On November 19, 2019, rather than filing an opposition to the motion, Sugarloaf sought a continuance from granting BOTW relief from the automatic stay on the grounds that it had just received an offer to purchase the Property (including all the real and personal property owned by Sugarloaf) from Triple C Farms, L.L.C., a Utah limited liability company ("Triple C") for $20,718,813 (ECF No. 163).

10. The Court entered an agreed order on November 27, 2019 requiring the sale close and the full amount due BOTW be paid in full no later than January 31, 2020 (ECF No. 166).

11. As part of the agreed order, BOTW paid a total of $200,000 of adequate protection payments for the months of December 2019 and January 2020 (Ex. BB at 110:5-11). Sugarloaf has made no payments to BOTW or Ursus since January 2020 (*Id.* at 112:12-25)

12. On December 4, 2019, the Debtor filed its motion to sell the Property to Triple C for $20,719.813 (ECF No. 169).

13. On January 7, 2020, after notice and hearing, the Court granted the Debtor's motion to sell the property (ECF No. 180).

14. After Triple C failed to close on January 31, 2020, the Court granted BOTW relief from the automatic stay on February 4, 2020 (ECF No. 195). Mr. Gray testified that Triple C has been unable to close the sale.

15. Sometime in the spring of 2020, Mr. Gray retained the services of Mr. Grant Sumsion to represent the Debtor's interest in connection with BOTW's trust deed sale of the Sugarloaf farm property. However, Mr. Sumsion did not file an application to be employed until May 15, 2020 (ECF No. 213). Mr. Sumsion did not file a disclosure of compensation under § 329(a) and Bankruptcy Rule 2016(b) until June 9, 2002 (ECF No. 239). The disclosure of compensation states that Mr. Sumsion would be paid by "Gray Holdings LLC" unless the Court

approved payment from the estate. At the hearing, Mr. Gray testified that the fee arrangement with Mr. Sumsion was "to be determined."

16. On May 22 and May 26, 2020, personnel of the Utah Water Rights Division visited the farm property to investigate Sugarloaf's uses of the water rights at issue in the Double O Pavhant Case. The Enforcement Engineer, Kurt Vest, detailed his observations and concerns in a Notice of Investigation dated May 28, 2020 (Ex. AA). Mr. Vest explained,

> The total irrigated acreage allowed under [WRN 67-1752] is limited to 686.0 acres. This right is limited to a flow rate of 0.0732 cubic feet per second or 32.85 gallons per minute. With the irrigation season running from April 1 to October 31 each year, the total annual diversion for irrigation is limited to 31.07 acre-feet. It is also noted that irrigation under this right is limited to Sections 27 and 28 of Township 20 South, Range 5 West, SLB&M.

(*Id.* at 1 (emphasis added).)

17. Mr. Vest noted the replacement well "was equipped with a 100 hp pump and operating at 50 psi." (*Id.*) "Due to the lack of proper measuring devices located on [that] well[], it [was] impossible to determine the rate at which water is being pumped and the total volume that has been pumped to date." (*Id.* at 2.)

18. Mr. Vest additionally noted that the visits revealed "land was being irrigated outside the approved place of use designated under water right 67-1752." (*Id.*)

19. Based on the observations, Mr. Vest concluded, "The diversion and use of water to irrigate the subject properties may be occurring without the benefit of established water rights and/or in violation of established water rights." (*Id.*)

20. On June 16, 2020, personnel of the Utah Water Rights Division inspected the farm property and noted which lands had been irrigated by Sugarloaf's irrigation system and determined that of the 1297.1 acres that were being irrigated, only 246.2 acres were being irrigated in the approved place of use (Ex. Z)

21.     On June 25, 2020, the Utah Water Rights Division entered its Notice of Violation and Cease and Desist Order against Sugarloaf (Ex. Z). In the Notice of Violation, the Division assessed an administrative fine of $81,826.20 against the Debtor for 36 days of using certain water rights outside their permitted place and manner of use. The fine had a per diem accrual of $2,272.95 (or $757.65 per day times the 3.00 penalty multiplier) for each additional day the misuse continued (*Id.* at 7). Additionally, the Division assessed $5,950.79 in costs for the enforcement and ordered Sugarloaf to replace 200% of the water determined to have been improperly taken, being calculated to total 1745.6 acre-feet of water (*Id.* at 8)

22.     Mr. Harward testified that at noon on July 13, 2020, outside the Millard County Courthouse, Mr. Billings, as counsel for Mr. Suniville as the Substitute Trustee, announced it was the intent of the Substitute Trustee to sell all 77 parcels of the Debtor's real property and all water rights along with shares of the Chalk Creek Irrigation Co., excepting Water Right No. 67-1752. Mr. Sumsion, as state-court counsel for Sugarloaf, objected to preceding in this manner noting that Sugarloaf had the right under UTAH CODE ANN. § 57-1-27(1)(c) to direct the order of each parcel and intended to exercise that right. Mr. Harward testified that Mr. Sumsion did not provide any specific information to Mr. Billings as to which parcels the Debtor wanted sold and in what order.[4] Nor did anyone for Sugarloaf contact the Substitute Trustee to inform them of the Debtor's proposed order of sale until the July 13 sale was about to begin.

---

[4] While Mr. Gray initially testified that he or his counsel presented specifics regarding the order of sale, when pressed he stated that the Mr. Billings continued the sale quickly after Mr. Sumsion made the objection and asserted that the events of July 13 outside the Millard County Courthouse had been recorded on video. Given Sugarloaf's failure to offer said video as evidence, the lack of any detail regarding what was supposedly proposed, and Mr. Gray's admission that Sugarloaf failed to contact Ursus or the Substitute Trustee in advance of the sale, the Court finds Mr. Gray's testimony in this regard to be unpersuasive.

6

23. Mr. Harward testified that Sugarloaf began pumping water on May 20 and did not remove the pump until July 6, 2020, after the Notice of Violation and Cease and Desist Order was issued, meaning the total fine could be $106,828.65 for the 47 days of improper water usage.

24. During the course of his testimony, Mr. Gray admitted that Sugarloaf had failed to timely file a written appeal with the Utah Water Rights Division regarding the Notice of Violation.

25. Mr. Gray estimated that Sugarloaf had $30,000 cash on hand at the end of July, but he admitted he had not looked at the Debtor's bank statements for May or June.

26. The Debtor has failed to file the required monthly financial reports for May and June 2020 (See Local Rule 2081-1(b)).

27. Mr. Gray blamed the COVID pandemic for his failure to file these required reports as he had previously met in person with the Debtor's accountants to prepare the prior monthly operating reports. Mr. Gray's testimony is not persuasive in that he failed to explain why he could not communicate with the Debtor's accountants via email, telephone or other electronic means, especially given that the March and April 2020 reports were filed. Further, Mr. Gray's explanations do not justify his admitted failure to review the bank statements for May or June.

28. Confirming a report from the U.S. Trustee, Mr. Gray also admitted that the Debtor has failed to pay the United States Trustee fees for the last two quarters totaling $2,606.05.

29. In December 2019, the Debtor disclosed the existence of cattle grazing leases with 4D Cattle Company LLC, Rafter 7 Bar LLC, and Diamond T Land & Cattle Co. LLC (ECF No. 170). Each entity is a Utah limited liability company with its principal place of business in Utah. Despite propounding the Debtor with discovery requests on this subject on May 27, 2020, copies of these leases have never been provided to BOTW.

30. After making a court-ordered adequate protection payment in January 2020, the Debtor failed to pay any income received from leaseholders and/or Triple C to Movants, despite clear language in the certain Loan and Security Agreement (the "Agreement"), (Ex. G at §§ 1.2, 2.3, 4.1, 6.3, 6.17) and the Trust Deed that states that lease payments and proceeds thereof are Movants' collateral (Ex. K at §§ 1.3, 1.5). Instead, the Debtor used the lease payments it received from insider Gray Holdings Corp ("Gray Holdings")[5] and others to fund operations and make an adequate protection payment to AGCO of $30,000 on February 27, 2020.[6] (ECF No. 202 at 3, 12)

31. The Debtor filed a Plan of Reorganization on June 12, 2019, (ECF No. 134) and a Disclosure Statement on July 8, 2019 (ECF No. 139). The Court denied approval of the disclosure statement on October 9, 2019, (ECF No. 156). The Debtor did not file a new disclosure statement at that time so that the parties could focus on BOTW's motion to lift stay and to await the results from the sale of the cattle and crops (ECF No. 157). The Debtor has not filed an amended disclosure statement or plan, and Mr. Gray testified at the hearing that he could not conceive of any way to propose a feasible plan.

32. In his testimony, Mr. Gray admitted that the Debtor failed to meet any of its projections offered at the cash collateral evidentiary hearings. For example, yearling cattle were purchased on February 28, 2019 for $200,030, which is inconsistent with the Debtor's revised cash collateral budget that indicated a cattle purchase in December 2018 (Ex. T and ECF No. 128). Sugarloaf failed to sell the cattle by the end of June as projected (Ex. T). Rather, the cattle were

---

[5] Mr. Gray testified that these payments were for an undisclosed number of cattle of an undisclosed family member. He did not state the terms of this lease in his testimony. Given the Debtor's repeated failures to disclose the terms of any of the leases on the estate as requested via BOTW's discovery request on May 27, Sugarloaf is in violation of the Court's scheduling order. Therefore, the Court makes an adverse inference regarding the terms of these leases under Fed. R Bankr. P. 7037(b)(2)(A)(i).

[6] While AGCO obtained relief from the automatic stay on February 26, 2020 (ECF No. 200), it has not yet sought to recover its collateral, which is likely due to the receipt of this payment.

sold at an auction in Salina, Utah, on or about September 3, 2019, for a loss $22,659.23. This loss does not include an accounting for the Debtor's time and expense of raising and feeding the cattle (ECF No. 159). This was $257,359.23 less than Sugarloaf budgeted in support of the request for cash collateral (Ex. T). Mr. Gray explained at the hearing that Tyson had a huge fire that shocked the cattle market in a negative fashion, but the Debtor did not expand on the cause and effect of this event. Mr. Gray also testified that he had family members that bought cattle, but he did not expand on this. Sugarloaf has not owned any cattle since the sale in September 2019 (Ex. U at 6).

33. Sugarloaf also lost significant money from the planting and sale of chickpeas. The Debtor entered into agreements with Hinrichs Trading, LLC ("Hinrichs") for the purchase of seeds and the sale of chickpeas. It was anticipated that the Sugarloaf would use the approved cash collateral to purchase the chickpea seeds, as set forth in the cash collateral budget (Ex. T). Instead, Mr. Gray entered into essentially a credit agreement with Hinrichs, who advanced the seed at a total cost of $148,160 in exchange for an agreement to purchase the chickpeas when harvested. However, almost half of the harvested chickpeas were dirty or damaged, and their sale only grossed $22,701 (ECF No. 257). This resulted in the allowance of an administrative expense claim to Hinrichs of $125,458.26 (ECF No. 275).

34. Sugarloaf failed to disclose the chickpea transaction to the Court or to creditors. It was only because Hinrichs filed a motion for allowance of an administrative expense that the Court and creditors learned Sugarloaf incurred a substantial loss from its chickpeas crop. This is information BOTW consistently sought in its unanswered discovery requests. Mr. Gray did not explain why he purchased the chickpea seeds under a credit arrangement rather than using the approved cash collateral, and he has not fully explained how the Debtor spent the cash collateral funds of approximately $586,000.

35. Based on these facts and the Debtor's failure to make full disclosures to the Court and in the monthly financial reports, the Court continues to have questions regarding the Debtor's disposition of cash collateral and other property of the estate.

36. Mr. Harward testified that he and at least one of Sugarloaf's neighbors would be unwilling to purchase real or personal property from the Debtor under Mr. Gray's management but these adjoining landowners might be interested in purchasing certain parcels of land and rights to water should a trustee be appointed.

37. Mr. Gray testified that before the bankruptcy filing, Sugarloaf had purchased and installed over 20 miles of underground piping paid for by funds from the BOTW loan. This piping crisscrosses multiple parcels and feeds into an underground settling pond that is primarily used to collect and de-silt water obtained through the Debtor's shares in the Chalk Creek Irrigation Company. Water collected in this cistern can be transported through the piping to other areas of the Sugarloaf farm property. The underlay of this piping across multiple parcels will complicate a sale of separate parcels of the Sugarloaf farm because of possible competing claims and disputes as to the usage of this piping system.

38. Mr. Riley testified that all of the Debtor's water rights, including the Chalk Creek Shares, were limited in their permitted place of use, and that the use of the piping system to move water to other parcels might be illegal.

39. Mr. Riley testified that it would take 2.3 years for the Debtor to pay back the 200% water replacement penalty from the Notice of Violation, and over 20 years to pay back this penalty repayment was limited to using just the two water rights in the Notice of Violation, namely 67-1752 and 67-1776.

40. Given the findings in the Notice of Violation and that Sugarloaf did not stop pumping water after receiving either the Notice of Investigation or the Notice of Violation, Mr. Riley stated that in his opinion new management or ownership (including a bankruptcy trustee) would likely have more success in negotiating a reduction (or potentially an elimination) of the fine and/or the water replacement obligations than if Mr. Gray remained as manager of the Debtor.

41. According to Mr. Riley's testimony, the designated place of use for Water Right No. 67-1776 is over 700 acres spread over four different wells. Likewise, the designated place of use for Water Right No. 67-1752 is 686 acres. Both water rights cover multiple parcels. To Mr. Riley's knowledge, no other water rights have places of use that cross multiple parcels, except perhaps the Chalk Creek Shares.

42. Mr. Gray testified that he had not investigated and would not pursue potential claims against R. Gary Winger in connection with allegations of a bridge loan payment made on or about December 26, 2017 (Ex. GG). Mr. Gray also testified that he would not pursue a claim against Triple C for failing to close on the purchase of the Sugarloaf farm. In contrast, Mr. Gray testified that Sugarloaf would continue to pursue its state court litigation against BOTW and the Substitute Trustee, as well as the case it had against its neighbors regarding water rights, including Water Right No. 67-1752. However, the evidence establishes that the Debtor lacks sufficient funds to pursue such litigation.

43. As of July 31, 2020, the total amount of the indebtedness Sugarloaf owes to Ursus for the Crop LOC, the Livestock LOC, and the Term Loan is $14,529,937.93, together with attorney fees and costs, which continue to accrue (Exs. H-J, CC).

44. Ursus and BOTW have stated a willingness to negotiate a reasonable carve out to facilitate a Chapter 11 trustee's review and administration of the estate for a possible benefit to all creditors (ECF No. 270 at 11).

## **CONCLUSIONS OF LAW**

1. The Court read its Conclusions of Law on the record at a hearing on August 5, 2020, at 9:00 a.m.

**\*\*\*\*END OF ORDER\*\*\***